### AVOCENT HUNTSVILLE CORP., Plaintiff,

v.

### CLEARCUBE TECHNOLOGY, INC., Defendant.

### No. CIVA CV03S2875NE.

United States District Court, N.D. Alabama, Northeastern Division.

July 12, 2006.

James D. Berquist, J. Scott Davidson, Donald L. Jackson, Michael R. Casey, Peter W. Gowdey, Davidson Berquist Jackson & Gowdey, LLP, Arlington, VA, J. Jeffery Rich, Sirote & Permutt, P.C., Huntsville, AL, for plaintiff Avocent Huntsville Corp.

Harlan I. Prater, IV, Lightfoot, Franklin & White, LLC, Birmingham, AL, Joseph M. Cloud, Joseph M. Cloud, P.C., Huntsville, Al, Russell T. Wong, J. David Cabello, Wong, Cabello, Lutsch, Rutherford & Brucculeri, LLP, Houston, TX, for defendant ClearCube Technology, Inc.

## MEMORANDUM OPINION

SMITH, District Judge.

Plaintiff, Avocent Huntsville Corporation ("Avocent"), owns two patents directed to the problems of transmitting computer-generated, analog color video signals over extended distances: *i.e.*, U.S. Patent No. 6,150,997 ("the '997 patent"), and U.S. Patent No. 6,184,919 ("the '919 patent"). Avocent contends that accused products of defendant, ClearCube Technology, Inc. ("ClearCube"), infringe claim 1 of the '997 patent, and claims 1, 6, and 16–18 of the '919 patent.[1] *See* 35 U.S.C. § 271. ClearCube's amended answer asserts affirmative defenses and counterclaims for invalidity under 35 U.S.C. §§ 102, 103, and 112, and for patent unenforceability under the doctrine of inequitable conduct before the Patent and Trademark Office.[2] Numerous motions are pending, but not all are addressed in this opinion. A list of those motions raising issues discussed herein is set out below, followed immediately by an outline of the ensuing discussion.

A. Document Number ("doc.no.") 136—ClearCube's motion for summary judgment declaring that certain Avocent patents and/or applications constitute prior art to the patents-in-suit;[3]

B. doc. no. 142—Avocent's motion for a partial summary judgment declaring that the patents-in suit "are not invalid";[4]

---

1. Doc. no. 1 (complaint); *see also* doc. no. 125 (Avocent Huntsville's Summary and Background of the Technology Embodied in the Claims of the Patents–in–Suit), at 1.

2. *See* doc. no. 61 (ClearCube's First Amended Answer), ¶¶ 21, 23, 48–55 (invalidity) and 26–42, 56–77 (inequitable conduct).

3. ClearCube's motion asks the court to declare that: "the filing date of the '442 application is January 5, 1994; that the '442 application lacks copendency with the '404 patent/'689 application; and accordingly, that no Avocent application or patent can claim priority to the '404 patent/'689 application to receive an earlier effective filing date; that the effective filing date accorded to claim 1, 6, and 16–18 of the '919 patent is June 3, 1996; that the effective filing date accorded to claim 1 of the '997 patent is January 5, 1994; that the '404 patent constitutes prior art under 35 U.S.C. § 102(b) as

against the '919 patent; that the common subject matter between the '997 patent and the '442 application constitutes prior art under 35 U.S.C. § 102(e) as against the '919 patent; and that the '404 patent constitutes prior art under 35 U.S.C. §§ 102(a) and 102(e) as against the '997 patent." Doc. no. 136, at 29–30.

4. Avocent's motion has five sub-parts: "More specifically, Avocent seeks summary judgment [declaring] that: (1) ClearCube has failed to provide any evidence of invalidity under 35 U.S.C. §§ 102 and 112; (2) ClearCube's affirmative defenses under 35 U.S.C. § 103 are defective as a matter of law because ClearCube has failed to identify evidence of a proper motivation, teaching or suggestion for combining the prior art references; (3) the '997 patent is not prior art to the asserted claims of the '919 patent; (4) the '442 application was filed on January 4, 1995 in accordance with 35 U.S.C. § 21 and 37 C.F.R. § 1.10;

C. doc. no. 154—Avocent's motion for separate trial of ClearCube's inequitable conduct allegations;

D. doc. no. 157—Avocent's motion for a partial summary judgment declaring that it engaged in "no inequitable conduct";

E. doc. no. 160—Avocent's motion for a partial summary judgment declaring that ClearCube's products satisfy the "amplifier" limitation of claims 1 and 6 of the '919 patent, and, claim 1 of the '997 patent;

F. doc. no. 166—ClearCube's motion for partial summary judgment of non-infringement of claims 1 and 6 of the '919 patent;

G. doc. no. 168—Clear Cube's motion for partial summary judgment of non-infringement;

H. doc. no. 171—ClearCube's motion for a partial summary judgment declaring that Avocent's '919 and '997 patents are not enforceable; and,

I. doc. no. 174—Avocent's motion to strike the supplemental expert report of Gregg L. Vaughn, Ph.D.

## OUTLINE OF DISCUSSION

PART ONE *Standards of Review* .............................................1293

PART TWO *Background of the Patents–in–Suit* .....................................1294
A. *The '689 Application and '404 Patent*.......................................1296
B. *The '442 Application* ....................................................1296
C. *The Patents–in–Suit* ....................................................1296
1. *The '076 application and '919 patent* ....................................1296
2. *The '697 application and '997 patent* ....................................1297

PART THREE *The Disputed Claims* ..........................................1297

PART FOUR *Claim Construction Decisions* ....................................1300

PART FIVE *Avocent's Motion to Strike the Supplemental Report of ClearCube's Expert Witness, Dr. Gregg L. Vaughn* .........................................1300
A. *Procedural Background* ..................................................1300
B. *Section II of Vaughn's Supplemental Report—the "amplifier" non-infringement opinion* ...................................................1303
1. *Avocent's argument* ...................................................1304
2. *Conclusion* ........................................................1304
C. *Section III of Vaughn's Supplemental Report—the "adapter" non-infringement opinion* ...................................................1305
1. *Conclusion* ........................................................1307
D. *Sections IV and V of Vaughn's Supplemental Report—"obviousness" and the validity of the patents-in-suit* .........................................1307
1. *Scope of Dr. Vaughn's rebuttal* .........................................1308
a. *Conclusion* .......................................................1308
2. *New "prior art"* .....................................................1308

PART SIX *Infringement Contentions* ........................................1309
A. *Avocent's Motion for Partial Summary Judgment Declaring that ClearCube's Accused Products Include the "Amplifier" Element Recited in Claim 1 of the '997 Patent, and, Claims 1 and 16 of the '919 Patent*....1310
1. *Infringement analysis* ...............................................1311

and (5) Robert Asprey is the sole inventor of the '997 patent claims and the asserted claims of the '919 patent (*i.e.*, claims 1, 6, and 16–18)." Doc. no. 142 at 1.

 a. "a circuit (or a device when connected in a circuit)" . . . . . . . . . . . . . . . 1313
 b. "that draws power from a source other than the input signal" . . . . 1313
 c. "and provides an output signal that reproduces the essential
 features of the input signal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1313
 *i.* Dr. Vaughn's testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1314
 2. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1315

**B.** *ClearCube's Motion for Partial Summary Judgment Declaring Non–Infringement of Claim 1 of the '997 Patent, and, Claims 1 and 6 of the '919 Patent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1316
 1. *Procedural background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1317
 2. *ClearCube's summary judgment contentions* . . . . . . . . . . . . . . . . . . . 1319
 3. *Avocent's response* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1321
 4. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1322

**C.** *"The Adapter Motion"—i.e., ClearCube's Motion for Partial Summary Judgment Declaring Non–Infringement of Claims 1 and 6 of the '919 Patent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1322
 1. *Facts relevant to "the adapter motion"* . . . . . . . . . . . . . . . . . . . . . . . 1323
 2. *ClearCube's argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1324
 a. *ClearCube's "testing" contention* . . . . . . . . . . . . . . . . . . . . . . 1324
 b. *ClearCube's credibility contentions* . . . . . . . . . . . . . . . . . . . . 1325
 c. *Dr. Vaughn's rebuttal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1325
 3. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1326

**D.** *Avocent's Motion for Partial Summary Judgment Declaring that Claims 16–18 of the '919 Patent are Infringed* . . . . . . . . . . . . . . . . . . . . . . . . . . 1326

**PART SEVEN** *Avocent's Motion for a Partial Summary Judgment Declaring That The Patents–in–Suit "Are Not Invalid"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1326

**PART EIGHT** *ClearCube's Failure to Provide Evidence of Invalidity Under 35 U.S.C. §§ 102 and 112* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1328

**PART NINE** *The Issues of Whether the '997 Patent is Prior Art to the Asserted Claims of the '919 Patent, and, Whether the '404 Patent is Prior Art to Both the '997 and '919 Patents* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1328
 **A.** *The '404 Patent is Prior Art to the '997 and '919 Patents* . . . . . . . . . . . . . . . . . . . 1328
 **B.** *Is the '997 Patent Prior Art to the '919 Patent?* . . . . . . . . . . . . . . . . . . . . . . . . . 1329
 1. *The first and second requirements of § 102(e)(2)* . . . . . . . . . . . . . . . . 1330
 2. *The fourth requirement of § 102(e)(2)* . . . . . . . . . . . . . . . . . . . . . . . . 1330
 3. *The third requirement of § 102(e)(2)* . . . . . . . . . . . . . . . . . . . . . . . . 1331
 a. *Common versus disparate inventors* . . . . . . . . . . . . . . . . . . . . 1331
 4. *Conclusion: The '997 patent is not prior art to the asserted claims of the '919 patent, due to Robert Asprey's common inventorship* . . . . 1334

**PART TEN** *ClearCube's Contention that the Patents–in–Suit Are Invalid for "Obviousness"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1334
 **A.** *The Patent Requirement of "Non–Obviousness"* . . . . . . . . . . . . . . . . . . . . . . . . 1335
 1. *Obviousness is a question of law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1336
 2. *The presumption of validity applies to the issue of obviousness* . . . . . . . . . 1336
 **B.** *The Prior Art References Relied Upon by ClearCube as Support for its Contention that the Patents–in–Suit are Invalid for Obviousness* . . . . . . . . . . 1337
 1. *Impact of conclusion that the '997 patent is not prior art to the asserted claims of the '919 patent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1337
 2. *Impact of rulings on Avocent's motion to strike Dr. Vaughn's supplemental report* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1338
 **C.** *The Problems Attendant to Combining Prior Art References* . . . . . . . . . . . . . 1339
 1. *The requirement of "some teaching, suggestion, or motivation" in the prior art for selecting and combining references* . . . . . . . . . . . . . . . . . . . 1339
 a. *The presumption of validity applies to the issue of combining prior art references* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1341

D. *The Deficiencies of ClearCube's Proofs* ....................................1341

E. *Conclusion* .................................................1342

PART ELEVEN *Motions Pertaining to the Accusation of "Inequitable Conduct" in the Patent and Trademark Office* ............................................1342

A. *Facts Relevant to Accusation of Inequitable Conduct* ......................1344

 1. *Charles Phillips and Mark Clodfelter* ...............................1346

 2. *The '689 application that issued as the '404 patent* ......................1346

 3. *The filing date of the '442 application* .................................1347

 4. *Rejection of claims in the '442 application in view of the '404 patent* ....1348

 5. *Simultaneous prosecution of the '442 application and the patents-in-suit* ...........................................1348

 a. *Continuing dispute over the filing date of the '442 application* ......1348

 b. *Notice of rejection?* ...........................................1349

 c. *Abandonment of the '442 application* .............................1349

 6. *The '076 application and pending claim 20* .........................1350

 a. *Charles Phillips's fifth request for correction of the filing date of the '442 application* ..........................................1350

 b. *Clodfelter's first (March 4, 1999) amendment in response to the PTO's Office Action Summary rejecting pending claim 20* ....1351

 c. *Clodfelter's second (March 22/23, 1999) amendment in response to the PTO's Office Action Summary rejecting pending claim 20—the so-called "Supplemental Amendment"* ...................1351

 d. *The PTO's "Notice of Allowability" of pending claim 20* .............1352

 e. *Examiner Le's markings on the Supplemental Amendment* ........1353

 f. *Rejection of Charles Phillips's request for a change to the filing date accorded the '442 application* .............................1353

 g. *Amendment under 37 C.F.R. § 1.312* ............................1353

 7. *Issuance of the patents-in-suit* ....................................1354

B. *The Inequitable Conduct Doctrine* ....................................1354

 1. *The materiality of withheld information, or false and misleading statements to an examiner* ......................................1354

 2. *Intent to deceive* ...............................................1356

 3. *Balancing the materiality of withheld information or false and misleading statements to an examiner against evidence of an intent to deceive* .........................................1356

 4. *Knowledge: claims of inequitable conduct arising from failure to disclose prior art* ............................................1357

C. *That Aspect of Avocent's Motion Seeking a Declaration against Clear-Cube's "inequitable conduct affirmative defenses and counterclaims"* ....1357

 1. *ClearCube's challenge to the '919 patent based upon the "Extender" and "AutoBoot Commander" line of products* ......................1357

 a. *Materiality* ...................................................1358

 b. *Knowledge* ...................................................1358

 c. *Intent* .......................................................1359

 d. *Conclusion* ...................................................1360

 2. *ClearCube's challenge to the '997 patent based upon the "Extender" line of products* .............................................1360

 a. *Materiality* ...................................................1360

 b. *Knowledge* ...................................................1360

 c. *Intent* .......................................................1360

 d. *Conclusion* ...................................................1361

 3. *ClearCube's challenge to the '919 patent based upon the filing date of the '442 application and pending claim 20 of the '076 application* ....1361

 a. *Materiality* ...................................................1361

 b. *Conclusion* ...................................................1362

D. *ClearCube's "Motion for Summary Judgment for Unenforceability of Avocent's '919 and '997 Patents"* ......................................1364

 1. *ClearCube's challenge to the '919 patent* ...........................1365

 2. *ClearCube's challenge to the '997 patent* ............................... 1365
 E. *Motions Related to the Precise Filing Date of the '442 Application* ........... 1366
 1. *Avocent's motion* ......................................... 1367
 a. *Analysis* ......................................... 1368
 2. *ClearCube's motion* ......................................... 1369
 3. *Avocent's motion under MPEP § 609* ............................. 1370
 4. *Avocent's motion under 37 C.F.R. § 1.312* ........................... 1371

**PART TWELVE** *Avocent's Motion for Separate Trial of ClearCube's Inequitable
 Conduct Allegations* ............................................ 1372

**CONCLUSION** ......................................................... 1373

## PART ONE

### Standards of Review

The Federal Rules of Civil Procedure provide that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the moving party has discharged its burden, the non-moving party cannot rest upon the pleadings. Instead, Rule 56(e) requires the party opposing summary judgment to go beyond the pleadings, and to demonstrate by affidavit or other appropriate means that there is a genuine issue of material fact for trial. *See also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995) (*per curiam*) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Conversely, "summary judgment may be granted when no 'reasonable jury could return a verdict for the nonmoving party.'" *Pro–Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1572 (Fed.Cir.1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment, and all justifiable inferences are to be drawn in that party's favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *see also, e.g., IPXL Holdings, LLC v. Amazon.com, Inc.,* 430 F.3d 1377, 1380 (Fed.Cir.2005); *Elekta Instrument v. O.U.R. Scientific International, Inc.,* 214 F.3d 1302, 1306 (Fed.Cir.2000); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303, 1307 (Fed. Cir.1998); *Pro–Mold & Tool,* 75 F.3d at 1572.

When a district court is, as here, presented cross motions for summary judgment on the same issues, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 335–36 (1998) (footnote omitted).

"The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other. Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the court must evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the nonmoving party."

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1302 (Fed.Cir.2005) (quoting *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed. Cir.1998)) (internal alteration omitted).

## PART TWO

### *Background of the Patents–in–Suit*

Personal computers usually are located near video monitors. Consequently, computer-generated video signals normally are transmitted over cables that are no more than ten to twenty feet in length.[5] Avocent was known as Cybex Computer Products Corporation prior to 2000,[6] and Cybex was in the business of developing products that allowed customers to locate personal computers at extended distances from a user's monitor, keyboard, and mouse.[7] In a business setting, this resulted in less clutter at each user's workstation, as well as increased security. As Avocent explained:

> If the video, keyboard and mouse signals can be reliably transmitted over extended distances, the computers themselves can be located in a backroom where only an authorized computer administrator can physically access them. This prevents unauthorized software or files from being installed on the computers or copied from the computers.[8]

There is a problem inherent in such configurations, however: computer-generated video signals degrade when transmitted over extended distances, resulting in undesirable debasement of clarity in the images depicted on the monitor's screen.[9]

Cybex's early innovations directed to this problem were tailored to the transmission of *digital,*[10] as opposed to *analog,*[11]

---

**5.** *See* doc. no. 125 (Avocent Huntsville's Summary and Background of the Technology Embodied in the Claims of the Patents–in–Suit), at 5 n. 2. *See also Microsoft Computer Dictionary* 552 (5th ed.2002) (defining *video signal* as a noun describing the "signal sent from a video adapter or other video source to a raster display. The signal can include horizontal and vertical synchronization signals, as well as image information."). *Compare id.* 117 (defining *composite video display* as a "display that receives all encoded video information (including color, horizontal synchronization, and vertical synchronization) in one signal," and observing that a "composite video signal under NTSC (National Television System Committee) standards is generally required for television sets") *with id.* 453–54 (defining *RGB monitor* as meaning a "color monitor that receives its signals for red, green, and blue levels *over separate lines*") (emphasis supplied); and doc. no. 133 (*Markman* claim construction memorandum opinion) at 29–41 (concluding that the disputed claim term "discrete," as it is used in Avocent's '997 and '919 patents, means—as the foregoing definitions indicate—that the computer monitor receives its signals for red, green, and blue color levels *over separate lines* of twisted-pair wiring).

**6.** *See* doc. no. 125 (Avocent Huntsville's Summary and Background of the Technology Embodied in the Claims of the Patents–in–Suit), at 5.

**7.** *See id.* at 1–2.

**8.** *Id.* at 2.

**9.** *See* Transcript of *Markman* Hearing, Vol. I (Feb. 22, 2006 testimony), at 63–66.

**10.** *See Microsoft Computer Dictionary* 157–58 (defining (*i*) *digital* as an adjective referring to "something based on digits (numbers)," and usually associated with the processing of "information coded as different combinations of the binary digits (bits) 0 and 1"; (*ii*) *digital data transmission* as a noun referring to the "transfer of information encoded as a series of bits rather than as a fluctuating (analog)

video signals. That was due to the fact that, during the 1980s, the leading computer signal-standard was the Color/Graphics Adapter ("CGA") developed by IBM.[12] CGA was a *digital* standard: that is, each "bit" of information was expressed as either a "1" or "0" value.[13] IBM later introduced another signal standard, called the Enhanced Graphics Adapter ("EGA").[14] EGA also was a *digital* standard. Accordingly, Cybex's original technology was designed to compensate for the degradation of *digital* signals transmitted by computers over extended distances: that is,

> the digital information could be reliably recovered by comparing the received signal to an intermediate reference point. A "1" would be registered if the received signal was above the reference point; a "0" would be registered if the

signal was below that reference point, regardless of line-induced degradation.[15]

In the early 1990s, however, IBM introduced an *analog* video standard, called the Video Graphics Adapter ("VGA"),[16] which presented a new set of challenges. Analog signals can have an infinite number of amplitudes between a minimum and maximum value,[17] and the specific amplitude transmitted by the computer *is* the information conveyed by the signal. Thus, *any* degradation in the amplitude of an analog signal may cause an uncorrectable loss of information. As the computer industry began replacing digital video systems with the new, analog VGA systems, Cybex commenced its work on the problems associated with the transmission of analog VGA video over extended distances. Cybex's innovations in this area ultimately led to the inventions disclosed in the patents-in-suit.[18]

signal in a communications channel"; and (*iii*) *digital display* as a noun that describes a "video display capable of rendering only a fixed number of colors or gray shades. Examples of digital displays are IBM's Monochrome Display, Color/Graphics Display, and Enhanced Color Display.").

11. *Id.* at 26 (defining (*i*) *analog* as an adjective that pertains to "a device or signal that is continuously varying in strength or quantity, such as voltage or audio, rather than based on discrete units, such as the binary digits 1 and 0"; (*ii*) *analog data* as a noun referring to "[d]ata that is represented by continuous variations in some physical property, such as voltage, frequency, or pressure," as opposed to digital data; and (*iii*) *analog display* as a noun that refers to a "video display capable of depicting a continuous range of colors or shades rather than discrete values").

12. *See* doc. no. 125 (Avocent Huntsville's Summary and Background of the Technology Embodied in the Claims of the Patents–in–Suit), at 5. *See also Microsoft Computer Dictionary* 93 (observing that CGA was "[a] video adapter board introduced by IBM in 1981. The CGA is capable of several character and graphics modes, including character modes of 40 or 80 horizontal characters (columns) by 25 vertical lines with 16 colors, and graphics modes of 640 horizontal pixels by 200 vertical

pixels with 2 colors, or 320 horizontal pixels by 200 vertical pixels with 4 colors").

13. *See supra* note 10.

14. *See Microsoft Computer Dictionary* at 186 (observing that EGA is "[a]n IBM video standard introduced in 1984. It emulates the Color/Graphics Adapter (CGA) and the Monochrome Display Adapter (MDA) and provides medium-resolution text and graphics. It was superseded by Video Graphics Display (VGA)").

15. Doc. no. 125 (Avocent Huntsville's Summary and Background of the Technology Embodied in the Claims of the Patents–in–Suit), at 6.

16. *See Microsoft Computer Dictionary* 551 (defining VGA as a "video adapter that duplicates all the video modes of the EGA (Enhanced Graphics Adapter) and adds several more").

17. *See id.* at 26 (defining *amplitude* as a "measure of the strength of a signal . . . determined by the distance from the baseline to the peak of the waveform").

18. Doc. no. 125 (Avocent Huntsville's Summary and Background of the Technology Em-

## A. The '689 Application and '404 Patent

An early achievement for Cybex was the development of an amplifier device that could boost a weak analog video signal to a usable amplitude.[19] Cybex filed U.S. Patent Application Serial No. 07/912,689 ("the '689 application") on July 13, 1992, and that application issued as U.S. Patent No. 5,276,404 ("the '404 patent") on January 4, 1994.[20] Claim 1 of the '404 patent recites a "non-inverting, constant current voltage amplifier,"[21] and the remaining claims (2–6) are dependent upon claim 1.

## B. The '442 Application

Cybex mailed U.S. Patent Application Serial No. 08/177,442 ("the '442 application") to the Patent and Trademark Office ("PTO") in early January 1994. The PTO assigned the application a filing date of January 5, 1994—an action that is disputed by Avocent. Even so, discussion of Avocent's contention that the PTO should have assigned the '442 application a filing date of January 4, 1994 (i.e., the same day upon which the '404 patent issued) will be addressed *infra*, in Part Eleven, Sections A(3), C(3), and E of this opinion, concerning ClearCube's assertion that Avocent engaged in inequitable conduct before the Patent and Trademark Office.

The '442 application described various systems for the transmission of computer-generated analog color video signals, and purported to be a "continuation-in-part"[22] of the inventions disclosed in the '689 application that issued as the '404 patent.[23] Robert R. Asprey was the sole inventor of the subject matter claimed in the application.[24] The '442 application never issued as a patent.

## C. The Patents–in–Suit

In 1996, during the pendency of the '442 application that never matured into an issued patent, Cybex filed two additional patent applications, both of which ultimately issued as the patents-in-suit.

### 1. The '076 application and '919 patent

Cybex filed U.S. Patent Application Serial No. 08/660,076 ("the '076 application") on June 3, 1996, reciting various systems for the transmission of analog color video signals over extended distances.[25]

bodied in the Claims of the Patents–in–Suit), at 7–8.

19. *See* doc. no. 150 (ClearCube's brief in opposition), Ex. F (U.S. Patent No. 5,276,404: "the '404 patent"), col. 1, lines 37–41 (stating the object of the invention) and cols. 6–8 (claims 1 through 6). This was not the first achievement in the field of analog color video signal transmission by Cybex (now Avocent). *See, e.g.,* doc. no. 136 (ClearCube's brief), Ex. C (showing Avocent's earlier inventions in the field). Even so, these earlier inventions are not relevant to the present analysis.

20. *See* doc. no. 150 (ClearCube's brief in opposition), Ex. F ('404 patent).

21. *See id.,* col. 6, line 43.

22. A "continuation-in-part application" is one of three types of patent applications that are entitled to enjoy the filing date of an earlier, "parent" patent application. Such an application has some subject matter in common with the earlier, "parent application," but it also may have some new subject matter. This subject is discussed more fully *infra*, in Part Nine, Section B(2) of this opinion, and notes 176 and 178.

23. *See* doc. no. 136 (ClearCube's brief), Ex. D ('442 application).

24. *See* doc. no. 143 (Avocent's Combined Memorandum in support of its motion for partial summary judgment that the patents-in-suit are not invalid), Ex. 7 at 4–5 (Declaration of Robert Asprey filed in the PTO, and averring that he is the "original, first, and sole inventor ... of the subject matter which is claimed and for which a patent is sought on the invention" described in the '442 application).

25. *See* doc. no. 136 (ClearCube's brief), Ex. B ('919 patent).

The '076 application purported to be a "continuation-in-part" of the '442 application,[26] and it issued as the '919 patent on February 6, 2001.[27] Robert R. Asprey, Philip M. Kirshtein, and Thomas V. Lusk are the three inventors named on the '919 patent.

### 2. *The '697 application and '997 patent*

Cybex also filed U.S. Patent Application Serial No. 08/741,697 ("the '697 application") on October 31, 1996, reciting systems for the transmission of analog color video signals.[28] The '697 application purported to be a continuation-in-part of the '442 application,[29] and it issued as the '997 patent on November 21, 2000.[30] Robert R. Asprey is the sole inventor named on the '997 patent.

It should be noted that, even though the '697 application was filed last, on October 31, 1996—almost four months *after* the filing date of the '076 application that matured into the '919 patent—it issued first, as the '997 patent, on November 21, 2000. Conversely, the '076 application, which was filed first (on June 3, 1996), issued last, as the '919 patent, on February 6, 2001.

---

**26.** Doc. no. 171 (ClearCube's motion for summary judgment), Ex. W ('076 application), at "Cross Reference of Related Applications." As stated in note 22 *supra*, the subject of a "continuation-in-part application" is discussed more fully *infra*, in Part Nine, Section B(2) of this opinion, and notes 176 and 178.

**27.** *See* doc. no. 136 (ClearCube's brief), Ex. B ('919 patent).

**28.** *See id.*, Ex. A ('997 patent).

**29.** *See* doc. no. 171 (ClearCube's motion for summary judgment), Ex. G ('697 application), at "Cross Reference of Related Applications."

**30.** *See* doc. no. 136 (ClearCube's brief), Ex. A ('997 patent).

**31.** Doc. no. 1 (complaint); *see also* doc. no. 125 (Avocent Huntsville's Summary and

### PART THREE

#### *The Disputed Claims*

Avocent contends that ClearCube's accused products infringe claim 1 of the '997 patent, and claims 1, 6, and 16–18 of the '919 patent.[31] Claim 1 of the '997 patent, and claims 1, 16, and 18 of the '919 patent, are independent claims. Claim 6 of the '919 patent is dependent on claim 1, and claim 17 of the same patent is dependent on claim 16. *Claim 1 of the '997 Patent* recites:

> 1. A system for transmission of analog color video signals between a source of said signals and a video monitor, being at spaced locations, comprising:[32]
> a plurality of computers, each providing, as a set, said color video signals;
> a switch receiving said sets of said color video signals, each with respect to a common reference, from said computers and providing a selected said set of said color video signals as an output;
> a signal transmitter at a first location responsive to said output of a set of said color video signals, said transmitter, including[33] an amplifier for each

---

Background of the Technology Embodied in the Claims of the Patents–in–Suit), at 1.

**32.** The word "comprising" is a term of art in Patent law that means the claim includes all of the elements that follow in the body of the claim statement, but does not exclude additional, unrecited elements. *See, e.g., Georgia–Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1327–28 (Fed.Cir.1999). Claims that use "comprising" are sometimes referred to as "open claims." *See, e.g., Vivid Techs. v. American Science & Eng'g*, 200 F.3d 795, 811 (Fed.Cir.1999).

**33.** The word "including" is another term that, like "comprising," signals the claim statement encompasses all of the elements that follow, but does not exclude additional, un-recited elements. *See* Robert C. Faber, LANDIS ON MECHANICS OF PATENT DRAFTING § 7 (4th ed.1999).

said color video signal of one of said sets for providing a color video signal output and wherein [34] at least a high frequency portion of each said color video signal has been amplified as a direct function of frequency and providing both an inverting and non-inverting signal, available as an output;

a plurality of video transmission circuits, each said circuit having first and second ends, respectively, one circuit for each of said color video signals of one of said sets and each said circuit having an input responsive to an output of said transmitter at said first end, and each said circuit having a responsive signal output at said second end;

a signal receiver at a second location responsive to each of said transmitted signal outputs and color video signal at said second end, including an amplifier for each said color video signal for providing a discrete color video signal with respect to a common reference; and

signal means responsive to said receiver for providing each said color signal, each with respect to a common reference, to an analog color video monitor.[35]

*Claim 1 of the '919 Patent* recites:

1. An extended-in-length computer video communications link for transmitting computer video signals comprising:

a source of computer video signals including red, green, and blue video signals,

a video transmitter comprising a plurality of amplifiers, one of each said amplifiers for each of said red, green, and blue video signals, each said amplifier comprising:

a signal input for receiving a one of said red, green and blue video signals,

frequency sensitive compensating circuitry responsive to a said video signal so that said amplifier provides a first video signal that increases in amplitude with increasing frequency at a first output and a second video signal that is an inverse of said first video signal at a second output,

a twisted pair of conductors for each said amplifier, with first and second conductors of said twisted pair coupled at one end to respective said first and second outputs of said amplifier,

an adapter for each of said twisted pair of conductors, each said adapter coupled to an opposite end of a respective one of said twisted pair of conductors, each said adapter receiving said first video signal and said second video signal and providing a respective said video signal as a single ended output, and further configured to provide a ground reference potential for said transmitter at said adapter, whereby need for a reference ground conductor between said transmitter and said adapter is eliminated.[36]

*Claim 6 of the '919 Patent*, which is dependent to claim 1 above, recites "[a] video communications link as set forth in claim 1 wherein said source of video signals comprises a termination point of another video communications link." [37]

---

**34.** The word "wherein" is another term of Patent art that customarily signals the claim includes all the elements that follow, but does not necessarily exclude additional, unrecited elements. *See id.*

**35.** '997 patent, col. 13 & line 14 through col. 14 & line 15. A copy of the '997 patent is located, among many other places in the rec-

ord, at doc. no. 79 (Avocent's Combined Memorandum), Ex. A(2).

**36.** '919 patent, col. 18, lines 12–41. The '919 patent is located, among many other places in the record, at doc. no. 79 (Avocent's Combined Memorandum), Ex. A(1).

**37.** *Id.,* col. 19, lines 5–7.

*Claim 16 of the '919 Patent* recites:

16. A computer video signal communications system for selectively coupling sets of R, G, B computer color video signals from one of a plurality of computers to a separately located color monitor, said system comprising:

a transmitter including:

 switching means for selectively providing a said set of said color video signals from a selected said computer, and

 a first signal format converter responsive to each said color signal of a said set of color signals from said switching means for converting a signal format of each said color signal from single ended format to a balanced format;

a plurality of sets of twisted pair conductors, each set of said conductors having a first end and second end, with a said first end of each of said sets of conductors receiving a discrete color video signal from said transmitter;

a receiver coupled to said second ends of said sets of said twisted pair conductors and including:

 a plurality of second signal format converters for converting a said balanced format of each said discrete color video signal from each said set of conductors from balanced to unbalanced format; and

signal means responsive to unbalanced format signals from said receiver for coupling color video signals to a color video monitor.[38]

*Claim 17 of the '919 Patent,* which is dependent to claim 16 above, recites "[a] system as set forth in claim 16 wherein said receiver includes frequency compensation means for boosting a frequency response of at least one said color video

signal directly as a function of frequency." [39]

*Claim 18 of the '919 Patent* recites:

18. A computer video signal communications system for selectively coupling a set of R, G, and B computer color video signals from one of a plurality of computers to a separately located color monitor, said system comprising:

a transmitter including:

 switching means for selectively providing said set of R, G, and B computer color video signals from a selected said computer, and

 a first signal format converter responsive to each said R, G and B color video signal for converting a signal format of each said R, G and B color video signal from single ended format to a balanced format;

a set of twisted pair conductors for each said balanced format R, G, and B color video signals, each said set of twisted pair conductors having a first end and a second end, with a said first end of each of said sets of twisted pair conductors receiving a discrete one of said balanced format R, G, and B color video signals from said transmitter;

a receiver coupled to said second ends of said sets of twisted pair conductors and including:

 frequency compensation means for boosting a frequency response of each said R, G and B color video signal directly as a function of frequency;

 a plurality of second signal format converters for converting said balanced format of each said R, G and B color video signal from each said set of twisted pair conductors from balanced to unbalanced format; and

---

38. *Id.,* col. 20 & line 48 through col. 21 & line 7.

39. *Id.,* col. 21, lines 8–11.

signal means responsive to siad [sic] unbalanced format signals from said receiver for coupling said R, G and B color video signals to a color video monitor.[40]

## PART FOUR

### Claim Construction Decisions

A claim construction hearing was held on February 22 and 23, 2006. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (holding that the first issue in any patent infringement case is that of "claim construction": the interpretation of words used in a patent's claim, "the portion of the patent document that defines the scope of the patentee's rights"); *see also, e.g., Rockwell International Corporation v. United States,* 147 F.3d 1358, 1362 (Fed.Cir.1998) ("The first step in any invalidity or infringement analysis is claim construction.") (citations omitted). The memorandum opinion and order entered on March 15, 2006, set forth this court's interpretation of the following, disputed, claim terms.[41]

"Twisted pair" wiring, which is used in the '919 patented invention to conduct analog video signals, may be either "shielded" or "unshielded."

The term "amplifier," as it is claimed in both the '997 and '919 patents, was defined as "a circuit (or a device when connected in a circuit) that draws power from a source other than the input signal and provides an output signal that reproduces the essential features of the input signal."

The term "discrete," as it is used in the claims of both patents, simply means that a color video signal (*e.g.,* red) is separate or distinct from the other two color video signals (*e.g.,* green and blue).

Finally, the phrase "for said transmitter," as recited in claim 1 of the '919 patent, was construed as meaning "from the signals received from the transmitter."

## PART FIVE

### Avocent's Motion to Strike the Supplemental Report of ClearCube's Expert Witness, Dr. Gregg L. Vaughn

Avocent's motion to strike the April 24, 2006 supplemental report of ClearCube's expert witness, Dr. Gregg Vaughn,[42] will be granted in part and denied in part.

**A.** *Procedural Background*

Discovery commenced on March 8, 2004.[43] Pursuant to a scheduling order entered on June 25, 2004,[44] as amended on September 15, 2004,[45] the parties were required to disclose, no later than August 2, 2004, the identity of all specially retained or employed expert witnesses, together with a complete report under Fed.R.Civ.P. 26(a)(2)(B). Rebuttal reports were due September 20, 2004. The party bearing the burden of proof on a claim or counterclaim was required to initiate this sequence of disclosures.[46]

Each party disclosed an expert report on August 2, 2004. Avocent's expert, Jo-

---

**40.** *Id.,* col. 21, lines 12–44.

**41.** *See* doc. nos. 133 (memorandum opinion) and 134 (order).

**42.** *See* doc. no. 174 (Avocent's combined motion to strike and supporting memorandum).

**43.** *See* doc. no. 14 (Initial Order Governing All Further Proceedings), at 5 ("The parties are authorized to commence discovery pursu-

ant to the terms of Federal Rule of Civil Procedure 26 and Local Rule LR26.1 immediately after the required report has been filed"); doc. no. 24 (Report of Parties' Planning Meeting) (filed March 8, 2004).

**44.** Doc. no. 43.

**45.** Doc. no. 66.

**46.** Doc. no. 43.

seph C. McAlexander, explained how ClearCube's accused products infringed the patents-in-suit.[47] ClearCube's expert, Dr. Vaughn, opined that the patents-in-suit were not valid.[48] The parties' rebuttal reports followed, with Dr. Vaughn rebutting McAlexander's findings of infringement, while two individuals—McAlexander and Robert Asprey—rebutted Vaughn's opinions concerning the validity of the patents-in-suit.[49] On the latter issue, McAlexander and Asprey both challenged Dr. Vaughn's validity analysis on the basis that he had failed to articulate a motivation, suggestion, or teaching to combine selected prior art references in a way that would lead to the claimed inventions.[50]

The court's scheduling orders did not provide for the submission of responsive expert reports after the September 20, 2004 deadline, but neither did it expressly preclude the submission of supplemental reports. Consequently, Avocent served a supplemental report addressing the issue of patent infringement on November 26, 2004.[51]

After a period of delay in this litigation,[52] the claim construction hearing was conducted on February 22 and 23, 2006. On the first day of the hearing, Avocent's counsel (Donald Jackson) informed the court that Robert Asprey had died the previous month.[53] Jackson noted that Avocent had served rebuttal reports on the issue of patent validity authored by McAlexander *and* Asprey. Even so, he sought permission to supplement McAlexander's report, but only to the extent necessary to incorporate issues addressed by Asprey.[54] Ken Kuffner, a witness retained by Clear-Cube to provide an expert opinion on the issue of inequitable conduct, also had died prior to the hearing. ClearCube thus sought permission to secure additional expert testimony on the issue Kuffner had been prepared to address at trial.[55] Near the conclusion of the hearing, Avocent's counsel also posed the following question to the court: Would Avocent's expert

47. *See* doc. no. 82 (Motion to Strike Supplemental Expert Report and Related Testimony), Ex. A (Expert Report of Joseph McAlexander, III, Regarding Infringement of U.S. Patent Numbers 9,184,919 and 6,150,997).

48. Doc. no. 174 (Avocent's combined motion and memorandum), Ex. 4.

49. *See* doc. no. 187 (ClearCube's brief in opposition), Ex. I (Expert Report of Robert R. Asprey), and doc. no. 246 (Avocent's response to court's June 23, 2006 order), Attachment A (Rebuttal Expert Report of Joseph C. McAlexander, III, Regarding Validity of U.S. Patent Numbers 6,184,919 and 6,150,997).

50. *See, e.g., id.,* McAlexander's invalidity report, at 27 ("I find no motivation, suggestion, or teaching, for example, in the '997 patent to consider the 94/30012 publication."); *e.g.,* doc. no. 187 (ClearCube's brief in opposition), Ex. I (Asprey's report), at 3 ("If McDermott has its solution to a problem, and if the '997 patent has a different solution to the same problem, why would anyone skilled in the art be motivated to modify one reference to in-

clude part of the solutions described by the other reference? The answer is: they would not be motivated to make such a combination of or modification to the references.").

51. *See* doc. no. 82 (Motion to Strike Supplemental Expert Report), Ex. C (Supplemental Expert Report of Joseph C. McAlexander, III, Regarding Infringement of U.S. Patent Numbers 6,184,919 and 6,150,997). ClearCube subsequently moved to strike this supplemental report. The motion was ultimately denied, however, as explained in note 132, *infra.*

52. Among other delays, this court continued the parties' claim construction hearing pending the Federal Circuit's decision in *Phillips v. AWH Corporation,* 415 F.3d 1303 (Fed.Cir. 2005) (*en banc*).

53. *See* Transcript of *Markman* hearing, Vol. I (February 22, 2006 testimony), at 5.

54. *See id.*

55. *See id.* at 6–7.

(McAlexander) be allowed to incorporate the court's construction of disputed claim terms in his patent infringement analysis?[56] This court deferred an answer to that question.

The court's claim construction opinion, construing the patent terms and phrases described in Part Four *supra*, was entered on March 15, 2006.[57] To advance the case toward trial, the court ordered the parties to enumerate all pre-trial procedures that needed to be completed. The parties filed a Joint Status Report on March 23, 2006, and they reiterated their agreement on one point: "supplemental" expert reports would be necessary to fill the evidentiary voids resulting from the deaths of Asprey and Kuffner. Avocent also renewed its request for leave to incorporate the court's construction of disputed claim terms in Joseph McAlexander's infringement reports.[58]

This court entered a Revised Scheduling Order on March 31, 2006,[59] accomplishing two things of relevance to the present discussion. First, the parties were ordered to designate expert witnesses to replace Asprey and Kuffner.[60] Avocent also was granted leave to incorporate the court's construction of claim terms into McAlexander's infringement analysis.[61]

McAlexander served his second supplemental report on April 10, 2006,[62] and supplemented his earlier opinions on patent infringement in three respects: (1) the court's construction of the claim term "amplifier" was consistent with his preexisting understanding of the term and, therefore, his earlier infringement opinions (at least with respect to the "amplifier") were not altered; (2) a review of ClearCube's data sheets showed that the accused products included an "amplifier," even under ClearCube's original construction of the term; and (3) a schematic showed that a receiver located at the far end of ClearCube's transmission system provided a ground reference potential "for said transmitter,"

56. *See id.*, Vol. II (February 23, 2006 testimony), at 201–02.

57. *See* doc. nos. 133 and 134.

58. *See* doc. no. 137.

59. Doc. no. 138.

60. That portion of the Revised Scheduling Order provided:

 1. **Reports of "Replacement" Experts:**
 A. The parties shall designate expert witnesses to replace Bob Asprey and Ken Kuffner, both now deceased, by April 3, 2006.
 B. Reports prepared by the newly-designated witnesses shall be served on opposing counsel no later than April 10, 2006.
 C. Depositions pertaining to the new reports shall be completed by April 17, 2006.
 D. Reports rebutting the contentions set forth in the new reports shall be served on opposing counsel by April 24, 2006.
 E. Depositions pertaining to the rebuttal reports shall be completed by May 3, 2006.

*Id.* at 1–2 (footnote omitted).

61. That portion of the Revised Scheduling Order provided:

 2. **Avocent's Supplemental Expert Report:**
 A. Avocent's supplemental expert report, to the extent such a report is necessary, shall be served on opposing counsel no later than April 10, 2006.
 B. Depositions pertaining to the supplemental expert report shall be completed by April 17, 2006.
 C. ClearCube's rebuttal report shall be served on opposing counsel by April 24, 2006.
 D. Depositions pertaining to the rebuttal report shall be completed by May 3, 2006.

*Id.* at 2–3 (footnote omitted).

62. Doc. no. 174 (Avocent's motion to strike), Ex. 2 (Second Supplemental Expert Report of Joseph C. McAlexander, III, Regarding U.S. Patent Numbers 6,184,919 and 6,150,997).

as that phrase was construed by the court.[63]

McAlexander's second supplemental report also addressed ClearCube's assertions of patent invalidity. McAlexander stated that, upon comparing his original report to Asprey's, he found the opinions expressed in each essentially the same,[64] with one exception: Asprey's report had discussed in greater detail the technical differences between *television* and *computer* video systems. McAlexander thus incorporated, by reference, those portions of Asprey's report addressing those differences.[65]

Vaughn served his rebuttal report on April 24, 2006, addressing in one comprehensive *document* McAlexander's updated infringement analysis, and the invalidity opinions of Robert Asprey, as adopted by McAlexander. Section II of Vaughn's rebuttal addressed McAlexander's infringement analysis premised on the court's construction of the claim term "amplifier." Section III addressed McAlexander's infringement analysis premised on the court's construction of the phrase "for said transmitter." Section IV addressed the alleged invalidity of the '919 patent, and Section V did the same for the '997 patent. Avocent followed with the subject motion, asking the court to strike Sections II through V of Dr. Vaughn's report.

**B.** *Section II of Dr. Vaughn's Supplemental Report—the "amplifier" noninfringement opinion*

The first numbered claims of both patents-in-suit require "amplifiers" to assist in

the transmission of analog color video signals. This court construed the term "amplifier" as meaning "a circuit (or a device when connected in a circuit) that draws power from a source other than the input signal and provides an output signal that reproduces the essential features of the input signal."[66] Following claim construction, McAlexander supplemented his earlier opinions on patent infringement to reiterate his position that ClearCube's accused products included the claimed "amplifier."

Not surprisingly, Dr. Vaughn's rebuttal report took the opposite position that ClearCube's products did not include the claimed "amplifier" and, therefore, there was no infringement. Dr. Vaughn's opinion, set forth in Section II of his rebuttal report, built upon several analytical steps. He first focused on that aspect of the court's construction of "amplifier" requiring reproduction of "the essential features of the input signal." Dr. Vaughn opined that "the essential features of the input signal" meant "the frequency components of the video signal."[67] He then asserted that, when a computer and monitor are separated by extended distances, each "frequency component of the video signal" must be transmitted from the computer to the monitor without significant loss of amplitude.[68] Specifically, Dr. Vaughn opined that a change in signal amplitude even as small as one-half of one percent (measured at the computer and monitor) could alter the intensity of the color displayed on the

---

63. *See id.* at 5–7.

64. *See id.* at 8.

65. *See id.*

66. *See* doc. nos. 134 (claim construction order) at 2; doc. no. 133 (claim construction memorandum), at 24–28. *See also* Part Four *supra*.

67. Doc. no. 174 (Avocent's motion to strike), Ex. 1 (Vaughn supplemental report) ¶ 5, at 3.

68. *See Microsoft Computer Dictionary* 26 (5th ed. 2002) (defining *amplitude* as a "measure of the strength of a signal ... determined by the distance from the baseline to the peak of the waveform").

monitor's screen.[69] Dr. Vaughn based this opinion upon his analysis of the '919 patent specification, as well as Joseph McAlexander's testimony at the claim construction hearing.[70]

Dr. Vaughn also noted that the patent claims at issue impose limitations on the "amplifier." Claim 1 of the '997 patent, for example, recites an "amplifier ... for providing a color video signal output and wherein at least a high frequency portion of each said color video signal has been *amplified as a direct function of frequency*,"[71] while claim 1 of the '919 patent recites an "amplifier" that "provides a first video signal that *increases in amplitude with increasing frequency* at a first output."[72] Dr. Vaughn understood the emphasized claim language as requiring that "each frequency component ha[ve] a higher gain than the previous frequency component."[73]

Finally, having laid this groundwork, Dr. Vaughn stated his non-infringement analysis in two sentences:

> The circuitry on the transmitting end of a ClearCube system does not have an amplifier because it does not reproduce the essential features of the input signal nor does it provide greater gain for frequency components at successively higher frequencies. So, the circuitry on the

transmitting end of a ClearCube system does **not reproduce the essential features** of the input signal.[74]

### 1. *Avocent's argument*

As a preliminary matter, the court finds that Avocent's motion to strike *all* opinions set forth in Section II of Dr. Vaughn's rebuttal report is over-inclusive. That is because the gravamen of Avocent's complaint is directed to the second step of Dr. Vaughn's analysis: *i.e.*, that the amplifier must reproduce "the frequency components of the video signal" in such a manner that the voltage level of the signal at the computer, the input end of the transmission path, and the voltage level of the signal at the monitor on the other end, do not differ by even one-half of one percent. Avocent contends that this opinion raises an additional, previously undisclosed limitation on the claim term "amplifier," purportedly supported by the patent specification and the testimony of Joseph McAlexander at the claim construction hearing. In other words, it is an untimely attempt at claim construction.

### 2. *Conclusion*

■ This court agrees that the following portions of Section II of Dr. Vaughn's rebuttal report are due to be stricken: the last sentence of paragraph 5, and paragraphs 6 and 7.[75] As will be discussed in

---

69. *See* doc. no. 174 (Avocent's motion to strike), Ex. 1 (Vaughn supplemental report) ¶ 7, at 3–4.

70. *See id.*, ¶¶ 6 and 7, at 3–4.

71. Doc. no. 187 (ClearCube's brief in opposition), Ex. E ('997 patent), col. 13, lines 26–29 (emphasis supplied).

72. *Id.*, Ex. D ('919 patent), col. 18, lines 23–25 (emphasis supplied).

73. Doc. no. 174 (Avocent's motion to strike), Ex. 1 (Vaughn supplemental report) ¶¶ 9 and 10, at 4.

74. *Id.*, ¶ 11 at 4 (boldface emphasis in original).

75. The last sentence of paragraph 5 states: "If the monitor is some distance away from the source of the video signal (computer) each of the frequency components must arrive at the monitor with substantially the same amplitude they had when they left the computer or else the image on the monitor will not be correct." Paragraphs 6 and 7 read as follows:

> 6. The accuracy with which the video signal at the monitor must match the video signal at the source computer has been clearly specified by the specification of the '919 Patent. In the specification of the '919 Patent, the phrase, "The conditioning of the video signals includes reducing the analog video signals from their nominal

greater detail in Part Six, Section B of this opinion *infra,* ClearCube has continually shifted its claim construction contentions throughout the course of litigation, foisting last-minute surprises on Avocent's counsel and this court. Now, after claim construction and on the eve of trial, ClearCube proffers yet another, previously undisclosed claim limitation. Avocent's motion to strike these portions of Dr. Vaughn's rebuttal report will be granted. *Cf. Atmel Corporation v. Information Storage Devices, Inc.,* 1998 WL 775115, at *2–3 (N.D.Cal.1998) (refusing to allow amendment to claim charts after claim construction). Avocent's motion to strike the other portions of Section II, however, will be denied.

### C. *Section III of Vaughn's Supplemental Report—the "adapter" non-infringement opinion*

Claim 1 of the '919 patent recites an "adapter ... further configured to provide a ground reference potential *for said transmitter* at said adapter." [76] This court has construed the emphasized phrase, "for said transmitter," as meaning "from the signals received from the transmitter." In whole cloth, therefore, claim 1 of the '919 patent recites an "adapter ... further configured to provide a ground reference potential [*from the signals received from the transmitter* ] at said adapter." [77]

McAlexander opined in his second supplemental report that a structure called a "C–Port," located on the receiver-side of ClearCube's accused products, is config-

amplitude swing of from 0–700 millivolts ..." ('919 Patent, 7:6–8), shows that the source produces 700 millivolt peak-to-peak video signals and that the monitor requires the same. Another reference in the same document confirms the required signal level, "Where the output is coupled to a conventional analog VGA computer monitor 18, the monitor represents a load 19, which may be a resistor of about 75 ohms, with the output signal from region 14 across this 75 ohm load being about 700 millivolts." ('919 Patent, 3:11–15) This same color video signal level has been in use for many years in computers with analog video monitors. An example is the SUN–3 computer system with the Sony P2 GDM–1604 color monitor, whose End–of–Support Life was April 1996. This system also used video signal frequencies much higher than those of conventional color television. The resolution was 1152 by 900 pixels and the pixel frequency was 92.94 MHz. In addition it had the analog color video signals on separate conductors from the synchronization signals. (Sun 3 April 1996).

7. The accuracy with which the video signal at the monitor must match the video signal at the source computer has been further quantified by the testimony of Mr. McAlexander. In his testimony at the Markman hearing, he describes "True Color" video in which 8 bits of information

represent the intensity level of each of the three colors. He said, "So when we look back on Figure 1 of the display, the distance between zero and 700 millivolts is—has—is, in fact, 256 separate increments. And each one of those increments is a different voltage level. And each voltage level defines a different intensity." Thus, if the analog voltage for any pixel at the monitor is different from that same voltage level at the source computer by more than one part in 256 (1/256 or less than one-half of one percent), the intensity of the color will not be the same. Mr. McAlexander has stated that the threshold for measuring a difference in the intensity of a color is one part in 256 of 700 millivolts. Thus, if the voltage level at the monitor and at the source computer differ by 2.7 millivolts (about 0.5%) for any pixel in the display, the color intensity will be wrong.

Doc. no. 174 (Avocent's motion to strike), Ex. 1 (Vaughn's supplemental report), at 3–4 (boldface emphasis in original).

**76.** Doc. no. 187 (ClearCube's brief in opposition), Ex. D ('919 patent), col. 18, lines 32, 37–39.

**77.** *See* doc. no. 134 (claim construction order) at 2; doc. no. 133 (claim construction memorandum), at 41–46.

ured to provide a ground reference potential "from the signals received from the transmitter."[78] Dr. Vaughn disagreed, and grounded his contrary opinion on two assertions: (1) a "common-mode filter" located on the front end of ClearCube's transmission system did not allow recovery of the ground reference potential at the accused C–Port; and (2) there was no need to recover the ground reference potential at the C–Port, because signals in the ClearCube system were sent in "balanced" format.[79]

Dr. Vaughn was subsequently deposed on May 1, 2006, at which time he was questioned about his analysis of Avocent's claimed "adapter." In pertinent part, Dr. Vaughn was asked about the concept of transmitting video signals from a transmitter to the adapter, and whether there was a "path" through which the signals could "return" to the transmitter.[80] Dr. Vaughn opined that, indeed, the laws of physics require a "return path" for the video signals, and asserted that the "return path" in Avocent's system was through the "twisted pair" of conductors connecting the transmitter and adapter.[81] Dr. Vaughn also suggested that the "return path" re-

quirement was implicit in this court's construction of the phrase "for said transmitter."[82]

Avocent now moves to strike Section III of Dr. Vaughn's supplemental *report* on the basis of Dr. Vaughn's *deposition testimony* regarding the "return path" requirement. According to Avocent, Dr. Vaughn asserts new claim construction arguments relating to the "adapter" component that were not raised during the claim construction process.

In Section III of his report, Dr. Vaughn does state that there is a "return path" from "the adapter (or receiver)" to the transmitter, but that is merely a passing reference in the text; and this court cannot conclude from the text alone that Dr. Vaughn is engaging in claim construction, as Avocent contends.[83] Dr. Vaughn was asked to elaborate on his opinions at deposition, however, and he explained that (*i*) claim 1 of the '919 patent requires a "return path" from the adapter to the transmitter, (*ii*) the "return path" is "generated from the signals that are received from the transmitter," and (*iii*) the "return path" in Avocent's system runs through the "twist-

---

**78.** *See* doc. no. 174 (Avocent's motion to strike), Ex. 2 (Second Supplemental Report), at 7–8.

**79.** *See id.*, Ex. 1 (Vaughn supplemental report), at 5–6.

**80.** *See* doc. no. 174 (Avocent's motion to strike), Ex. 3 (Vaughn deposition), at 182–88. Claim 1 of the '919 patent, on its face, says nothing about a "return path" for video signals. The court's construction of "adapter" also is silent on the issue.

**81.** *See id.*

**82.** Dr. Vaughn stated:

The purpose of the reference ground conductor is to be a return path for signals. So, if you eliminate the adapter—the reference ground conductor, there still has to be

a return path. There must be a return path. So, in the claim language, there still has to be a return path. So the Court is saying that the return path is generated from the signals that are received from the transmitter instead of from a separate ground conductor all by itself.

*Id.* at 186.

**83.** In paragraph 13, Dr. Vaughn notes that video signals generally have alternating current ("AC") components as well as direct current ("DC") components. *See* doc. no. 200 (ClearCube's reply brief), Ex. L (Vaughn supplemental report), at 5. Dr. Vaughn then states: "when constructing a ground reference for video signals at the adapter (or receiver), it is not necessary that there be a DC path back to the transmitter, but it is necessary that there be an AC path back to the transmitter." *Id.*

ed pair" of conductors connecting the transmitter and adapter.

### 1. Conclusion

■ To the extent Avocent seeks to preclude this testimony at trial, that is the proper subject of a motion *in limine*. Indeed, Avocent has filed such a motion: doc. no. 218 seeks to preclude Dr. Vaughn from testifying that the claimed "adapter" requires "twisted pair conductors to serve as a return current path from the receiver to the transmitter." [84] However, Avocent's motion to strike Section III of Dr. Vaughn's supplemental report will be denied.

### D. Sections IV and V of Vaughn's Supplemental Report—"obviousness" and the validity of the patents-in-suit

Section IV of Dr. Vaughn's supplemental report sets forth his opinions on the validity of the '919 patent, and Section V does the same for the '997 patent. Dr. Vaughn disclosed his original validity report on August 2, 2004,[85] and he then opined that it would have been obvious at the time of the subject inventions to a person of ordinary skill in the art "of video transmission"—*i.e.*, someone holding "a Bachelor of Science degree in Electrical Engineering and at least four years of experience in the field" [86]—to combine the information contained in each binary set of prior art references identified by him.[87] Dr. Vaughn further described, on a claim-by-claim basis, how the identified prior art combinations contained all of the elements found in the asserted claims of the patents-in-suit.[88]

Robert Asprey and Joseph McAlexander followed with their rebuttal reports on September 20, 2004, and each challenged Dr. Vaughn's analysis on the basis that he had failed to articulate a motivation, suggestion, or teaching for combining the selected prior art references to lead to the claimed inventions. Both noted that, while the patents-in-suit addressed the problem of transmitting *computer*-generated video signals over extended distances, Vaughn repeatedly cited prior art references directed to the transmission of other types of signals, such as *television* signals. Asprey's report provided a particularly detailed discussion of this subject matter.[89]

84. Doc. no. 218 (Avocent Huntsville's Motion *In Limine* to Preclude Evidence And/Or Arguments Based on Improper Claim Constructions for the Terms of the '919 and '997 Patents), at 4.

85. *See* doc. no. 150 (ClearCube's brief in opposition to Avocent's motion for partial summary judgment that the patents-in-suit are not invalid), Ex. C (Aug. 2, 2004 Expert Report of Gregg L. Vaughn, Ph.D.)

86. *Id.* § II, at 2.

87. *See id.*, §§ III and IV.

88. *See id.*

89. Asprey explained that *television* signals operated at a single horizontal and vertical synchronization rate, making it relatively easy with the use of existing technology to determine ground from the video information. In contrast, *computer* video signals have the potential for multiple synchronization rates, making it more difficult to accomplish the same task. *See, e.g.*, doc. no. 187 (ClearCube's brief in opposition), Ex. I (Asprey's invalidity report), at 4, 7–8, 10–11, 13–14, 19–20. Asprey's ultimate conclusion was that, due to critical differences between computer and television signals, no one skilled in the art would have looked to prior art references in the field of television signal transmission to solve the particular problems addressed in the '919 and '997 patents. Even so, according to Asprey, that is precisely what Dr. Vaughn had done in his invalidity analysis. *See, e.g., id.* at 17.

Like Asprey, McAlexander also cited the differences between computer and television signals as a reason to conclude that there was no motivation, suggestion, or teaching that would have led a person of ordinary skill in the art to look to the prior art references identified by Dr. Vaughn. *See* doc. no. 246 (Avocent's response to the court's June 23, 2006 order), Attachment A (McAlexander's

Additionally, for each binary set of prior art references identified by Dr. Vaughn, McAlexander's report attempted to demonstrate that the references taught entirely "different solutions for transmitting video signals" than did the patents-in-suit—a *further* reason to conclude that there was no motivation, suggestion, or teaching to combine elements from the selected prior art references.[90]

Following the death of Asprey, and in accordance with the Revised Scheduling Order entered on March 31, 2006, McAlexander incorporated eight passages from Asprey's report into his second supplemental report.[91] Those passages all involved Asprey's discussion of the differences between computer-generated video signals and television signals, in the context of challenging the motivation-suggestion-teaching element of Dr. Vaughn's invalidity analysis.

Dr. Vaughn served his rebuttal report in response to Asprey's opinions, as thus incorporated by McAlexander. Avocent now asserts two independent arguments to strike Sections IV and V of Dr. Vaughn's latest report: (1) the scope of Dr. Vaughn's rebuttal exceeded that of Asprey's opinions, as incorporated by McAlexander; and (2) Dr. Vaughn cited five new "prior art" references in his rebuttal report.

### 1. *Scope of Dr. Vaughn's rebuttal*

Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure provides that "rebuttal disclosures are those that relate to evidence that is 'intended solely to contradict or rebut evidence on the same subject matter identified by another party' in its expert disclosures." *Aircraft Gear Corpo-*

*ration v. Marsh*, 2004 WL 1899982, at *5 (N.D.Ill. Aug.12, 2004); *see also Gilbane Building Company v. Downers Grove Community High School District No. 99*, 2005 WL 838679, at *11 (N.D.Ill. April 5, 2005) (same).

#### a. *Conclusion*

■ The court finds that the following paragraphs in Sections IV and V of Dr. Vaughn's supplemental report rebut Asprey's contentions regarding the differences between computer video signals and television signals: ¶¶ 20, 22, and 41. The following paragraphs also rebut Asprey's contentions, but only to the extent that each incorporates, by reference, paragraph 22: ¶¶ 30, 33, 37, 43, and 48. Avocent's motion to strike these portions of Dr. Vaughn's supplemental expert report is denied.

However, Avocent's motion to strike all other opinions set forth in Sections IV and V of Dr. Vaughn's supplemental report will be granted, because those portions extend beyond the limited subject matter incorporated into McAlexander's invalidity analysis.

### 2. *New "prior art"*

Avocent also moves to strike Sections IV and V of Dr. Vaughn's supplemental report on the basis that the report includes five new "prior art" references that were not previously disclosed. These references are: the "VGA to RGB Converter" article (cited in paragraph 22 of the Vaughn supplemental report); the "Sun–3" article (¶ 22); "Fast Ethernet Alliance" (¶ 23); "Application Notes" (¶ 25); and the "EDN Magazine" articles (¶ 25).

original invalidity report), at 27, 30, 33, 37, 43, and 46.

90. *See* doc. no. 246, Attachment A (McAlexander's original invalidity report), at 27–29, 31–33, 34–36, 38–41, 43–46, 47–48.

91. *See* doc. no. 174 (Avocent's motion to strike), Ex. 2 (McAlexander's Second Supplemental Report), at 8.

Paragraphs 23 and 25 of the Dr. Vaughn's supplemental report already have been stricken. Accordingly, the references cited in those paragraphs—the Fast Ethernet Alliance, Application Notes, and the EDN Magazine articles—will not be discussed here. On the other hand, the "VGA to RGB Converter" article and the "Sun–3" article are cited in paragraph 22 of the Vaughn supplemental report. So far, that paragraph has survived Avocent's motion to strike.

Dr. Vaughn cites these articles to illustrate a purported flaw in Asprey's opinion that there are important differences between computer and television video signals. This was in direct rebuttal to Asprey's opinions, as incorporated by McAlexander. Avocent attempts to characterize these references as previously undisclosed "prior art" references to the patents-in-suit, but that argument is misleading. Dr. Vaughn does not attempt to combine elements from the "VGA to RGB Coverter" and "Sun–3" articles with elements from other prior art references to show the "obviousness" of the patents-in-suit. The articles merely are cited to show what a person of ordinary skill in the relevant technology allegedly would have known in 1996.

Avocent also advances the argument that it did not have the opportunity to reply to Dr. Vaughn's invalidity analysis under the court's latest Revised Scheduling Order. Therefore, Avocent contends that the previously undisclosed references should be stricken. This court disagrees. After claim construction, the parties filed a Join Status Report, wherein Avocent *agreed* that its "supplemental" report on invalidity would be disclosed first, followed by ClearCube's rebuttal. Avocent cannot complain about the sequence of expert disclosures under these circumstances.

## PART SIX

### *Infringement Contentions*

■ The resolution of a patent infringement claim entails a two-step analytical progression. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir.1995) (*en banc*). The first step is that of "claim construction": the interpretation of words used in a patent's claims, "the portion of the patent document that defines the scope of the patentee's rights." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *see also, e.g., Rockwell International Corporation v. United States*, 147 F.3d 1358, 1362 (Fed.Cir.1998) ("The first step in any invalidity or infringement analysis is claim construction.") (citations omitted).

■ The second step requires a comparison of each element of the properly construed claim to the device accused of infringing. *See Markman*, 52 F.3d at 976. At this step of the analysis, a plaintiff may establish infringement in either of two ways: it may show that the asserted claim reads literally on the accused device, or it may show infringement under the so-called "doctrine of equivalents." *See, e.g., Becton Dickinson and Company v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir.1990). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Technologies, Inc. v. Cardinal IG Company*, 54 F.3d 1570, 1575 (Fed.Cir. 1995) (citing *Becton Dickinson*, 922 F.2d at 796). Under the doctrine of equivalents, every limitation in the claim must be found in the accused device, at least by "substantial equivalent." *Becton Dickinson*, 922 F.2d at 796. Stated more fully,

[a]n accused product that does not literally infringe a claim may infringe under the doctrine of equivalents if "it performs substantially the same function in substantially the same way to obtain

the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950). Only if an accused product contains specific structure which meets all limitations of an asserted claim directed to structure, at least equivalently, can that product infringe under the doctrine of equivalents. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (*in banc*), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

*Southwall Technologies*, 54 F.3d at 1579.

■ While claim construction is an issue of law, *see Markman*, 52 F.3d at 970–91, the determination of an allegation of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *See, e.g., Elekta Instrument*, 214 F.3d at 1306.

■ "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *PC Connector Solutions LLC v. SmartDisk Corporation*, 406 F.3d 1359, 1364 (Fed.Cir.2005) (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353–54 (Fed.Cir.1998)).

A. *Avocent's Motion for Partial Summary Judgment Declaring that Clear-Cube's Accused Products Include the "Amplifier" Element Recited in Claim 1 of the '997 Patent, and, Claims 1 and 16 of the '919 Patent*

Claim 1 of the '997 patent is directed to the problem of transmitting computer-gen-

erated analog color video signals over extended distances. A plurality of computers is located at the front end of the system, and each computer provides a set of color video signals to a "switch," which selectively provides each set of color video signals to a "transmitter." The "transmitter," in turn, includes an element called the "amplifier." Claim 1 of the '997 patent recites, in part, "a signal transmitter at a first location responsive to said output of a set of said color video signals, said transmitter, including an *amplifier* for each said color video signal of one of said sets for providing a color video signal output." [92]

Claim 1 of the '919 patent also is directed to the problem of transmitting computer-generated analog color video signals over extended distances. A source of computer-generated color video signals is located at the front end of the system. A "transmitter" is located immediately thereafter, and it comprises a plurality of "amplifiers." Claim 1 of the '919 patent recites, in part, "a video transmitter comprising a plurality of *amplifiers*, one of each said *amplifiers* for each of said red, green, and blue video signals." [93] Claim 6 of the '919 patent is dependent on claim 1.

At claim construction, the term "amplifier," as recited in these claims, was construed as meaning "a circuit (or a device when connected in a circuit) that draws power from a source other than the input signal and provides an output signal that reproduces the essential features of the input signal." [94]

Avocent's subject motion for partial summary judgment asks the court to declare that ClearCube's accused products satisfy "the 'amplifier' limitation" of claims 1 and 6 of the '919 patent and claim 1 of

**92.** Doc. no. 159 (Avocent's memorandum in support of its motion for partial summary judgment), Ex. B ('997 patent), col. 13, lines 23–27 (emphasis supplied).

**93.** *Id.*, Ex. A, '919 patent, col. 18, lines 17–19 (emphasis supplied).

**94.** *See* doc. no. 134.

the '997 patent.[95] The scope of the motion is tightly circumscribed. Avocent seeks to isolate the "amplifier," as that term has been construed by this court, from the surrounding claim language. Avocent then turns to ClearCube's accused products.[96] The ClearCube "Cage" is a centralized chassis that holds up to eight computers. In ClearCube's terminology, each computer is called a "Blade."[97] Each Blade, in turn, transmits analog color video signals (as well as other types of signals) to a "transmitter," which ClearCube calls a "Backpack."

The precise question before the court is whether Avocent's claimed "amplifier" also can be identified in ClearCube's "Back-pack." If so, and there is no fact dispute, Avocent's motion for partial summary judgment is due to be granted.

### 1. *Infringement analysis*

A circuit diagram assigned the Bates stamp number "CC 41852" represents a portion of the ClearCube Backpack.[98] The diagram illustrates eight sets of three circuits, or twenty-four circuits in all. Each set of three circuits receives signal information from one of the eight computers, or "Blades," located at the front end of the ClearCube system. The following schematic illustrates the three circuits that receive signal information from computer number 8 (designated "CP8" in the drawings):

---

**95.** Doc. no. 160.

**96.** For a helpful illustration of ClearCube's system, *see* doc. no. 185 (ClearCube's brief in opposition), at 9.

**97.** *See* doc. no. 126 (ClearCube's summary of the technology concerning the accused device), at 1–2. *See also* description of Clear-Cube's products, *available* at http://www.clearcube.com.

**98.** *See* doc. no. 159 (Avocent's memorandum), Ex. G (document bearing Bates stamp No. CC 41852). *See also* doc. no. 185 (ClearCube's brief in opposition), Ex. L (Vaughn deposition), at 79.

The top circuit receives three types of signals: a "polarity" signal, a horizontal synchronization signal, and a green analog video signal ("GRN").[99] The middle circuit also receives three types of signals: a "blanking" signal, a horizontal synchro- nization signal, and a red analog video signal ("RED").[100] The third circuit illus- trated on the bottom of the diagram re- ceives a vertical synchronization signal, a horizontal synchronization signal, and a blue analog video signal ("BLU").[101]

99. See doc. no. 185 (ClearCube's brief in op- position), Ex. L (Vaughn deposition), at 79– 80.

100. See id. at 87.

101. See doc. no. 159 (Avocent's memoran- dum), Ex. G (document bearing Bates stamp No. CC 41852, on which the notations "HSYNC," "VSYNC," and "BLU" are writ- ten).

**a.** "*a circuit (or a device when connected in a circuit)*"

The claimed "amplifier," as construed by this court, must first and foremost have "a circuit (or a device when connected in a circuit)." It is undisputed that Clear-Cube's Backpack has twenty four "circuits," including the three circuits illustrated above.

**b.** "*that draws power from a source other than the input signal*"

This clause may be parsed into two elements: (1) there must be an "input signal" to each circuit; and (2) the circuit must "draw[ ] power from a source other than the input signal." The Backpack circuitry clearly receives an "input signal" from the computers, or "Blades," located at the front end of ClearCube's transmission system.[102] It also is undisputed that Clear-Cube's circuit "draws power from a source other than the input signal." At oral argument, Avocent's counsel identified the symbol "5V," standing for 5 volts, directly above the operational amplifiers located toward the right of the subject circuits. Avocent asserts, and ClearCube does not dispute, that this symbol represents the point at which power is drawn into the circuitry from a source other than the input signal. The actual power source is illustrated in another diagram, assigned Bates stamp number "CC 41851," under the heading "Power Supply No. 1 Connector."[103]

**c.** "*and provides an output signal that reproduces the essential features of the input signal*"

Finally, in view of the claimed "amplifier," it must be found that ClearCube's Backpack circuitry (*i*) "provides an output signal" (*ii*) "that reproduces the essential features of the input signal." It is undisputed that there is an "output signal" at the far right end of the Backpack circuitry.[104] Even so, the contested issue is whether that circuitry provides an output signal that "reproduces the essential features of the input signal." This is the question upon which Avocent's motion ultimately turns.

Avocent quotes a snippet of testimony from the deposition of ClearCube's expert witness, Dr. Gregg Vaughn, to satisfy this decisive requirement:

Q. So the red, green, and blue information that comes in get converted and combined, but that same information comes out on the right-hand side of that circuit; correct?

A. Yes, sir.[105]

Avocent then construes this portion of Dr. Vaughn's testimony as follows:

Dr. Vaughn expressly testified that the *operational amplifiers and the surrounding circuity, receives the red, green and blue color video signal information, and reproduces that color video information* [*i.e.,* the essential features of the input signal[106]] at the output of that circuitry.

---

102. *See, e.g, id.,* Ex. F (deposition of Raymond DuPont), at 97.

103. *See* doc. no. 159 (Avocent's memorandum), Ex. G.

104. *See, e.g., id.,* document CC 41852. The diagram shows an *output signal at the far right side of the circuit,* illustrated by the double arrows (>>).

105. Doc. no. 185 (ClearCube's brief in opposition), Ex. L (Vaughn deposition), at 87–88.

106. *See* doc. no. 159 (Avocent's motion for partial summary judgment), at 12 (stating that "[i]n the accused products, the 'essential features' to be reproduced by the claimed amplifiers are simply the color signals that make up the video image to be displayed, as embodied in the voltage or current, that is passed through ClearCube's amplifiers."); doc. no. 197 (Avocent's reply brief in support of its motion to strike), at 8 (asserting that "[t]he 'essential features' of the amplifier's input signal are the red, green and blue color information").

This testimony, coupled with the Court's construction of "amplifier," establishes that the ClearCube transmitter has an "amplifier" for each of the color video signals.[107]

Upon careful review of Dr. Vaughn's testimony, however, this court must disagree with Avocent's characterization of the evidence.

### i. Dr. Vaughn's testimony

Dr. Vaughn was asked during his deposition to review the Backpack circuits illustrated in the document bearing Bates stamp number CC 41852.[108] In response, Dr. Vaughn focused his analysis on the three circuits receiving signals from computer number 8, illustrated above. Dr. Vaughn observed that each circuit receives not only an analog color video signal, but also other signals, such as vertical and horizontal synchronization, polarity, and blanking signals.[109] These signals are combined algebraically, and then converted to a differential signal.[110] It was in this specific context that Avocent' counsel elicited the cited response from Dr. Vaughn:

Q. Okay. And those combined differential signals are then outputted from the circuitry that's on this page, correct?

A. Yes, sir, eventually . . . . .

. . . . .

Q. This combined signal, just take the green positive, for example—

A. Okay.

Q. —that would include the polarity data, the synchronization data, as well as the color video—the green color video information; correct?

A. Yes, sir.

Q. And the same would be true for the red except perhaps it's—strike that. With respect to the red, the differential signal—again, just take positive as an example—that would have the red color video information that was input on the left side of that circuit as well as the data from the other two signals that comes in on the left side of that circuit; correct?

A. Yes, sir. Red would have blanking and horizontal sync.

Q. Okay. And then the same or a similar analysis would hold for blue. The blue signal would come in from the computer on the left side and would be combined with information from two other signals—

A. Yes, sir.

Q. —converting to a differential signal and then output as a combined signal on the right-hand of that circuitry; correct?

A. That's correct.

Q. So the red, green, and blue information that comes in get converted and combined, but that same information comes out on the right-hand side of that circuit; correct?

A. Yes, sir.[111]

This testimony does not squarely address the question of whether ClearCube's Backpack circuitry provides an output signal that "reproduces the essential features of the input signal." Rather, and construing the evidence in the light most favorable to ClearCube, the non-moving party, Dr. Vaughn simply agrees with Avocent's counsel that in ClearCube's circuitry, the analog color video signal is provided as an output, notwithstanding the fact that it is

---

107. Doc. no. 198 (Avocent's reply brief), at 9.

108. Doc. no. 185 (ClearCube's brief in opposition), Ex. L (Vaughn deposition), at 79.

109. See id. at 82–85.

110. See id. at 85.

111. Id. at 86–88.

combined with other signals, such as horizontal and vertical synchronization signals, and converted into a differential format.

The distinction is made clearer upon review of another portion of Dr. Vaughn's deposition testimony. Later in his deposition, Dr. Vaughn was specifically asked to provide a meaning for the phrase "reproduces the essential features of the input signal," as set forth in the court's construction of the claimed "amplifier."[112] Dr. Vaughn opined that the "essential features" of the video signal are the "frequency components" of the video signal,[113] a term that he defined as encompassing signal voltage or current.[114] Dr. Vaughn also provided an opinion on what it meant to "reproduce" the essential features of the input signal: the claimed "amplifier" had to output the frequency components of the video signal in such a manner that, ultimately, the monitor would display the same image as originally transmitted by the computer.[115]

When Dr. Vaughn was asked *in this context* to state whether ClearCube's accused system included the claimed "amplifier," Dr. Vaughn unequivocally stated that it did not, because ClearCube's circuitry did not "reproduce the essential features of the input signal."[116] Dr. Vaughn reasoned that in Avocent's claim "amplifier," the frequency components of the input signal had to be reproduced at the output signal to an accuracy of less than one-half of one percent (0.5%); otherwise, the information transmitted from the computer would not be correctly displayed on the monitor.[117] In contrast, the circuitry in

ClearCube's Backpack actually decreased the frequency components by a ratio of one-third.[118]

Avocent complains that this portion of Dr. Vaughn's analysis includes improper claim construction, as well as arguments regarding the concept of voltage or current "gain" previously rejected by this court at claim construction. There is some merit to that contention. For example, as discussed in Part Five, Section B of this opinion, *supra,* Dr. Vaughn's opinion regarding the requisite degree of accuracy in the claimed "amplifier" (0.5%) is due to be stricken.

Even so, this only underscores the fact that Avocent's *reliance* on Dr. Vaughn's deposition testimony to prove infringement of the claimed "amplifier" is misplaced. Dr. Vaughn never testified that the circuitry in ClearCube's Backpack provides an output signal that "reproduces the essential features of the input signal." His conclusion was just the opposite.

### 2. *Conclusion*

 Where, as here, the party moving for summary judgment bears the burden of proof on an issue, then that party must satisfy not only the initial Rule 56(c) responsibility of informing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial, but that party also must carry its ultimate burden by showing that it would be entitled to a directed verdict at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct.

112. *See* doc. no. 185 (ClearCube's brief in opposition), Ex. L (Vaughn deposition), at 126–27.

113. *Id.* at 127.

114. *Id.* at 128, 136.

115. *Id.* at 130–31.

116. *Id.* at 140.

117. *Id.* at 144.

118. *See* doc. no. 185 (ClearCube's brief in opposition), Ex. L (Vaughn deposition), at 145.

2548, 91 L.Ed.2d 265 (1986). Avocent has failed to prove by a preponderance of the evidence that the circuitry in ClearCube's Backpack provides an output signal that "reproduces the essential features of the input signal." Avocent's motion for partial summary judgment will, therefore, be denied.

**B.** *ClearCube's Motion for Partial Summary Judgment Declaring Non–Infringement of Claim 1 of the '997 Patent, and, Claims 1 and 6 of the '919 Patent*

The court now turns to a related motion, filed by ClearCube, seeking a partial summary judgment declaring that claim 1 of the '997 patent, and claims 1 and 6 of the '919 patent, are *not* infringed by ClearCube's accused products. Claim 1 of the '997 patent recites, in relevant part:

1. A system for transmission of analog color video signals between a source of said signals and a video monitor, being at spaced locations, comprising:

. . . . .

a signal transmitter at a first location responsive to said output of a set of said color video signals, said transmitter, including an *amplifier* for each said color video signal of one of said sets for providing a color video signal output and wherein at least a high frequency portion of each said color video signal has been *amplified as a direct function of frequency* [.] [119]

Claim 1 of the '919 patent recites, in part:

1. An extended-in-length computer video communications link for transmitting computer video signals comprising:

a source of computer video signals including red, green, and blue video signals,

a video transmitter comprising a plurality of *amplifiers,* one of each said *amplifiers* for each of said red, green, and blue video signals, each said *amplifier* comprising:

a signal input for receiving a one of said red, green and blue video signals,

frequency sensitive compensating circuitry responsive to a said video signal so that said *amplifier* provides a first video signal that *increases in amplitude with increasing frequency* at a first output[.] [120]

Claim 6 of the '919 patent is dependent on claim 1.

ClearCube's motion focuses upon the functional limitations imposed on the "amplifier"—*i.e.,* that the "amplifier" provide "a color video signal output and wherein at least a high frequency portion of each said color video signal has been *amplified as a direct function of frequency*" (claim 1 of the '997 patent), and "a first video signal that *increases in amplitude with increasing frequency* at a first output" (claim 1 of the '919 patent).

Setting aside the preliminary question of whether its accused products include an "amplifier" as that term has been construed by the court, ClearCube contends that its circuitry, if it constitutes an "amplifier" at all, does not perform the functional requirements described in the language italicized above. The thrust of Avocent's response is that ClearCube's non-infringement motion raises an untimely claim construction contention.

---

**119.** Doc. no. 168 (ClearCube's motion for partial summary judgment), Ex. B ('997 patent), col. 13, lines 14–30.

**120.** *Id.,* Ex. A ('919 patent), col. 18, lines 12–25.

### 1. *Procedural background*

Critical events underlying ClearCube's motion, and Avocent's opposition to it, involve the parties' conduct during the course of discovery and their compliance with the orders entered by this court. Avocent propounded an interrogatory on March 16, 2004, requesting ClearCube to disclose each claim element or limitation in each patent-in-suit that required construction by the court.[121] When ClearCube failed to answer responsively, Avocent moved to compel ClearCube's claim construction contentions, and that motion was granted on July 12, 2004.[122] ClearCube was ordered to provide full and complete responses to Avocent's request for claim construction contentions and, if necessary, to supplement its responses immediately upon gaining new information.[123]

ClearCube answered Avocent's interrogatory on July 23, 2004, representing that the claim terms "discrete" and "twisted pair" required construction.[124] Avocent also ascertained, through the course of subsequent discovery involving expert witnesses, that the claim term "amplifier" was disputed by ClearCube.[125]

In September 2004, the court entered a Revised Scheduling Order in anticipation of a claim construction hearing.[126] The parties were ordered, among other things, to prepare and file a Joint Claim Construction and Pre–Hearing Statement that included the information specified in Local Patent Rule 4–3 implemented by Judge T. John Ward of the United States District Court for the Eastern District of Texas.[127] That Rule, in turn, required that the parties' Joint Claim Construction and Pre–Hearing Statement include the construction of claim terms, phrases, or clauses on which the parties agreed, as well as each party's proposed construction of disputed claim terms, phrases, or clauses.[128] In compliance with those instructions, the parties filed their Joint Claim Construction and Pre–Hearing Statement on December 17, 2004.[129] ClearCube asserted that the claim term "amplifier," as recited in claim 1 of the '997 patent, required construction. Imbedded in its lengthy construction of "amplifier," however, was a proposed construction of the claim phrase "amplified as a direct function of frequency"—*i.e.*, the additional, functional limitation on the "amplifier" recited in claim 1 of the '997 patent. ClearCube stated: " 'Amplified as a direct function of frequency' means that as the frequency increases the amount of amplification, in other words the amplitude, increases to compensate for line losses of a given length of conductor." [130]

Avocent subsequently moved to strike "amplified as a direct function of frequency" from the court's claim construction

---

121. *See* doc. no. 40 (Avocent's memorandum in support of motion to compel), Ex. A ("Plaintiff Avocent's Interrogatories Nos. 1–9"), at 4–5.

122. Doc. no. 51.

123. *See id.*

124. *See* doc. no. 79 (Avocent's combined memorandum), Ex. A(3) (ClearCube's first supplemental responses and objections), at 8–9.

125. *See* doc. no. 79 (Avocent's combined memorandum), at 22.

126. Doc. no. 66.

127. *See id.* at ¶ 3 at I.

128. The Patent Rules of the United States District Court for the Eastern District of Texas may be accessed on-line, *available at* http://www.txed.uscourts.gov/Rules/Local-Rules/LocalRules.htm.

129. Doc. no. 78.

130. *Id.* at 9.

analysis.[131] Avocent correctly observed that the court's July 12, 2004 order had instructed ClearCube to fully disclose its claim construction contentions, and if new information was obtained, to *immediately* supplement its interrogatory answers. ClearCube's response, however, was that Avocent *had* received notice during discovery that the phrase was disputed. The major premise in ClearCube's argument was that the phrase "amplified as a direct function of frequency," as recited in claim 1 of the '997 patent, was synonymous with the phrase "increases in amplitude with increasing frequency," as recited in claim 1 of the '919 patent. Indeed, ClearCube represented to the court that "the phrase 'increasing signal amplitude with increasing frequency' *is just another way of saying* 'amplified as a direct function of frequency.' " [132] ClearCube argued that, because the parties had repeatedly probed the meaning of the phrase "increases in amplitude with increasing frequency" during discovery,[133] Avocent was placed on notice that the related phrase,

"amplified as a direct function of frequency," was disputed.[134]

At oral argument, the court reserved ruling on Avocent's motion to strike Clear-Cube's claim construction contention for "amplified as a direct function of frequency." Additionally, the court understood ClearCube's argument—that "amplified as a direct function of frequency" was synonymous with "increases in amplitude with increasing frequency"—to mean that the latter phrase also needed to be construed, in tandem with its purported counterpart.[135]

The court entered an order on November 29, 2005, instructing as follows: "ClearCube *must file a brief,* no later than Wednesday, December 14, 2005, clearly addressing its specific contentions regarding the construction of the phrase 'increases in amplitude with increasing frequency' from Claim 1 of the '919 patent. Avocent *may respond* on or before Friday, December 30, 2005." [136] Despite the unequivocal

131. *See* doc. no. 79 (Avocent's combined memorandum), at 22–23.

132. Doc. no. 96 (ClearCube's reply in support of its motion to strike the supplemental report of Joseph C. McAlexander), at 3 n. 4 (emphasis supplied). After Avocent moved to strike ClearCube's claim construction contentions, ClearCube responded with a motion to strike the November 26, 2004 supplemental infringement report served by Avocent's expert, Joseph McAlexander. *See* doc. no. 82. Avocent asserted that the supplemental report was necessary only because of ClearCube's untimely claim construction contentions. ClearCube responded that claim construction was not Avocent's concern at all; rather, Avocent was attempting to shore up deficiencies in McAlexander's original infringement report. Following oral argument, both motions were denied. *See* doc. no. 117 (denying ClearCube's motion to strike); March 15, 2006 stamp order (denying Avocent's motion to strike ClearCube's claim construction contentions).

133. *See* doc. no. 84 (ClearCube's response to Avocent's motion to strike), at 37–38.

134. *See id.*

135. Indeed, in the Joint Claim Construction and Pre–Hearing Statement, ClearCube had imbedded the following sentence in its lengthy construction of "amplifier," as recited in claim 1 of '919 patent: "The amplifier provides a first video signal that increases in amplitude with increasing frequency at a first output, such that the first output signal has been increased relative to the input signal to the amplifier to compensate for line losses of a given conductor." Doc. no. 78 (Joint Claim Construction and Pre–Hearing Statement), at 11.

136. Doc. no. 124 (Order appointing Technical Advisor and setting agenda for claim construction hearing), at 5 n. 1 (boldface emphasis in original) (italicized emphasis supplied).

instructions set forth in this order, Clear-Cube did not file a brief.

The court conducted its claim construction hearing on February 22 and 23, 2006. On the first day of the hearing, Avocent's counsel (Donald Jackson) informed the court that Avocent had not filed a "response" regarding the phrase "increases in amplitude with increasing frequency," for the obvious reason that ClearCube had failed to comply with the court's order to "file a brief." This court accordingly ruled that it would not construe that phrase, due to ClearCube's failure to abide by the specific instructions set forth in the November 29, 2005 order.[137] Later during the hearing, ClearCube's counsel (Joseph Cloud) admitted that counsel were fully aware of the explicit instruction, stated in the court's November 29, 2005 order, that "ClearCube *must file a brief*, no later than Wednesday, December 14, 2005, clearly addressing its specific contentions regarding the construction of the phrase 'increases in amplitude with increasing frequency' from Claim 1 of the '919 patent." Even so, counsel independently decided to not comply:

> MR. CLOUD: The decision was made by ClearCube's counsel that the—we didn't need a separate definition for increases in amplitude and increase in frequency. We felt as though and do feel as though that it's incorporated into the amplifier definition and that the amplifier definition—that one of the essential characteristics to the amplifier definition is the increasing amplitude with increasing frequency. When we made the decision, we thought we don't need to ask the Court to go out and define additional

words of increase. We think it is—it's there within the confines of amplifier itself. And I think not only that, but— so that was the reason that there wasn't some kind of specific brief filed on it. I think the decision was we don't want to ask the Court to come find a new definition of increase or increases in amplitude.[138]

After the court's ruling, precluding analysis of "increases in amplitude with increasing frequency," ClearCube did not ask that the purportedly synonymous phrase, "amplified as a direct function of frequency," be construed.

### 2. *ClearCube's summary judgment contentions*

It is against this backdrop that Clear-Cube now moves for partial summary judgment declaring that claim 1 of the '997 patent and claims 1 and 6 of the '919 patent are not infringed. ClearCube argues that the pertinent claim limitations on the "amplifier"—*i.e.*, "amplified as a direct function of frequency" in claim 1 of the '997 patent, and "increases in amplitude with increasing frequency" in claim 1 of the '919 patent—both impose a particular requirement: *i.e.*, when there is an increase in the frequency of a video signal at the claimed "amplifier," the amplitude of the signal will *always* increase; it may *never* decrease, nor remain the same.[139] ClearCube relies on the adjective "monotonic" to describe this feature.[140] According to ClearCube, "monotonic" is a term that means "*always* moving in one direction; in this instance it means *always* increasing, *never* decreasing."[141]

---

137. *See* doc. no. 182 (Avocent's brief in opposition), Ex. 3 (Transcript of *Markman* claim construction hearing: Feb. 22, 2006 testimony), at 30–31.

138. *Id.* at 190.

139. *See* doc. no. 168 (ClearCube's motion for partial summary judgment), at 2, 6, 22, 24.

140. *See id.* at 2.

141. *Id.* at 2 n. 3 (emphasis supplied).

ClearCube also asserts the now-familiar argument that "amplified as a direct function of frequency" is synonymous with "increases in amplitude with increasing frequency."[142] Under this rationale, the "monotonic" requirement applies with equal force to the "amplifier" in claim 1 of the '997 patent, and, the "amplifier" recited in claims 1 and 6 of the '919 patent.

ClearCube's analysis then turns to the question of non-infringement. Joseph McAlexander was retained by Avocent to determine whether ClearCube's products infringed the patents-in-suit. He served an infringement report on November 26, 2004.[143] To avoid a fact dispute at summary judgment, ClearCube now adopts the results of McAlexander's laboratory tests (*i.e.*, Avocent's own evidence) for purposes of this motion. During his testing, McAlexander attempted to identify circuitry in ClearCube's products that evidenced the same characteristics as Avocent's claimed "amplifier."[144] A sample of his test results showed that, *at certain frequency ranges*, an increase in signal frequency resulted in an increase of signal amplitude. At *other ranges of frequency increase*, however, the signal amplitude either remained the same, or decreased. ClearCube relies on the phrase "meanders as to increasing frequency" to describe this phenomenon.[145] The following is ClearCube's graphical representation of one of McAlexander's data sets, with signal frequency represented on the horizontal axis, and signal amplitude represented on the vertical:[146]

| MHz | 5 | 10 | 20 | 40 | 47 | 55 | 65 | 75 | 90 | 105 |
|---|---|---|---|---|---|---|---|---|---|---|
| Voltage Output Non-Inverted | 0.298 | 0.302 | 0.333 | 0.387 | 0.354 | 0.367 | 0.209 | 0.212 | 0.293 | 0.314 |

Figure 3

142. *See id.* at 1 (characterizing "amplified as a direct function of frequency" and "increases in amplitude with increasing frequency" as both requiring "that the amplitude voltage of the video signal being sent increases when the frequency increases").

143. *See* doc. no. 168 (ClearCube's motion for partial summary judgment), Ex. F (Supplemental Expert Report of Joseph C. McAlexander, III, Regarding Infringement of U.S. Patent Numbers 6,184,919 and 6,150,997).

144. *See id.* at 5–6.

145. *See* doc. no. 202 (ClearCube's reply brief), at 9.

146. Doc. no. 168 (ClearCube's motion for partial summary judgment), undisputed fact No. 7, at page (vii). This illustration is ClearCube's graphical representation of McAlexander's test result. Avocent admits that the data values shown in the illustration are correct, and that the graph appears to correctly plot the data points.

On the strength of this evidence, Clear-Cube contends that claim 1 of the '997 patent, and claims 1 and 6 of the '919 patent, are not infringed by its accused products.

### 3. *Avocent's response*

Avocent challenges ClearCube's contention that the claim limitations of "amplified as a direct function of frequency" recited in claim 1 of the '997 patent, and "increases in amplitude with increasing frequency" recited in claim 1 of the '919 patent, require an increasing, "monotonic" relationship between signal frequency and amplitude. Avocent asserts that the language of the claims does not state that limitation, nor can that limitation be construed in view of other intrinsic evidence. Avocent also maintains that the asserted claims are literally infringed by ClearCube's accused products.

Where, as here, the parties do not dispute any relevant facts regarding Clear-Cube's products, but disagree over possible interpretations of the claim language, the question of literal infringement *should* collapse to one of claim construction, and thus be amenable to summary judgment. *See General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 983 (Fed.Cir.1997); *Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.,* 73 F.3d 1573, 1578 (Fed. Cir.1996). The problem in this case, however, is that claim construction was completed months ago, and the parties are now on the eve of trial. Thus, a resolution of ClearCube's motion for partial summary judgment on the merits cannot be accomplished without casting the parties backward in this litigation.

What is most troublesome, however, is not the possibility of delay. Rather, it is the indifference with which ClearCube's counsel construed the orders of this court. Nearly two years ago, on July 12, 2004, ClearCube was ordered to provide full and complete responses to Avocent's request for claim construction contentions and, if necessary, to supplement its responses immediately upon gaining new information. ClearCube answered Avocent's claim construction interrogatory on July 23, 2004, representing that only two claim terms, "discrete" and "twisted pair," required construction. It is undisputed that Clear-Cube *never* supplemented its interrogatory responses to state that the claim phrase "amplified as a direct function of frequency" was disputed, or required construction.

When ClearCube finally did disclose that contention in the parties' Joint Claim Construction and Pre–Hearing Statement, and Avocent moved to strike it, ClearCube represented to this court that, contrary to all appearances, it actually had acted in good faith. ClearCube's argument was that the phrase "amplified as a direct function of frequency" was synonymous with the phrase "increases in amplitude with increasing frequency," and since the latter concept was discussed repeatedly during deposition discovery, Avocent could not complain. That led this court to *order* that "ClearCube *must file a brief,* no later than Wednesday, December 14, 2005, clearly addressing its specific contentions regarding the construction of the phrase 'increases in amplitude with increasing frequency' from Claim 1 of the '919 patent." *There was no equivocation in that instruction.*

Of course, if ClearCube's counsel had filed such a brief, and disclosed the contention they now advance at summary judgment—*i.e.,* that "amplified as a direct function of frequency" and "increases in amplitude with increasing frequency" both describe an increasing, "monotonic" relationship between signal frequency and amplitude—Avocent would have responded, and this court would have addressed the issue on the merits at the stage of claim construction. But, that is not what occurred. ClearCube elected to disregard

the specific instructions of this court and, as explained by ClearCube's counsel at the claim construction hearing, the reasons were strategic.

In hindsight, this court may reasonably ascertain what that strategy entailed. ClearCube made the following assertion in the parties' Joint Claim Construction and Pre–Hearing Statement: "'Amplified as a direct function of frequency' means that as the frequency increases the amount of amplification, in other words the amplitude, increases to compensate for line losses of a given length of conductor." Notably, this restatement of "amplified as a direct function of frequency" tracks the language of the phrase "increases in amplitude with increasing frequency." ClearCube clearly wished to solidify its major premise that "amplified as a direct function of frequency" was synonymous with "increases in amplitude with increasing frequency."

As explained by ClearCube's counsel at the claim construction hearing, however, ClearCube did not then desire to have the critical phrase "increases in amplitude with increasing frequency" construed. Clear-Cube's position is that the plain and ordinary meaning of the phrase "increases in amplitude with increasing frequency" describes an increasing, "monotonic" relationship between signal frequency and amplitude, and that no words need to be added or deleted from the claim language to express that concept.

Maybe so. But to reiterate, ClearCube was *ordered* by this court to set forth such an argument in a brief. There was no room for gamesmanship during the critical time period leading up to the claim construction hearing. This should have been patently clear to ClearCube's counsel, in light of Avocent's contemporary accusations that ClearCube's conduct, with regard to disclosure of claim construction contentions, was one of "delay, conceal, and surprise."[147]

The court also notes the following request placed in a marginal note of Clear-Cube's summary judgment brief:

> To the extent the claim language [*i.e.*, "amplified as a direct function of frequency" and "increases in amplitude with increasing frequency"] does not appear clear and unambiguous as to the required relationship between increasing frequency and increasing amplitude, *ClearCube asks that the Court further construe the subject claims to eliminate any possible confusion.*[148]

This request will be denied. ClearCube was given the opportunity to "eliminate any possible confusion" prior to the claim construction hearing, but it elected not to do so. This court will not revisit claim construction upon ClearCube's request, especially under these egregious circumstances, unless ordered to do so upon subsequent appeal to the Federal Circuit.

### 4. Conclusion

ClearCube's motion for partial summary judgment, which relies upon a disputed interpretation of "amplified as a direct function of frequency" and "increases in amplitude with increasing frequency," is denied.

### C. "The Adapter Motion"—*i.e.*, *Clear-Cube's Motion for Partial Summary Judgment Declaring Non–Infringement of Claims 1 and 6 of the '919 Patent*

ClearCube also moves for a partial summary judgment declaring that its accused products do not infringe claims 1 and 6 of the '919 patent.[149] The parties convenient-

---

**147.** Doc. no. 79 (Avocent's combined memorandum), at 23.

**148.** Doc. no. 168 (ClearCube's motion for partial summary judgment), at 25 n. 44 (emphasis supplied).

**149.** *See* doc. nos. 166 (ClearCube's Motion

ly refer to this as "the adapter motion," because it addresses the functions of the "adapter" recited in the asserted claims. Claim 1 of the '919 patent recites in part:

1. An extended-in-length computer video communications link for transmitting computer video signals comprising:

. . . . .

an *adapter* for each of said twisted pair of conductors, each said *adapter* coupled to an opposite end of a respective one of said twisted pair of conductors, each said *adapter* receiving said first video signal and said second video signal and providing a respective said video signal as a single ended output, and further configured to provide a ground reference potential *for said transmitter* at said *adapter*, whereby need for a reference ground conductor between said transmitter and said adapter is eliminated.[150]

Claim 6 of the '919 patent is dependent on claim 1.

### 1. *Facts relevant to "the adapter motion"*

Most of the facts pertinent to the discussion of "the adapter motion" were set forth in detail in Part Five, Section A *supra.* A brief summary is provided below.

Joseph McAlexander was retained by Avocent to show how ClearCube's accused products infringed the patents in suit. McAlexander served his original infringement on August 2, 2004, and he served a supplemental infringement report on November 26, 2004.[151] McAlexander opined that each element of the claimed "adapter," as recited in claim 1 of the '919 patent and incorporated into dependent claim 6 of the same patent, also was found in ClearCube's accused products, specifically in a structure called a "C–Port."[152]

At claim construction, one issue addressed by this court was the meaning of the phrase "for said transmitter," as it limited the claim term "adapter." This court construed that phrase as meaning "from the signals received from the transmitter." In other words, claim 1 of the '919 patent recites an "adapter . . . further configured to provide a ground reference potential [*from the signals received from the transmitter*] at said adapter."[153]

Following claim construction, the court issued a Revised Scheduling Order permitting the parties to conduct additional discovery for the purpose of incorporating, to the extent necessary, this court's construction of disputed claim terms into the infringement analysis.

McAlexander disclosed his second supplemental report on April 10, 2006.[154] He opined that, like the "adapter" in claims 1 and 6 of the '919 patent, ClearCube's "C–Port" provided a ground reference potential "from the signals received from the

---

for Partial Summary Judgment of Non–Infringement of Claims 1 and 6 of the '919 Patent and Memorandum in Support Thereof) and 169 (redacted version of same motion and memorandum).

**150.** Doc. no. 166 (ClearCube's motion for partial summary judgment), Ex. A ('919 patent), col. 18 lines 12–41 (emphasis supplied).

**151.** *See* Part Five, Section A *supra.*

**152.** *See* doc. no. 177 (Avocent brief in opposition), Ex. 7 (McAlexander's Aug. 2, 2004 infringement report), at infringement chart

pages A-a9 through A-a13; doc. no. 82 (ClearCube's motion to strike), Ex. C (McAlexander's November 26, 2004 supplemental report), at 8.

**153.** *See* doc. no. 134 (claim construction order) at 2; doc. no. 133 (claim construction memorandum), at 41–46.

**154.** Doc. no. 177 (Avocent's brief in opposition), Ex. 4.

transmitter." The focal point of McAlexander's analysis was a circuit diagram of the C–Port shown on a document bearing Bates stamp number "CC 9225." [155] McAlexander's report isolated a portion of that schematic, showing transmission of positive and negative red video signals, and identified two resistors, labeled "R16" and "R21," in particular. This analysis followed:

> To take the positive and negative red conductors as an example, when one "looks into" the C–Port at the nodes above R16 and below R21, one can determine that that circuitry provides a ground reference potential from the signals received from the transmitter, as required by the Court's Markman Order. The equivalent resistance across R16 is approximately 51 ohms. The equivalent resistance across R21 is approximately 55 ohms. The mid-point between R16 and R21 is shown as corresponding to the ground used by the remaining C–Port circuitry. This shows that the C–Port circuitry provides a ground reference for the C–Port from the signals received from the transmitter.
>
> Essentially the same circuitry is reproduced for the blue and the green signal pairs as they enter the C–Port. [156]

McAlexander was deposed by ClearCube's counsel on April 17, 2006. [157]

#### 2. ClearCube's argument

ClearCube asserts that its accused products do not include an "adapter," or any corresponding structure that provides a ground reference potential "from the signals received from the transmitter." At summary judgment, however, the decisive

question is this: Do the findings and opinions contained in McAlexander's April 10, 2006 supplemental report (and his April 17, 2006 deposition testimony) create a genuine issue of material fact as to whether ClearCube's "C–Port" provides a ground reference potential "from the signals received from the transmitter"?

#### a. ClearCube's "testing" contention

ClearCube initially challenges McAlexander's infringement analysis on the basis that it is founded upon speculation and conjecture, and directs the court to a snippet of his deposition testimony in which McAlexander was asked the following:

> Q. Did you do any testing of the C–Port to see whether it was providing the ground reference potential for the C–Port? This mid-point, whether it was providing the ground reference potential for the C–Port?
>
> A. If you're asking if I tested it like I did the McDermott, *I have not tested yet. I can see from the schematics that it is, that it does provide a potential that captures what is at the transmitter.* [158]

Seizing upon the statement "I have not tested yet," ClearCube asserts that, because McAlexander's opinions are not supported by test data, they are not sufficient to resist summary judgment. This court disagrees. ClearCube ignores McAlexander's immediate qualification: *"I can see from the schematics that . . . [the C–Port] does provide a potential that captures what is at the transmitter."* [159] McAlexander repeatedly referred to the C–Port schematic diagram during his deposition as support for his opinion that ClearCube's

---

**155.** The schematic is located at doc. no. 177 (Avocent's brief in opposition), Ex. 3.

**156.** *Id.*, Ex. 4, second supplemental report, at 7.

**157.** Doc. no. 166 (ClearCube's motion and memorandum), Ex. E.

**158.** *Id.* at 126 (emphasis supplied).

**159.** *Id.* (emphasis supplied).

C–Port provides a ground reference potential "from the signals received from the transmitter." [160]

Moreover, the *allegation* that some type of (unspecified) testing is a necessary predicate to support McAlexander's conclusion that ClearCube's C–Port provides a ground reference potential "from the signals received from the transmitter" merely affects the *weight* a decision-maker may choose to accord his opinion, but certainly not its admissibility.

**b.** *ClearCube's credibility contentions*

ClearCube also attacks the credibility of the opinions stated in McAlexander's second supplemental report. ClearCube observes that, in his first two infringement reports (both issued prior to claim construction), McAlexander opined that, like the invention embodied in claims 1 and 6 of the '919 patent, ClearCube's accused products lacked a separate conductor for the transmission of ground signals. ClearCube complains that McAlexander's latest report is a departure. The following statements illustrate the argument:

"ClearCube submits that it is simply not credible for Mr. McAlexander to submit a supplemental report (after the Court's claim construction ruling for the term 'adapter') to the effect that ClearCube's system now works differently, particularly since nothing has changed in the ClearCube product design"; [161]

"Avocent has not offered any ... testimony or evidence other than the contradictory and vacillating testimony of its own expert which should be given no weight"; [162]

"Avocent failed to present any credible evidence raising a fact as to infringement"; [163] and,

"Mr. McAlexander first said one thing about the operation of the adapter, and when that did not suit Avocent's purposes, he said something else. Accordingly, Mr. McAlexander's opinions provide no support for Avocent's infringement arguments." [164]

ClearCube ignores the hornbook principle that it is not proper for this court to assess witness credibility when considering a motion for summary judgment; such determinations are reserved for the jury. *See, e.g., Wanlass v. Fedders Corporation,* 145 F.3d 1461, 1463 (Fed.Cir.1998) ("In determining the propriety of summary judgment, credibility determinations may not be made.").[165]

**c.** *Dr. Vaughn's rebuttal*

ClearCube also directs the court to the opinion of its expert, Dr. Vaughn, who opines that ClearCube's "C–Port" does not perform the same functions as the claimed "adapter," because it is not configured to provide a ground reference potential "from the signals received from the transmitter."

---

**160.** *See id.* at 117–120.

**161.** Doc. no. 166 (ClearCube's motion and memorandum), at 10.

**162.** *Id.* at 23.

**163.** Doc. no. 200 (ClearCube's reply brief), at 10.

**164.** *Id.* at 2.

**165.** *See also, e.g., Amsted Industries, Inc. v. Buckeye Steel Castings Company,* 24 F.3d 178,

183 (Fed.Cir.1994) ("It is within the province of the jury to determine the credibility of a witness and the weight to be given his testimony."); *Lane v. Celotex Corporation,* 782 F.2d 1526, 1528 (11th Cir.1986) ("[T]he district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the jury to assess the probative value of the evidence. The district court must not assess the probative value of any evidence presented to it, for this would be an unwarranted extension of the summary judgment device.") (internal citations and alterations omitted).

Dr. Vaughn's opinion is grounded in two assertions: (1) a "common-mode filter" located on the front end of ClearCube's transmission system does not allow recovery of the ground reference potential at the accused receiver; and (2) there is no need to recover the ground reference potential at the accused receiver, because signals in the ClearCube system are sent in a balanced format.[166] ClearCube argues that Dr. Vaughn's opinions have remained consistent throughout this litigation, bolstering its motion for summary judgment.

This argument stumbles coming out of the gate: it is axiomatic that, when considering a motion for summary judgment, the court is required to accept the *non-moving* party's evidence as true, and draw all reasonable inferences in favor of the *non-moving* party. While ClearCube may *ultimately* persuade a jury, on the strength of Dr. Vaughn's testimony, that its "C–Port" does not provide a ground reference potential "from the signals received from the transmitter," that is of no moment at this stage of the litigation. Dr. Vaughn's opinions merely create a fact dispute requiring resolution by a jury.

### 3. Conclusion

█ ClearCube's motion for a partial summary judgment declaring non-infringement of claims 1 and 6 of the '919 patent will be denied.

**D.** *Avocent's Motion for Partial Summary Judgment Declaring that Claims 16–18 of the '919 Patent Are Infringed.*

This court entered an order on May 10, 2006, holding that some accused products marketed by ClearCube literally infringe claims 16–18 of the '919 patent. That partial declaratory judgment and accompanying memorandum opinion were entered as doc. nos. 152 and 153, respectively.

**166.** *See* doc. no. 200 (ClearCube's reply brief),

### PART SEVEN

*Avocent's Motion for a Partial Summary Judgment Declaring That The Patents–in–Suit "Are Not Invalid"*

In the first sentence of the motion docketed in this case as doc. no. 142, Avocent asks the court to render a partial summary judgment declaring that the '997 and '919 patents "are not invalid"—a grammatically-disapproved double-negative (negation of an opposite) that is construed as requesting a judgment declaring the patents-in-suit to be "valid." The motion will be denied for the reasons discussed below.

Congress declared in § 282 of the Patent Act that all issued patents "shall be presumed valid," and the burden of proving invalidity "rest[s] on the party asserting ... invalidity":

> *A patent shall be presumed valid. Each claim of a patent* (whether in independent, dependent, or multiple dependent form) *shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.* Notwithstanding the preceding sentence, if a claim to a composition of matter is held invalid and that claim was the basis of a determination of nonobviousness under section 103(b)(1), the process shall no longer be considered nonobvious solely on the basis of section 103(b)(1). *The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.*

35 U.S.C. § 282 (emphasis supplied); *see also, e.g., American Hoist & Derrick Company v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1358–60 (Fed.Cir.1984).

Ex. L (Vaughn supplemental report), at 5–6.

This statutory presumption of validity is not a principle of substantive law, nor is it "evidence" to be weighed against a challenger's argument of invalidity; instead, it is "a procedural device" that places the burden of going forward with the production of evidence—as well as the burden of persuading a decision-maker that a patent is not valid—upon the alleged infringer, the party asserting invalidity as an affirmative defense. *See, e.g., SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 885 (Fed.Cir.1988) (observing that the presumption "places the burden of proof of facts, and the ultimate burden of persuasion to establish invalidity," on the party attacking validity); *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed.Cir.1988) (same).

 "Thus, unless the alleged infringer undertakes to challenge validity with evidence, the patentee need do nothing to establish its rights under the patent." *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed.Cir. 1992).

The burden of persuasion never shifts. The Federal Circuit has clearly stated in numerous cases that "the burden of persuasion on invalidity must, under the statute, remain at all times on the party asserting invalidity." *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.1984); *see also, e.g., American Hoist & Derrick Co.*, 725 F.2d at 1358 (observing that the burden is "permanent"); *Solder Removal Co. v. U.S. International Trade Commission*, 65 C.C.P.A. 120, 582 F.2d 628, 632–33 (Cust. & Pat.

App.1978) (holding that "the burden of persuasion is and remains always upon the party asserting invalidity").

 Of course, very much like the familiar, burden-shifting, analytical framework crafted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for use in Title VII disparate treatment cases based upon circumstantial evidence, when a challenger presents a *prima facie* case of invalidity, the patent-holder then comes under a burden of producing rebuttal evidence. Even so, "the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Innovative Scuba Concepts, Inc. v. Feder Industries, Inc.*, 26 F.3d 1112, 1115 (Fed.Cir.1994).

 Further, a determination of invalidity "must be predicated on facts established by clear and convincing evidence." *Rockwell International Corporation v. United States*, 147 F.3d 1358, 1362 (Fed. Cir.1998) (citing *National Presto Industries v. West Bend Company*, 76 F.3d 1185, 1189 (Fed.Cir.1996)).[167]

 The foregoing principles underscore the impropriety of that portion of Avocent's motion asking this court to declare the patents-in-suit "valid" (or, as Avocent phrases it, "not invalid"). The Federal Circuit has quite clearly held that it is "neither necessary nor appropriate for a court to declare a patent valid. A trial court is required by Congress . . . to say

---

167. " 'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.' " *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir. 1988) (citing *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247

(1984)); *see also Price v. Symsek*, 988 F.2d 1187, 1191 (Fed.Cir.1993) (same). District courts are instructed to "remain[ ] cognizant" of this heightened standard at the summary judgment stage. *Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed.Cir.1998).

only whether the patent challenger carried its burden of establishing invalidity in the particular case before the court." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1569 (Fed.Cir.1987) (citations and footnote omitted).

## PART EIGHT

*ClearCube's Failure to Provide Evidence of Invalidity Under 35 U.S.C. §§ 102 and 112*

Avocent moves for a partial summary judgment declaring that "ClearCube has failed to provide any evidence of invalidity under 35 U.S.C. §§ 102 and 112." [168] ClearCube concedes these issues: it does not contend that "any reference meets all of the limitations of the patents-in-suit so as to anticipate the claims at issue" under § 102,[169] or that the patents-in-suit are invalid under § 112.[170] This aspect of Avocent's motion, therefore, is due to be granted.

## PART NINE

*The Issues of Whether the '997 Patent is Prior Art to the Asserted Claims of the '919 Patent, and, Whether the '404*

*Patent is Prior Art to Both the '997 and '919 Patents*

In the motion for partial summary judgment docketed as doc. no. 136, ClearCube asks this court to declare that the '404 patent constitutes "prior art" for both of the patents-in-suit, and, that the '997 patent is prior art for the asserted claims of the '919 patent. Conversely, sub-parts (3) and (5) of Avocent's motion for partial summary judgment (doc. no. 142) ask this court to declare that "the '997 patent is *not* prior art to the asserted claims of the '919 patent," and that "Robert Asprey is the sole inventor of the '997 patent claims and the asserted claims of the '919 patent (*i.e.,* claims 1, 6, and 16–18)."

### A. The '404 Patent Is Prior Art to the '997 and '919 Patents

Avocent did not contest ClearCube's contention that the '404 patent constitutes prior art for both of the patents-in-suit, characterizing it as a "red herring argument." [171] Therefore, ClearCube's motion

168. Doc. no. 142, ¶ 5.

169. Section 102 requires that a patent not be "anticipated" by prior art. If a single piece of relevant prior art contains *all* the claimed elements of a patent challenged as invalid under § 102, it is said to "anticipate" the product or process. *See, e.g., ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed.Cir.1998) ("A patent is invalid for anticipation when the same device or method, having all of the elements and limitations contained in the claims, is described in a single prior art reference. An anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed and that its existence was recognized by persons of ordinary skill in the field of the invention.") (citations omitted). *See generally* Robert L. Harmon, *Patents and the Federal Circuit* 92–93 (7th ed.2005) (observing that "anticipation requires that *each and every element* of the claimed invention be disclosed in *a single prior art reference* or embodied in *a single prior art device or practice,*" and that "absence

from the reference of any claimed element negates anticipation") (emphasis supplied) (footnotes omitted). If a *single* prior art reference does not "anticipate" each and every element of the claimed invention, the invention still might be rendered *invalid* if it is proven to have been "obvious" under § 103(a). The requirement of "non-obviousness" is addressed *infra*, in Part Ten, Section A of this opinion.

170. *See* doc. no. 150 (ClearCube's brief in opposition), at iv and 2.

171. Doc. no. 143 (Avocent's Combined Memorandum in support of its motions that the patents-in-suit are not invalid), at 9. Specifically, Avocent replied to ClearCube's motion as follows:

ClearCube's motion *also* seeks summary judgment that the '442 application was filed on January 5, 1994—not January 4, 1994—and therefore, was *not* co-pending with the application that matured into the '404 patent. Ostensibly, ClearCube seeks this sum-

for summary judgment is due to be granted,[172] and the '404 patent will be deemed prior art to the asserted claims of both patents-in-suit.

## B. *Is the '997 Patent Prior Art to the '919 Patent?*

The term "prior art" is not expressly defined in Title 35. *See In re Wertheim,* 646 F.2d 527, 532 (Cust. & Pat.App.1981). Nevertheless, the Federal Circuit has construed the term, as it is used in § 103, as referring "at least to the statutory materials named in 35 U.S.C. § 102." *Riverwood International Corp. v. R.A. Jones & Company, Inc.,* 324 F.3d 1346, 1354 (Fed.Cir. 2003) (citing *In re Wertheim,* 646 F.2d at 532).[173] Both parties point to § 102(e) as the pertinent provision for determining whether the subject matter recited in numbered claim 1 of the '997 patent constitutes

§ 103 prior art to the asserted claims of the '919 patent (*i.e.,* claims 1, 6, and 16–18).

██ The pertinent part of § 102(e) provides that a person is *not* entitled to a patent *if* "the invention was described in ... a patent granted on an application for patent *by another* filed in the United States before the invention by the applicant for patent." 35 U.S.C. § 102(e)(2) (emphasis supplied). A careful parsing of § 102(e)(2)'s language yields four elements that must be satisfied before the numbered claims of a reference patent may be deemed "prior art" under that provision, when read in conjunction with § 103: *i.e.,* "there must be (1) an application for a patent (2) which issues as a patent, (3) filed by another (4) before the invention thereof by the applicant." *In re Ornitz,* 54 C.C.P.A. 1304, 376 F.2d 330, 333 (Cust. & Pat.App.1967).[174] All four of these re-

mary judgment to establish that the '404 patent [that issued on January 4, 1994] is prior art to the two patents-in-suit. But in this litigation, Avocent has never asserted that the '404 patent was not prior art to the patents-in-suit. Indeed, during prosecution of the '442 application [that never issued as a patent], the Patent Office considered the '404 patent to be prior art, applied it as prior art against the '442 application, and allowed the '997 patent to issue over it. Thus, although the '404 patent should *not* be prior art, it no longer matters whether the '404 patent is prior art to the '919 or '997 patents (the Patent Office has said that they are patentable despite their treatment of the '404 patent as prior art)—so Avocent does not contest this red herring argument.

*Id.* Despite the foregoing statements, Avocent goes on to "dispute the underlying factual issue as to the correct date on which the '442 application was filed," *id.* at 10, and argue that the "correct" filing date was Jan. 4, 1994. *Id.* at 10–12. This argument is pertinent to the parties' contentions regarding the precise filing date of the '442 application, which is addressed *infra,* in Part Eleven, Sections E(1) and (2).

**172.** Issues and contentions not raised in a party's brief are deemed abandoned. *See,*

*e.g., Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir.2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir.1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 269 (7th Cir.1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

**173.** The statutory materials named in § 102 include, among many other things, inventions that were "known or used by others" within the United States before the applicant's date of invention, 35 U.S.C. § 102(a), as well as inventions that were patented or described in a printed publication anywhere in the world more than one year prior to the date of the U.S. patent application at issue. *See* 35 U.S.C. § 102(b).

**174.** *See also, e.g., In re Land,* 54 C.C.P.A. 806, 368 F.2d 866, 879 (Cust. & Pat.App.1966)

quirements must be satisfied before a reference may be characterized as "prior art" for determining the validity of a later patent that is challenged as invalid on the ground of "obviousness."

### 1. The first and second requirements of § 102(e)(2)

It is undisputed that the first and second requirements of § 102(e)(2) are satisfied with respect to the '997 patent. The '697 application was filed on October 31, 1996, satisfying the first requirement that there be "an application for a patent." The application issued as the '997 patent on November 21, 2000, satisfying the second requirement that the application "issue[ ] as a patent." [175]

### 2. The fourth requirement of § 102(e)(2)

It also is clear that the fourth element of § 102(e)(2)—the requirement that the '697 application that issued as the '997 patent be filed "before the invention thereof by the applicant"—is satisfied.

When analyzed through the lens of § 102(e)(2), the effective filing date of a § 103 prior art reference "is the *application* filing date, *not* the *patent issuance* date." *In re Bartfeld*, 925 F.2d 1450, 1451 n. 4 (Fed.Cir.1991) (emphasis supplied) (citing *Hazeltine Research, Inc. v. Brenner*, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965)).

It is not unusual, however, for a reference patent to issue after a *series* of patent applications. *See, e.g., In re Wertheim*, 646 F.2d 527 (Cust. & Pat.App.1981). That fact gives rise to the question of which application filing date should apply to the reference patent. *See, e.g., id.* at 533 ("[T]he next question confronting the courts was what filing date was to be accorded a reference patent which issues after a series of applications. How far back can one extend the effective date of a reference patent as 'prior art' in such a case?").

The '697 application that issued as the '997 patent was a continuation-in-part of the '442 application,[176] to which the Pat-

---

(conflating the preceding elements into two: *i.e.*, "(1) the application for the reference patent must have been by one who is legally 'another' and (2) the filing date must be 'before the invention ... by the applicant ...' ").

**175.** See the discussion concerning the '697 application, that issued as the '997 patent, in Part Two, Section C(2) *supra.*

**176.** A "continuation-in-part application" is one of the three types of "continuing" patent applications that are entitled to enjoy the filing date of an earlier, "parent" application. (The other two types of continuing applications are "continuation applications" and "divisional applications.") Such applications are said to have as an "effective filing date" the date upon which the "parent application" was filed. If an application has an "effective filing date" earlier than the *actual filing date,* then prior art having a date *between* the *effective* and *actual* filing dates cannot be used against the application in a challenge to the validity of a patent on the ground of "obviousness." The requirements for claiming continu-

ing application status are that (*i* ) the application must be filed while the parent application is still pending ("copendency"), (*ii* ) at least one invention must be common to the two applications, and (*iii* ) the text of the second application must refer back to the first. *See* Patent and Trademark Office, U.S. Dept. Of Commerce, *Manual of Patent Examining Procedure* §§ 201.06, 201.07, 201.08, 201.11 (7th ed.1998, rev.2000).

A "continuation-in-part application" is an application for patent that has some subject matter in common with the earlier *parent application,* but one that "may also contain additional matter not disclosed in the prior application." *Augustine Medical, Inc. v. Gaymar Industries, Inc.,* 181 F.3d 1291, 1302 (Fed.Cir.1999) (citing *Waldemar Link v. Osteonics Corp.,* 32 F.3d 556, 558 (Fed.Cir. 1994)). *See also In re Wertheim,* 646 F.2d at 536 (providing the useful illustration that, where the initial application contained "subject matter A," a continuation-in-part application "may be said to contain subject matter AB, B representing new matter," and a fur-

ent and Trademark Office assigned a filing date of January 5, 1994. Avocent expressly admits—but only for purposes of the present, "prior art" analysis—that, due to the common subject matter between the '442 application and numbered claim 1 of the '997 patent, the effective filing date for claim 1 is January 5, 1994.[177] *See, e.g.,* 35 U.S.C. § 120; *In re Wertheim,* 646 F.2d 527 (Cust. & Pat.App.1981). That date was "before" the inventions now challenged by ClearCube for obviousness.

The '076 application, which was filed on *June 3, 1996,* issued as the '919 patent. While the '076 application also was a continuation-in-part application, it is undisputed that the asserted claims of the '919 patent involved the use of "twisted pair conductors"—a term that did not arise in earlier patent applications filed by Cybex. Avocent therefore admits that the appropriate filing date for claims 1, 6, and 16–18 of the '919 patent is June 3, 1996. *See, e.g., Augustine Medical, Inc. v. Gaymar Industries, Inc.,* 181 F.3d 1291, 1302 (Fed. Cir.1999) ("Subject matter that arises for the first time in the [continuation-in-part]

application does not receive the benefit of the filing date of the parent application.").[178]

### 3. The third requirement of § 102(e)(2)

Thus, ClearCube's contention that the subject-matter recited in numbered claim 1 of the '997 patent constitutes prior art to claims 1, 6, and 16–18 of the '919 patent comes down to, and hinges upon, the third element of § 102(e)(2), which may be paraphrased as follows: Was the sole inventor named on the '697 application that issued as the '997 patent (Robert Asprey) *also* the inventor responsible for numbered claims 1, 6, and 16–18 in the '076 application that issued as the '919 patent? In other words, were the relevant inventive entities the same, or different (legally "another")?

### a. Common versus disparate inventors

To qualify as "prior art" under § 102(e), the inventive entity responsible for the subject matter of a prior reference must be different from the inventive entity of the subject matter that is alleged to be

---

ther continuation-in-part application "may be said to contain ABC, C representing the additional new matter in that application").

177. *See* doc. no. 143 (Avocent's combined memorandum), at page (iii) ("Response to Movant ClearCube's Statement)," fact no. 5. As noted in Part Two, Section B *supra,* however, Avocent argues that the '442 application should have been accorded a filing date of January *4,* 1994. Even so, the parties' arguments on this issue are not relevant to the present discussion of "prior art" status, and will be addressed in Part Eleven *infra,* in the context of ClearCube's contention that Avocent engaged in inequitable conduct before the Patent and Trademark Office.

178. A "continuation-in-part application" is entitled to the parent application's filing date as to any subject matter in common, but only its own filing date as to new matter not disclosed in the earlier application. *See* 35 U.S.C. § 120; *see also, e.g., Augustine Medi-*

*cal,* 181 F.3d at 1302 (holding that subject matter recited for the first time in a continuation-in-part application "does not receive the benefit of the filing date of the parent application"); *In re Wertheim,* 646 F.2d at 538–39 (clarifying that, due to the plain language of 35 U.S.C. § 120, portions of a disclosure in an earlier patent application "cannot be found 'carried over' for the purpose of awarding filing dates, unless that disclosure constituted a full, clear, concise and exact description," in accordance with 35 U.S.C. § 112); *In re Lund,* 54 C.C.P.A. 1361, 376 F.2d 982, 988 (Cust. & Pat.App.1967) (holding that, "where a patent purports on its face to be a 'continuation-in-part' of a prior application, the continuation-in-part application is entitled to the filing date of the parent application as to all subject matter carried over into it from the parent application, whether for purposes of obtaining a patent or subsequently utilizing the patent disclosure as evidence to defeat another's right to a patent") (citations omitted).

invalid on grounds of "obviousness." Common inventorship precludes prior art status. *See* 35 U.S.C. § 102(e)(2) (explicitly stating that the prior art reference at issue must be "by another"); *Riverwood International Corp. v. R.A. Jones & Co., Inc.,* 324 F.3d 1346, 1356 (Fed.Cir.2003) (holding that "an application issued to the same inventive entity cannot be prior art under section 102(e)") (quoting *In re Costello,* 717 F.2d 1346, 1349 (Fed.Cir.1983) ("An applicant may also overcome a reference by showing that the relevant disclosure is a description of the applicant's own work. The pertinent inquiry is under 35 U.S.C. § 102(e).")).

Section 111 provides that "[a]n application for patent shall be made, or authorized to be made, by the inventor, except as otherwise provided in this title, in writing to the Director." 35 U.S.C. § 111(a)(1). Section 116 elaborates that requirement in the following manner:

> When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. *Inventors may apply for a patent jointly even though* (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, *or* (3) *each did not make a contribution to the subject matter of every claim of the patent.*

35 U.S.C. § 116 (emphasis supplied).

Robert R. Asprey, a former Cybex employee, was the sole inventor of the claims recited in the '997 patent.[179] In contrast, the '919 patent identifies Asprey, Philip M. Kirshtein, and Thomas V. Lusk as inventors. These facts give rise to at least a suggestion, if not an inference or presumption, of separate inventive entities. *See In re Land,* 54 C.C.P.A. 806, 368 F.2d 866, 881 (Cust. & Pat.App.1966) (observing that "[i]t is certainly in accord with the weight of authority to regard Land and Rogers *individually* as separate legal entities from Land and Rogers as *joint inventors* ") (emphasis supplied) (footnote omitted).

Even so, for purposes of determining § 103 prior art status under § 102(e), the court must probe beyond the names of the inventors listed on the patents. "What is significant is not merely the differences in the listed inventors, *but whether the portions of the reference relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity.*" *Riverwood,* 324 F.3d at 1356 (emphasis supplied) (citing *In re De-Baun,* 687 F.2d 459, 462 (Cust. & Pat.App. 1982)).

On this issue, ClearCube offers little beyond the names of the inventors listed on the patents. Assuming, but not deciding, that this is sufficient "proof" to establish a *prima facie* case that the inventive entities were not the same, but "another," Avocent has come forward with evidence that Robert R. Asprey was the sole inventor of the subject matter that is claimed in the '442 application, the '997 patent, and, numbered claims 1, 6, and 16–18 of the '919 patent.[180]

---

179. *See* doc. no. 143 (Avocent's combined memorandum), Ex. 10 at 2 (Declaration of Robert Asprey filed in the PTO, and averring that he was "the original, first, and sole inventor ... of the subject matter which is claimed and for which a patent is sought on the invention" described in the '697 application that later issued as the '997 patent-in-suit).

180. *See supra* note 24 ('442 application); *see also* doc. no. 143 (Avocent's combined memorandum), Ex. 11 (Declaration of Robert R. Asprey) at ¶ 3 (sole inventor of claims in the '997 patent), ¶ 4 (sole inventor of the claims in the '442 application), and ¶ 5 (sole inventor of subject matter recited in claims 1, 6, and 16–18 of the '919 patent).

The opinion of the Court of Customs and Patent Appeals in *DeBaun* teaches that, when one of two (or more) inventors named on a patent contends that certain elements of the patent claims were his own work, as opposed to that of the other named inventor(s), he must "provide satisfactory evidence, in light of the total circumstances of the case, that the reference reflected is his own work." 687 F.2d at 463 (citing *In re Facius*, 56 C.C.P.A. 1348, 408 F.2d 1396, 1406 (Cust. & Pat.App. 1969), and *In re Land*, 54 C.C.P.A. 806, 368 F.2d 866, 879–80 (Cust. & Pat.App. 1966)). An "unequivocal declaration" submitted by the inventor may suffice,[181] provided it is corroborated.[182]

The '919 patent contains twenty claims, but of those, only claims 1, 6 and 16–18 are alleged by Avocent to have been infringed by ClearCube. Focusing on those claims, Avocent has submitted the sworn declarations of Robert Asprey and Philip Kirshtein, two of the three inventors named in the '919 patent. Asprey, who now is deceased, declared that he was "the *sole inventor* of the subject matter recited in claims 1, 6, and 16—18 of the '919 patent."[183] Asprey described the contributions of Philip Kirshtein and Thomas Lusk to the claims in the '919 patent as follows:

> I note that the '919 patent also names Mr. Philip Kirshtein and Mr. Thomas Lusk as co-inventors. I worked with Mr. Kirshtein and Mr. Lusk when I was an employee of Avocent (then Cybex). In the context of the '919 patent, Mr. Kirshtein and Mr. Lusk worked on the sync signal aspect of that patent. *Those aspects are recited in claims 2 and 3 of the '919 patent, and in the last paragraph of claim 19. Thus, I believe that they are the inventors of the additional subject matter recited in claims 2 and 3, and the sync signal subject matter of claim 19.*[184]

Asprey's statements are wholly corroborated by the declaration of Philip Kirshtein, who swore:

> I did not invent the subject matter recited in claim 1, 6, and 16–18 of the '919

---

**181.** *See DeBaun,* 687 F.2d at 463; *see also Riverwood,* 324 F.3d at 1356 (observing that, even though the *DeBaun* opinion addressed an appeal from a PTO examiner's rejection of DeBaun's application for patent on grounds of "obviousness," in light of an earlier patent issued jointly to DeBaun and another inventor (Noll), the decision was nevertheless instructive on "the use of a reference in a post-issuance validity challenge").

**182.** Not surprisingly, ClearCube urges a heightened burden of proof, relying on *Price v. Symsek,* 988 F.2d 1187 (Fed.Cir.1993), and *Ethicon, Inc. v. United States Surgical Corporation,* 135 F.3d 1456 (Fed.Cir.1998). In *Price,* the Court held that the facts surrounding a claim of derivation or priority of invention must be proved with *clear and convincing evidence,* and under no circumstances will an inventor's testimony, standing alone, meet that burden. *See Price,* 988 F.2d at 1191–94. "[S]ome form of corroboration *must* be shown." *Id.* at 1194 (emphasis supplied) (citation omitted).

"Whether the inventor's testimony has been sufficiently corroborated is evaluated under a 'rule of reason' analysis," where an " 'evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the [alleged] inventor's story may be reached.' " *Ethicon,* 135 F.3d at 1461 (emphasis and brackets in original) (quoting *Price,* 988 F.2d at 1194). Factors bearing on this question include the interest of the corroborating witness, and the corroborating witness's familiarity with the details of the alleged prior structure. *See Price,* 988 F.2d at 1195 n. 3.

This court is not persuaded that *Price* and *Ethicon* are controlling in this case. Even so, ClearCube's argument will be addressed on the merits in the text accompanying note 186 *infra.*

**183.** Doc. no. 143 (Avocent's Combined Memorandum), Ex. 11 (Declaration of Robert R. Asprey) at ¶ 5 (emphasis supplied).

**184.** *Id.,* ¶ 6 (emphasis supplied).

patent. *In fact, to my knowledge, Mr. Robert Asprey, who is a former co-worker of mine, was the sole inventor of the subject matter recited in claims 1, 6 and 16–18.* Mr. Thomas Lusk (also a co-inventor of the '919 patent) and I worked on the video sync signals and how those signals would be processed in the context of Mr. Asprey's video signal transmission system. *As a result of my work, I believe that Mr. Lusk and I are the inventors of subject matter recited in claims 2 and 3 of the '919 patent, and the sync signal aspect of claim 19.*[185]

Significantly, ClearCube offers no evidence to rebut the declarations of Asprey and Kirshtein.

In response to a contention raised by ClearCube,[186] the court finds that the evidence submitted by Avocent rises to the level of clear and convincing proof.[187] Asprey unequivocally testified that he was the sole inventor of the relevant claims. Kirshtein corroborated Asprey's testimony in all respects. Kirshtein's testimony cannot reasonably be called into doubt. In an attempt to impeach, ClearCube notes that Kirshtein is an employee of Avocent, but there is no specific evidence that he stands to benefit directly from his corroboration of Asprey's testimony. Whatever indirect benefits Kirshtein *may* receive would be *de minimis* when compared to the penalties of perjury, under which his declaration was submitted.

ClearCube also notes that the record does not include the testimonial evidence of Thomas Lusk, the third inventor named in the '919 patent. The court finds that the absence of Lusk's testimony does not render the totality of Avocent's evidence to be less than clear and convincing. "It is sufficient if the picture painted by all of the evidence taken collectively gives the [court] 'an abiding conviction' that [Asprey's] assertion of prior conception is 'highly probable.' " *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed.Cir.1993) (quoting *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir.1988)).

4. *Conclusion: The '997 patent is not prior art to the asserted claims of the '919 patent, due to Robert Asprey's common inventorship*

■ Based upon the foregoing, the court concludes that Avocent has produced more than "satisfactory evidence, in light of the total circumstances of the case," that Robert Asprey was the sole inventor of not only the '997 patent, but also the subject matter recited in claims 1, 6 and 16–18 of the '919 patent. *DeBaun*, 687 F.2d at 463. Accordingly, the '997 patent is *not* "prior art" to the asserted claims of the '919 patent.

## PART TEN

*ClearCube's Contention That The Patents–in–Suit Are Invalid For "Obviousness"*

■ Avocent moves for a partial summary judgment declaring that "ClearCube's affirmative defenses under 35 U.S.C. § 103 are defective as a matter of

---

185. *Id.,* Ex. 12 (Declaration of Philip M. Kirshtein) at ¶ 3 (emphasis supplied). *See, e.g., Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir.1993) (observing that "an inventor's testimony, standing alone, is insufficient to prove conception—some form of corroboration must be shown") (citation omitted).

186. *See supra* note 182.

187. " 'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.' " *Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir. 1988) (citing *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984); *see also Price v. Symsek*, 988 F.2d at 1191 (same).

law because ClearCube has failed to identify evidence of a proper motivation, teaching or suggestion for combining the prior art references." [188] Only valid patents give the patent owner the right to exclude others from making or using the patented invention; conversely, an invalid patent cannot be infringed. *See, e.g., Ever–Wear, Inc. v. Wieboldt Stores, Inc.*, 427 F.2d 373, 376 (7th Cir.1970). It follows, therefore, that an alleged infringer who shows that the patents asserted against him are invalid, because it would have been "obvious" to a person of ordinary skill in the relevant art to combine elements found in prior art references and thereby produce the claimed inventions, cannot be liable for infringement. *See* 35 U.S.C. § 103. An assertion of invalidity is an affirmative defense. *See* 35 U.S.C. § 282.

**A.** *The Patent Requirement of "Non–Obviousness"*

The three, fundamental requirements for the issuance of a patent are novelty, utility, and nonobviousness. *See* 35 U.S.C. §§ 101, 102, 103. *See also Graham v. John Deere Company of Kansas City*, 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ("[P]atentability is dependent upon three explicit conditions: novelty and utility as articulated and defined in § 101 and § 102, and nonobviousness . . . as set out in § 103.").

The first two of these requirements are suggested by the Constitutional provision vesting Congress with the power to "promote the Progress of . . . useful Arts, by securing for limited Times to . . . Inventors the exclusive Right to their respective . . . Discoveries." U.S. Const. art I, § 8, cl. 8. The phrase "promote the Progress of" clearly implies that, to be worthy of a patent, an invention must be "new," or

possess *novelty*. This term has been construed as meaning that the invention, with all of its parts and claimed elements, cannot be found in *a single piece of* "prior art." *See, e.g., RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.1984). The requirement that an inventor's "Art" be "useful" in order to merit a patent means that the invention must have *utility;* in other words, it must, at the very least, work. *See, e.g., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1358 (Fed.Cir. 1999) ("The utility requirement of 35 U.S.C. § 101 mandates that any patentable invention be useful and, accordingly, the subject matter of the claim must be operable.").

■ The fact that an inventor's product or process is both novel and useful will not alone merit the issuance of a patent, however. Instead, the invention also must not have been "obvious" to other persons possessing ordinary skill in the same field of relevant art. Thus, if such persons, looking at the same problem addressed by an inventor, would have reached the inventor's solution, the invention is said to be "obvious," and it cannot become the subject of a valid patent. Stated differently, a novel and useful product or process cannot become the subject of a valid patent *unless* the invention was "non-obvious" when made. *See, e.g., Graham*, 383 U.S. at 14, 86 S.Ct. 684 (holding that patentability also depends "upon the 'non-obvious' nature of the 'subject matter sought to be patented' to a person having ordinary skill in the pertinent art") (citing 35 U.S.C. § 103). Congress incorporated this requirement into Section 103, providing that:

A patent may not be obtained though the invention is not identically disclosed

**188.** Doc. no. 142 (Avocent's motion for partial summary judgment declaring that the patents-in-suit are not invalid), ¶ (2).

or described as set forth in section 102 of this title, *if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.* Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a) (emphasis supplied).[189]

### 1. *Obviousness is a question of law*

■ The issue of whether a challenged patent would, or would not, have been "obvious" to a person skilled in the relevant art "is a question of law based on factual inquiries which include: (1) the scope and content of the prior art; (2) the difference between prior art and the claims at stake; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness (secondary factors)." *Akzo N.V. v. United States International Trade Commission,* 808 F.2d 1471, 1480 (Fed.Cir.1986); *see also, e.g., In re Dembiczak,* 175 F.3d 994, 998 (Fed.Cir.1999) (same); *Micro Chemical, Inc. v. Great Plains Chemical Co.,* 103 F.3d 1538, 1545 (Fed.Cir.1997) (same).[190]

### 2. *The presumption of validity applies to the issue of obviousness*

The presumption of validity previously discussed in Part Seven of this opinion encompasses all three requirements of patentability: novelty, utility, *and* non-obviousness. The Federal Circuit succinctly stated the principle in *Structural Rubber Products Co. v. Park Rubber Co.,* 749 F.2d 707 (Fed.Cir.1984), holding that "included within the presumption of validity is a presumption of novelty, a presumption of non-obviousness, and a presumption of utility, *each of which must be presumed to have been met." Id.* at 714 (emphasis supplied) (citing *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567 (Fed.Cir.1983)); *see also, e.g., Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 291–92 (Fed.Cir.1985) (holding that a party asserting invalidity for obviousness "always retains the burden of persuasion on the issue of obviousness until a final judgment is rendered").

■ Where then, as here, an accused infringer defends by asserting that the patents-in-suit are invalid for obviousness, that party must show, with clear and convincing evidence, the existence of prior art references at the time of the invention that, alone or combined with other references, would have rendered the invention

**189.** This additional requirement of patentability flows from the deceptively simple observation that an invention that has utility and also is novel, "in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." *Graham,* 383 U.S. at 14, 86 S.Ct. 684 (quoting S.Rep. No.1979, 82d Cong., 2d Sess. at 6 (1952), and H.R.Rep. No.1923, 82d Cong., 2d Sess. 7 (1952)).

**190.** The so-called "secondary factors" (*i.e.,* objective evidence tending to show non-obviousness) include the "commercial success of the invention, satisfying a long-felt need, fail-

ure of others to find a solution to the problem at hand, and copying of the invention by others." *Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1572 (Fed. Cir.1996) (citing *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566 (Fed.Cir. 1987)). *See also In re Rouffet,* 149 F.3d 1350, 1355 (Fed.Cir.1998) (holding that objective evidence of nonobviousness [secondary considerations] "includes copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention") (citations omitted).

obvious to one of ordinary skill in the art. *See, e.g., Al–Site Corp. v. VSI International, Inc.,* 174 F.3d 1308, 1323 (Fed.Cir.1999) (citations omitted).

**B.** *The Prior Art References Relied Upon by ClearCube as Support for its Contention that the Patents–in–Suit are Invalid for Obviousness*

An initial step in the attempt to determine whether a party has presented clear and convincing evidence that patents-in-suit are invalid for obviousness is that of comparing the asserted claims to the scope and content of the prior art references relied upon by the alleged infringer. *See Graham,* 383 U.S. at 17, 86 S.Ct. 684; *see also, e.g., Riverwood International Corporation v. R.A. Jones & Company, Inc.,* 324 F.3d 1346, 1354 (Fed.Cir.2003).[191] Clear-Cube relies upon various combinations of prior art references as the bases for its argument that the patents-in-suit are invalid for obviousness under § 103.

*With regard to the '997 patent,* Clear-Cube asserts two binary combinations of elements from three *undisputed* prior-art references for the purpose of showing the invention was "obvious": *i.e.,* (1) elements found in the '404 patent and U.S. Patent No. 4,054,910, issued on October 18, 1977 ("the Chou patent"); and (2) elements found in the '404 patent and U.S. Patent No. 5,130,793, issued on July 14, 1992 ("the Bordry patent").

*With regard to the '919 patent,* Clear-Cube asserts four binary combinations of elements from five *purported* prior-art references for the purpose of showing the invention was "obvious." The combinations are: (1) *elements found in the '997 patent* and U.S. Patent No. 5,283,789, issued on February 1, 1994 ("the Gunnarsson patent"); (2) *elements found in the '997 patent* and the Patent Cooperation Treaty, International Publication No. WO 94/30012, published on December 22, 1994 ("the McDermott publication"); (3) elements found in the '404 patent and the McDermott publication; and (4) elements found in the '404 patent, together with elements from both the Gunnarsson patent and the so-called "Copper publication" (*i.e.,* D.E. Dodds, S. Kumar, G. Erker, G. Wells & G. Bradley, "Copper Access for Switched Video Services," published in the *1994 Proceedings* of the Canadian Conference on Electrical and Computer Engineering 25–28 (Vol. 2 1994)).[192]

**1.** *Impact of conclusion that the '997 patent is not prior art to the asserted claims of the '919 patent*

However, as a result of this court's conclusion that "the '997 patent is *not* 'prior art' to the asserted claims of the '919 patent" (see the discussion in Part Nine, Sections B(3) and (4) *supra* ), the combinations recited in (1) and (2) of the immediately preceding paragraph no longer may

191. A court also may have to determine the differences (if any) between the prior art and the patent claims at issue, and the level of ordinary skill in the pertinent art at the time the invention was made (*i.e., what would have been "obvious" to the hypothetical person of ordinary skill in the relevant art?* ). *See Graham,* 383 U.S. at 17–18, 86 S.Ct. 684; *see also id.* at 18, 86 S.Ct. 684 (observing that "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context," and that the court's inquiry "should be amenable to a case-by-

case development"). Secondary considerations, such as the commercial success of the challenged invention, also may have relevancy to the analysis. *Id.* at 17–18, 86 S.Ct. 684.

192. A useful diagram of the contentions is found in doc. no. 150 (ClearCube's brief in opposition) at Ex. E. *See also id.* Ex. C (Aug. 2, 2004 invalidity report of Gregg L. Vaughn); *id.* Ex. F (Chou patent); *id.* Ex. F (Gunnarsson patent); *id.* Ex. I (Bordry patent); *id.* Ex. J (McDermott publication); and *id.* Ex. K (Copper publication).

be considered on the issue of the obviousness of the '919 patent.

2. *Impact of rulings on Avocent's motion to strike Dr. Vaughn's supplemental report*

Moreover, as a result of this court's rulings on Avocent's motion to strike the supplemental report of Dr. Gregg Vaughn, discussed in Part Five, Section D *supra*, only the following paragraphs from Vaughn's supplemental report may be taken into account when determining whether ClearCube has established by clear and convincing evidence that the patents-in-suit are not valid for "obviousness":

20. Asprey's report, as specifically incorporated by Mr. McAlexander in his second supplemental report, attempts to generally distinguish various references and show their inapplicability by a long discussion, flawed in many places, about televisions signals. As to McDermott and Bordry, McAlexander (Asprey) overlooks that McDermott and Bordry specifically relate to RGB signals, not the television signals which McAlexander attempts to discuss. Further, by focusing on the details of television signals, McAlexander (Asprey) ignores that the references all relate to transmission of video signals over a distance over a pair of wires, generally twisted pairs, and generally discuss compensation or equalization of the video signals. As further discussed below, each of those references are particularly relevant to the issue of obviousness of the '919 Patent and the '997 Patent.

22. As more background and applicable to all of my invalidity omissions, one of ordinary skill in the art at the time of the '919 Patent knew that the color signals sent to a VGA monitor have the same voltage levels and terminating impedances as the color signals sent to a RGB monitor. There were conversion circuits for converting VGA to RGB that clearly showed that no conversion was needed for the three color signals. (e.g. VGA to RGB Converter 1995) A designer would have also known that there were computers that used RGB monitors with frequencies much higher than NTSC video signals. An example is the SUN-3 computer systems with the Sony P2 GDM-1604 color monitor, whose End-of-Support Life was April 1996, showing that it had already been available. This system also used video signal frequencies much higher than those of conventional color television. The resolution was 1152 by 900 pixels and the pixel frequency was 92.94 MHz. In addition it had the analog color video signals on separate conductors from the synchronization signals. (Sun3 April 1996)

41. Asprey's report, as specifically incorporated by Mr. McAlexander in his second supplemental report, attempts to generally distinguish various references and show their inapplicability by a long discussion, flawed in many places, about televisions signals. As to McDermott and Bordry, McAlexander (Asprey) overlooks that McDermott and Bordry specifically relate to RGB signals, not the television signals which he attempts to discuss. Further, by focusing on the details of television signals, McAlexander (Asprey) ignores that the references all relate to transmission of video signals over a distance over a pair of wires, generally twisted pairs, and generally discuss compensation or equalization of the video signals.[193]

193. Doc. no. 174 (Avocent's motion to strike), Ex. 1, Dr. Vaughn's supplemental report, at 7 and 10.

**C.** *The Problems Attendant to Combining Prior Art References*

The instruction in § 103 to view a patent "as a whole" prevents evaluation of an invention part by part.[194] This was the clear holding of the Federal Circuit in *Ruiz v. A.B. Chance Co.,* 357 F.3d 1270 (Fed.Cir.2004), stating that:

> Without this important requirement, an obviousness assessment might break an invention into its component parts (A + B + C), then find a prior art reference containing A, another containing B, and another containing C, and on that basis alone declare the invention obvious. This form of hindsight reasoning using the invention as a road map to find its prior art components, would discount the value of combining various existing features or principles in a new way to achieve a new result—often the very definition of invention.
>
> Section 103 precludes this hindsight discounting of the value of new combinations by requiring assessment of the invention as a whole.

*Id.* at 1275 (citation omitted).

The statutory command to consider the claimed invention "as a whole," rather than part by part, is an implicit recognition of the fact that virtually all inventions "arise from a combination of old elements *and each element may often be found in the prior art.*" *In re Kahn,* 441 F.3d 977, 986 (Fed.Cir.2006) (emphasis supplied); *see also, e.g., Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1575 (Fed.Cir.1987) ("Virtually all inventions are necessarily combinations of old elements."); *Environ-*

*mental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 698 (Fed.Cir.1983) (same).

"The notion, therefore, that combination claims can be declared invalid merely upon finding similar elements in separate prior patents would necessarily destroy virtually all patents and cannot be the law under the statute, § 103." *Panduit Corp.,* 810 F.2d at 1575 (footnotes omitted). "If identification of each claimed element in the prior art were sufficient to negate patentability, very few patents would ever issue." *In re Rouffet,* 149 F.3d 1350, 1357 (Fed. Cir.1998).

■ Therefore, an alleged infringer "cannot pick and choose among individual parts of prior art references 'as a mosaic to recreate a facsimile of the claimed invention.'" *Akzo N.V. v. United States International Trade Commission,* 808 F.2d 1471, 1481 (Fed.Cir.1986) (quoting *W.L. Gore & Associates, Inc. v. Garlock,* 721 F.2d 1540, 1552 (Fed.Cir.1983)); *see also, e.g., Micro Chemical, Inc. v. Great Plains Chemical Co.,* 103 F.3d 1538, 1546 (Fed.Cir.1997) (holding that an evaluation of a challenged invention for obviousness "must involve more than indiscriminately combining prior art") (citation omitted).

1. *The requirement of "some teaching, suggestion, or motivation" in the prior art for selecting and combining references*

The Federal Circuit enforces § 103's direction to assess an invention "as a whole," and thereby discourages parties and district courts from cobbling together "a fac-

---

**194.** Section 103 is quoted in the text accompanying note 189 *supra;* even so, for convenience, it is again set out below:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior

art are such that *the subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a) (emphasis supplied).

simile" of the claimed invention by indiscriminately combining prior art references, by requiring

> a showing that an artisan of ordinary skill in the art at the time of invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would select the various elements from the prior art and combine them in the claimed manner. In other words, the examiner or court must show some suggestion or motivation, before the invention itself, to make the new combination.

*Ruiz,* 357 F.3d at 1275; *see also, e.g., In re Rouffet,* 149 F.3d at 1357 (same); *In re Johnston,* 435 F.3d 1381, 1384–85 (Fed.Cir. 2006) ("Precedent requires that to find a combination obvious there must be some teaching, suggestion, or motivation in the prior art to select the teachings of separate references and combine them to produce the claimed invention."); *Pro–Mold and Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1573 (Fed.Cir.1996) ("It is well-established that before a conclusion of obviousness may be made based on a combination of references, there must have been a reason, suggestion, or motivation to lead an inventor to combine those references.").[195]

"Combining prior art references without evidence of such a suggestion, teaching, or motivation simply takes the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability—the essence of hindsight." *In re Dembiczak,* 175 F.3d 994, 999 (Fed.Cir.1999) (collecting cases).

■■■■ In practice, the teaching-suggestion-motivation requirement demands that a party who challenges a patent on the ground of obviousness present clear and convincing evidence as to "why" a person of ordinary skill in the relevant art "would have [been] led," at the time of the challenged invention, to *select* and *combine* the particular references relied upon as prior art, to achieve the invention at issue. *In re Kahn,* 441 F.3d at 986.

> An explicit teaching that identifies and selects elements from different sources and states that they should be combined in the same way as in the invention at issue, is rarely found in the prior art. As precedent illustrates, many factors are relevant to the motivation-to-combine aspect of the obviousness inquiry, such as the field of the specific invention, the subject matter of the references, the extent to which they are in the same or related fields of technology, the nature of the advance made by the

---

**195.** Other cases to the same effect include *Karsten Mfg. Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1385 (Fed.Cir.2001) ("In holding an invention obvious in view of a combination of references, there must be some suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in the way that would produce the claimed invention."); *In re Dance,* 160 F.3d 1339, 1343 (Fed.Cir.1998) ("When the references are in the same field as that of the applicant's invention, knowledge thereof is presumed. However, the test of whether it would have been obvious to select specific teachings and combine them as did the applicant must still be met by identification of some suggestion, teaching, or motivation in the prior art, arising from what the prior art would have taught a person of ordinary skill in the field of the invention."); *In re Fine,* 837 F.2d 1071, 1075 (Fed.Cir.1988) (there must be "some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art [that] would lead that individual to combine the relevant teachings of the references"); *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed. Cir.1985) ("When prior art references require selective combination by the court to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself.").

applicant, and the maturity and congestion of the field. Objective indicia are also relevant, *see Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), for the commercial response to an invention is a useful control upon hindsight evaluation of obviousness.

*In re Johnston,* 435 F.3d at 1385. Thus, a showing of some teaching, suggestion, or motivation to combine prior art references is an "essential evidentiary component of an obviousness holding," *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1352 (Fed.Cir.1998), and the party asserting invalidity on the basis of obviousness "must identify specifically the principle, known to one of ordinary skill, that suggests the claimed combination." *In re Rouffet,* 149 F.3d at 1359 (citing *Gechter v. Davidson,* 116 F.3d 1454 (Fed.Cir.1997)).

### a. *The presumption of validity applies to the issue of combining prior art references*

Nowhere does the presumption of validity have greater force than in the matter of the propriety of combining prior art references. *See, e.g., Panduit Corp.,* 810 F.2d at 1570 ("The presumption mandated by § 282 is applicable to all of the many bases for challenging a patent's validity. When, as here, the sole challenge is an allegation of obviousness, *the presumption is that the invention would not have been obvious.*") (emphasis supplied); *Ashland Oil,* 776 F.2d at 293 ("Where the party asserting invalidity must rely upon a combination of prior art references to establish invalidity, that party bears the burden of showing some teaching or suggestion in those references which supported their use in combination.") (citations omitted).

### D. *The Deficiencies of ClearCube's Proofs*

Essentially, ClearCube's argument comes down to the broad and conclusory assertion that it would have been obvious at the time of the subject inventions to a person of ordinary skill in the art "of video transmission"—*i.e.,* someone holding "a Bachelor of Science degree in Electrical Engineering and at least four years of experience in the field" [196]—to combine the information contained in each binary set of prior art references identified by its expert witness,[197] *because:* (a) *with regard to the '919 patent,* both references listed in each binary set "deal with the transmission of RGB video signals without loss of signal quality";[198] and (b) *with regard to the '997 patent,* both references in each binary set relied upon "deal with the amplification and frequency compensation of video signals in order to preserve the quality of the signals."[199]

The "reference-by-reference, limitation-by-limitation" comparison set forth in the charts incorporated into the reports of ClearCube's expert witness do not explain

---

196. Doc. no. 150 (ClearCube's brief in opposition to Avocent's motion for partial summary judgment that the patents-in-suit are not invalid), Ex. C (Aug. 2, 2004 Expert Report of Gregg L. Vaughn, Ph.D.) § II, at 2.

197. *See* Part Ten, Sections B(1) and (2) *supra.*

198. Doc. no. 150 (ClearCube's brief in opposition to Avocent's motion for partial summary judgment that the patents-in-suit are not invalid), Ex. C (Aug. 2, 2004 Expert Report of Gregg L. Vaughn, Ph.D.) § III, at 7 (Asprey's '404 patent and the McDermott publi-

cation) and 15 (Asprey's '404 patent, the Gunnarsson patent, and the Copper publication). Dr. Vaughn's reliance upon Asprey's '997 patent, in combination with either the McDermott publication (*id.* at 3) or the Gunnarsson patent (*id.* at 11) is precluded by this court's holding in Part Nine, Section B(4) of this opinion. However, even if that were not so, the conclusion here would be the same.

199. *Id.* § IV, at 19 (Asprey's '404 patent and the Chou patent) and 21 (Asprey's '404 patent and the Bordry patent).

how the various references "teach or suggest their combination ... to yield the claimed invention," *In re Dembiczak,* 175 F.3d at 1000, nor do they answer the question of "why" a person of ordinary skill in the relevant art "would have [been] led," at the time of the challenged invention, to *select* and *combine* the particular references relied upon and, thereby, achieve the inventions at issue. *In re Kahn,* 441 F.3d at 986. *See also, e.g., Al–Site Corp. v. VSI International, Inc.,* 174 F.3d 1308, 1324 (Fed.Cir.1999) ("Rarely ... will the skill in the art component operate to supply missing knowledge or prior art to reach an obviousness judgment.") (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed.Cir.1983)("To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.")).

ClearCube does not explain whether a combination of the teachings of any (or all) of the sets of prior art references relied upon would have suggested, expressly or by implication, the possibility of achieving further improvement by combining such teachings along the line of the patents-in-suit. *See In re Sernaker,* 702 F.2d 989, 994 (Fed.Cir.1983).

**E. *Conclusion***

 In summary, ClearCube has failed to present clear and convincing evidence of any motivation to choose and combine the prior art references relied upon. It provides no reasons that a person of ordinary skill in the art, seeking to avoid degradation of computer-generated, analog color video signals transmitted by twisted pair wires conductors over extended distances, would have selected the prior art references listed, and combined them in a manner that rendered the patents-in-suit obvious.

"The range of sources" relied upon by ClearCube "does not diminish the requirement for actual evidence. That is, the showing must be clear and particular. Broad conclusory statements regarding the teaching of multiple references, standing alone, are not 'evidence.' " *In re Dembiczak,* 175 F.3d at 999 (citations omitted).

As a consequence, Avocent's motion is due to be granted, and this court will enter a partial summary judgment declaring that "ClearCube's affirmative defenses under 35 U.S.C. § 103 are defective as a matter of law because ClearCube has failed to identify evidence of a proper motivation, teaching or suggestion for combining the prior art references." [200]

## PART ELEVEN

### *Motions Pertaining to the Accusation of "Inequitable Conduct" Before the Patent and Trademark Office*

ClearCube's amended answer asserts affirmative defenses and counterclaims under the judicially-created doctrine of "inequitable conduct." [201] In response, Avocent moved for a partial summary judgment declaring that it engaged in "no inequitable conduct." [202]

Inequitable conduct is an offense against the Patent and Trademark Office and the public. The offense is committed most commonly by intentional failures to submit material information to a patent examiner, or by making knowingly false or misleading statements to the examiner, in such a

---

**200.** Doc. no. 142 (Avocent's motion for partial summary judgment declaring that the patents-in-suit are not invalid), ¶ (2).

**201.** *See* doc. no. 61 (ClearCube's First Amended Answer), ¶¶ 26–42 and 56–77.

**202.** *See* doc. no. 157.

manner that it can be confidently said that, by deceitful intent, the patent prosecution process has been subverted. Although the conduct giving rise to judgments of unenforceability thus occurs in front of the patent examiner, the offense is considered deserving of its penalty because the processes of the Patent and Trademark Office have been transgressed. *See, e.g., Akron Polymer Cont. Corp. v. Exxel Cont. Inc.,* 148 F.3d 1380 (Fed.Cir.1998).

There are three parts to ClearCube's charge of inequitable conduct by Avocent. First, it is undisputed that Robert Asprey, Thomas Lusk, and Philip Kirshtein were the named inventors on the '076 application, which matured as the '919 patent. Mark Clodfelter was the prosecuting agent. ClearCube asserts that, during prosecution of the '076 application, one of the inventors, or Clodfelter, or all four individuals, intentionally failed to disclose to the patent examiner certain information known to them to be material to patentability. Specifically, it is alleged that information regarding the following Cybex products was deliberately withheld: the "Extender," the "PC Extender," the "PC Extender Plus," the "Autoboot Commander," and the "Autoboot Commander 4XP." [203]

Second, it is undisputed that, during prosecution of the '076 application, the patent office initially rejected pending claim 20 on the basis that the subject matter recited therein was "obvious" in light of prior art. ClearCube contends that Mark Clodfelter committed inequitable conduct to overcome the rejection. Specifically, ClearCube alleges that he misrepresented the filing date of an earlier Cybex patent application for the purpose of narrowing the scope of the prior art being examined by the patent examiners, and that the mis-

representation resulted in a withdrawal of the rejection by the patent examiner.[204]

Finally, ClearCube alleges that during prosecution of the '697 application, which matured as the '997 patent, inventor Robert Asprey and the prosecuting attorney, Charles Phillips, intentionally failed to disclose to the patent office certain information known to them to be material to patentability. Specifically, ClearCube alleges that information regarding the "Extender," the "PC Extender," and the "PC Extender Plus" were not disclosed.[205]

Several pending motions relate to ClearCube's assertion of inequitable conduct, but two motions in particular address the heart of the defense:

(1) That aspect of Avocent's motion for partial summary judgment seeking a declaration "against Defendant ClearCube Technology, Inc.'s inequitable conduct affirmative defenses and counterclaims" (doc. no. 157); and,

(2) "Defendant ClearCube's Motion for Summary Judgment for Unenforceability of Avocent's '919 and '997 Patents" (doc. no. 171).

The other motions that arguably relate to the inequitable conduct analysis are the following:

(3) That aspect of Avocent's motion for partial summary judgment seeking a declaration that the '442 application was filed on January 4, 1994, in accordance with 35 U.S.C. § 21 and 37 C.F.R. § 1.10 (doc. no. 142);

(4) That aspect of ClearCube's motion for partial summary judgment seeking a declaration that: (*i*) the filing date of the '442 application is January 5, 1994; (*ii*) the '442 application lacks copendency with the '689 application, which issued as the '404 patent; and

---

**203.** *See* doc. no. 61 (First Amended Answer), ¶¶ 40, 75.

**204.** *See id.,* ¶¶ 31–39, 63–74.

**205.** *See id.,* ¶¶ 27, 58.

(*iii*) accordingly, no Avocent application or patent can claim priority to the '689 application/'404 patent to receive an earlier effective filing date (doc. no. 136);

(5) That aspect of Avocent's motion for partial summary judgment seeking a declaration that "under Manual of Patent Examining Procedure § 609 and the case law interpreting and applying that rule, Avocent and its patent agent, Mr. Clodfelter, were not obligated to re-cite the '404 patent because it was considered by the Patent Office during prosecution of the parent '442 patent application" (doc. no. 157); and,

(6) That aspect of Avocent's motion for partial summary judgment seeking a declaration that, "under 37 C.F.R. § 1.312, Avocent and its patent agent, Mr. Clodfelter, were not required or obligated to withdraw the '919 patent application from issue based upon the changes made by the June 24, 1999 Rule 312 Amendment" (doc. no. 157).

**206.** Doc. no. 190 (ClearCube's brief in opposition), Ex. SS (July 15, 2004 deposition of Robert Asprey), at 8–11.

**207.** *Id.* at 11–13.

**208.** *Id.* at 13.

**209.** Robert Asprey explained the gist of the invention and its practical uses in the following passages from his deposition testimony:

Q. Tell me what the commander switch was, please.

A. It allowed one keyboard and monitor to hook up to any of several computers controlled by the operator, so you could select which computer they wanted their keyboard and monitor.

Q. What was its main application, that switch?

A. It started servicing a particular customer that had an atomic power plant with insufficient room inside the plant. They had to have several computers and didn't have room for the keyboard and monitor.

### A. Facts Relevant to the Accusation of Inequitable Conduct

Robert Asprey received a Bachelor of Science degree in electrical engineering from New Mexico State University in 1979. Five years later, during 1984, he began working for Avocent's predecessor, Cybex Computer Products Corporation.[206] One of Asprey's first projects was the development of a system for the transmission of *digital* video signals generated by a computer over extended distances.[207] This invention was commercially marketed in 1985 or 1986 and, to the best of Asprey's recollection, it was called "the Extender." [208]

Asprey's work for Cybex also focused on a so-called "commander switch," which allowed a user, sitting in front of a *single* keyboard and monitor, to receive and transmit information from *a plurality* of computers. The "switch" was the key mechanism that allowed the user to "select" which computer was being interfaced.[209]

So they contacted us and asked if it was possible to use a combination of our [digital] extension and a switch to hook up multiple computers, and we listened to our customer and did what they asked.

Q. And that's what you provided to that customer?

A. Yes.

Q. Could you describe to me: What was the way in which that system was set up? And what I mean by that is: The extension product and where the switch would be located versus where the user was and where the computer was, can you describe how that arrangement would be.

A. It was actually a modular system. The switch was a stand-alone unit. And it could plug in directly and have the computer run it there. Or they could plug two computers in locally, or they could use one of our standard extension products and put the computer at a distance or multiple computers at a distance. So really all we did was allow multiple com-

Asprey testified that much of his subsequent work for Cybex focused on permutations of, and improvements upon, the "extension" products and the "switch" device.[210] For example, Asprey worked on the "Autoboot Commander" in either the late–1980's or early–1990's.[211] He was assisted by Cybex's Chief Technician, Thomas Lusk.[212] The AutoBoot Commander was designed to address one practical pitfall of using a "switch" to connect a single keyboard to a number of different computers: a computer would not "boot" if it was "switched away" from the keyboard. Asprey explained this problem and its solution as follows:

Q. Can you tell us what the AutoBoot Commander is, please.

A. The auto-boot term in the AutoBoot Commander had to do with the fact that—probably everybody here has at one time or another turned on a computer that didn't have a keyboard plugged in, and it comes up to a certain point and stops and stays there for eternity unless you interact with it. And so if you were *switched away* from the keyboard when you're booting the computer, it would not detect

a keyboard present and it would hang the computer until you switched over or pressed the F1 key or whatever to continue. And so the AutoBoot took care of that problem. You could have a rack of computers, power them all on, and it would simulate the full presence of the keyboard—or I should say sufficient presence of the keyboard to satisfy the keyboard that there was, in fact, a keyboard present.[213]

Like Avocent's predecessor inventions, the original AutoBoot Commander was designed to be compatible with computer systems that transmitted *digital* video signals.[214] As explained in Part Two of this opinion, however, an *analog* video standard called the Video Graphics Adapter ("VGA") was introduced by IBM in the early–1990's. One of Asprey's first adaptations for the VGA standard was the "PC–Extender Plus," which was simply an "analog equivalent" of his first invention, the "Extender." [215] The fundamental goal of the subject matter remained the same: to allow the transmission of computer video signals (now generated in *analog* format) over extended distances.[216] There also is evidence indicating that the Auto-

puters to share the same keyboard and monitor.

 . . . . .

Q. .... [So] the purpose of the switch was to allow the user to switch among various computers to interact with[,] to use?

A. Yes, that's correct.

Doc. no. 190 (ClearCube's brief in opposition), Ex. SS (July 15, 2004 deposition of Robert Asprey), at 22–24.

**210.** *Id.* at 25–26.

**211.** *See id.* at 28.

**212.** Doc. no. 190 (ClearCube's brief in opposition), Ex. SS (July 15, 2004 deposition of Robert Asprey), at 27.

**213.** *Id.* at 26–27. An advertisement for the AutoBoot Commander also described Asprey's invention as follows:

 Commander's built-in AutoBoot feature intelligently manages the boot process for all

of your attached computers. During initial power-up or after a power failure, Commander will boot all computers transparently and simultaneously, without operator intervention. By fully emulating a keyboard and mouse at every computer, Auto-Boot technology assures error-free booting every time.

*Id.,* at deposition exhibit 21 (Document bearing Bates stamp No. 2147) (boldface emphasis in original).

**214.** *See* doc. no. 190 (ClearCube's brief in opposition), Ex. SS (July 15, 2004 Asprey deposition), at 28.

**215.** *See id.* at 31.

**216.** *See id.* at 32.

boot Commander was modified to be compatible with a full range of monitor types, including those supporting the VGA standard.[217]

Sometime during this period, Cybex hired Phillip Kirshtein, a person described by Asprey as "one of the best engineers I've ever known."[218] Kirshtein collaborated with Asprey on a number of projects, including further inventions for the transmission of analog video signals over extended distances.[219]

**1. Charles Phillips and Mark Clodfelter**

Charles Phillips was a patent attorney in Huntsville, Alabama during the time period relevant to this suit. In 1980, he employed his son-in-law, Mark Clodfelter, to assist his practice. Clodfelter did not have either a law degree or any prior patent experience, but he quickly learned how to become a patent draftsman.[220]

Phillips was retained by Cybex in the 1980's to prosecute the company's first patent applications.[221] Robert Asprey described the interaction between Cybex's inventors, on the one hand, and Phillips and Clodfelter on the other, as an "itera-

tive process."[222] Asprey and his colleagues described their inventions to Phillips and Clodfelter, who then drafted the patent language claiming the subject matter of their concepts. The two sides conferred repeatedly to ensure that what was claimed appropriately described the invention.[223] Asprey recalled that Phillips and Clodfelter "worked as a team."[224] Clodfelter also testified that, during all times relevant to this suit, he and Phillips collaborated extensively on their patent cases.[225]

**2. The '689 application that issued as the '404 patent**

Phillips was the prosecuting attorney for the '689 application filed on July 13, 1992,[226] that ultimately issued as the '404 patent. Clodfelter assisted in drafting the application.[227] Claim 1 of the '404 patent recites (in part) a "non-inverting, constant current voltage amplifier,"[228] and the remaining claims (2-6) are dependent upon claim 1. The '404 patent specification also includes six drawings, and a "switching circuit" is disclosed in Figure 1. The "switching circuit" receives analog video signals from a plurality of computers, and selectively outputs the signals to an amplifier for transmission to a monitor.[229]

**217.** See id. at deposition Ex. 21 (document bearing Bates stamp No. 2150).

**218.** See doc. no. 190 (ClearCube's brief in opposition), Ex. SS (July 15, 2004 Asprey deposition), at 52.

**219.** See id. at 52–53.

**220.** See doc. no. 171 (ClearCube's motion for summary judgment), Ex. P (Deposition of Mark Clodfelter), at 35–39.

**221.** See doc. no. 190 (ClearCube brief in opposition), Ex. SS (Asprey deposition), at 102.

**222.** Id. at 103. "Iterative" is defined as "marked by or involving repetition or reiteration or repetitiousness or recurrence." Webster's Third New International Dictionary 1203 (2002).

**223.** See doc. no. 190 (ClearCube brief in opposition), Ex. SS (Asprey deposition), at 102–03.

**224.** Id. at 104.

**225.** See doc. no. 171 (ClearCube's motion for summary judgment), Ex. P (Clodfelter deposition), at 37–44.

**226.** See id. at 168.

**227.** See id. at 80.

**228.** See id., Ex. S ('404 patent), col. 6, line 43.

**229.** See id. at Figure 1. See also, e.g., id., col. 2, lines 31–39 (describing the switching circuit (element 16) as being "coupled" to the input region of the amplifier).

**3.** *The filing date of the '442 application*

Clodfelter testified that he mailed the '442 application to the Patent and Trademark Office on January 4, 1994, *the same day upon which the '404 patent issued.* That application described various systems for the transmission of analog color video signals, and purported to be a continuation-in-part of the '689 application that had issued earlier the same day as the '404 patent.[230] Phillips was the prosecuting attorney named in the '442 application,[231] but Clodfelter assisted in drafting it.[232]

Clodfelter testified that he drove to a U.S. Postal Service station at approximately 8:00 p.m. Central Standard Time on January 4, 1994.[233] The station was closed,[234] but Clodfelter still had access to a "drop box" designated for the deposit of express mail items. Clodfelter said that he deposited Cybex's '442 patent application in the drop box that evening,[235] and completed an "Express Mail Certificate" reflecting January 4, 1994 as the document's "date of deposit."[236]

The following day, however, a Postal Service employee inscribed Clodfelter's express mail label with a "date in" of January 5, 1994, and a "time in" of "1617" (*i.e.*, 4:17 p.m.).[237]

The Patent and Trademark Office received the '442 application on January 6, 1994, and subsequently determined that the legal filing date was January 5, 1994. The reviewer correctly noted that the date written on the Express Mail Certificate by Clodfelter was January 4, but the "date in" inscribed on the label by a postal employee was January 5, 1994. The reviewer recorded the reason for assigning the '442 application a filing date of January 5 as follows: "the date on the certificate does not coincide with the date of deposit on the Express Mail label which the PTO takes as evidence of when the package was mailed .... Applicant cannot receive an earlier date than the 'In Date' from the Post Office."[238]

Phillips learned that the '442 application had been assigned a January 5 filing date sometime during the following month.[239] He mailed a "Request for Corrected Filing Receipt," which was received by the PTO on March 7, 1994.[240] Phillips argued that the correct filing date of the '442 application was January 4, as evidenced by the Express Mail certificate completed by Clodfelter. Phillips reiterated his position in correspondence received by the patent office on April 3, 1995,[241] and again in

---

230. *See* doc. no. 136 (ClearCube's motion for summary judgment), Ex. D ('442 application).

231. *See, e.g.,* doc. no. 171 (ClearCube's motion for summary judgment), Ex. B (patent office notice regarding the '442 application addressed to "C.A. Phillips").

232. *See id.,* Ex. P (Clodfelter deposition), at 169.

233. *See id.* at 91.

234. *See id.* at 120–21.

235. *See id.* at 91.

236. *See, e.g.,* doc. no. 143 (Avocent's memorandum and evidentiary submission), Ex. 6, at Bates number 8975.

237. *See id.* at Bates stamp number 8976.

238. Doc. no. 136 (ClearCube's motion for summary judgment on prior art), Ex. H (Jan. 10, 1994 determination).

239. *See* doc. no. 171 (ClearCube's motion for summary judgment on inequitable conduct), Ex. B (Notice to File Missing Parts of Application).

240. *See id.,* Ex. D (Request for Corrected Filing Receipt).

241. *See id.,* Ex. C (Amendment and Election), at 3–4.

correspondence received by the patent office in February 1996.[242]

#### 4. *Rejection of claims in the '442 application in view of the '404 patent*

Meanwhile, Patent Examiner Ulysses Weldon, assigned to "Group Art Unit 2609" in the patent office, was reviewing the '442 application.[243] In November 1995, Weldon rejected pending claim 2 and claims 9–14, after examining them in view of certain claims in the '404 patent. Weldon concluded that these claims in the '442 application were unpatentable over the '404 patent under the judicially-created doctrine of "obviousness-type double patenting."[244]

#### 5. *Simultaneous prosecution of the '442 application and the patents-in-suit*

Cybex filed two continuation-in-part applications during 1996, both of which ultimately issued as the patents-in-suit. The '076 application (issued as the '919 patent) was filed on June 3, 1996. Mark Clodfelter was the prosecuting agent. The application purported, on its face, to be "a continuation-in-part of application Serial No. 08/177, 442 [*the '442 application* ], *filed 01/04/94*, which is a continuation-in-part of application Serial No. 07/912,689, filed on July 13, 1992, now U.S. Patent No. 5,276,-404 [*the '404 patent* ] . . . ." [245]

The '697 application (issued as the '997 patent) was filed on October 31, 1996. Charles Phillips was the prosecuting attorney. The application also purported to be a "continuation-in-part of application Serial No. 08/177,442 [*the '442 application* ], *filed on January 4, 1994*, which is a continuation-in-part of application Serial No. 07/912,689, filed on July 13, 1992, now U.S. Patent No. 5,276,404 [*the '404 patent* ]." [246]

Thus, for a period of time, three Cybex applications were pending before the patent office: the '442 application, the '076 application, and the '697 application.

#### a. *Continuing dispute over the filing date of the '442 application*

In a correspondence received by the patent office on June 17, 1996, Phillips reiter-

---

242. *See id.,* Ex. I (Amendment).

243. *See, e.g.,* doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 11 (Examiner's Action).

244. *See id.* at 5. The Federal Circuit summarized the "double patenting" doctrine in *Perricone v. Medicis Pharmaceutical Corp.*, 432 F.3d 1368 (Fed.Cir.2005), as follows:

The double patenting doctrine generally prevents a patentee from receiving two patents for the same invention. Thus, this doctrine polices the proper application of the patent term for each invention. The proscription against double patenting takes two forms: statutory and non-statutory. Statutory, or "same invention," double patenting is based on the language in § 101 of the Patent Act mandating "a patent" for any new and useful invention. 35 U.S.C. § 101 (2000); *In re Goodman*, 11 F.3d 1046, 1052 (Fed.Cir.1993) ("If the claimed inventions are identical in scope, the proper rejection is under 35 U.S.C. § 101 because an inventor is entitled to a single patent for an invention.") (citations omitted). *Nonstatutory, or "obviousness-type," double patenting* is a judicially created doctrine adopted to prevent claims in separate applications or patents that do not recite the "same" invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection. *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 686 (Fed.Cir.1990) (citing *In re Thorington*, 57 C.C.P.A. 759, 418 F.2d 528, 534 (1969)). *Id.* at 1372–73 (emphasis supplied).

245. Doc. no. 171 (ClearCube's motion for summary judgment), Ex. W ('076 application), at "Cross Reference of Related Applications" (emphasis supplied).

246. *Id.,* Ex. G ('697 application), at "Cross Reference of Related Applications" (emphasis supplied).

ated (for the fourth time) his contention that the correct filing date for the '442 application was January 4, 1994.[247] During his deposition, Clodfelter was asked the following questions concerning that assertion:

Q. Do you recall whether you and Mr. Phillips had discussions regarding whether the '919 patent might be invalid if the filing date [of the '442 application] were not changed by the PTO to January 4, 1994?

A. He was pretty feisty. The whole time I was there, I don't think he ever accepted that. I don't think he ever accepted that possibility.

Q. Was he concerned about it?

A. Of course, he was concerned.

Q. Why was he concerned about the filing date being corrected right away?

MR. JACKSON: Objection, speculation.

Q. Did he ever voice to you his concern?

A. He was concerned about the chain of priority.

Q. When you say "the chain of priority," what does that mean?

A. The pendency of the one case from the other.

Q. And so he was concerned about the 404 and the 442 being codependent at the same time; correct?

MR. JACKSON: Objection, speculation.

A. Yes.[248]

Clodfelter also was asked the following questions during his deposition:

Q. All right. Did you have a concern that 919 might not be issued if 404 was not in the chain?

A. At what point?

Q. At any point.

A. I never considered that an option. I never considered that.

Q. Because you always believed that you had filed it [the '442 application] on January 4th?

A. I thought there were significant differences between the two.

Q. Let me ask you this.

A. Plus the fact that I filed it on the 4th.[249]

**b.** *Notice of rejection?*

The evidentiary materials submitted to this court include a Patent and Trademark Office form dated July 9, 1996,[250] on which the '442 application is clearly marked as the pertinent subject, and stating that the request to change the filing date of that application from January 5 to January 4, 1994 was *rejected*, because the "date requested is different from the 'date in' box on [the] Express Mail Label."[251] The form is generically addressed to the "Applicant or Attorney of Record," but otherwise does not specify Charles Phillips as the intended addressee. The record also does not specify the name of the patent office employee who completed the form or, indeed, confirm whether the form was ever mailed.

**c.** *Abandonment of the '442 application*

The '442 application was abandoned in 1997. Cybex's pending applications thus

---

247. *See id.*, Ex. J ("Amendment under 37 C.F.R. § 1.116"), at 2.

248. *Id.*, Ex. P (Clodfelter deposition), at 115–16.

249. *Id.* at 165.

250. *See id.*, Ex. R (document bearing Bates stamp No. 447).

251. *Id.*

were reduced to two: the '076 and '697 applications.

### 6. *The '076 application and pending claim 20*

The '076 application that ultimately issued as the '919 patent originally included twenty-six claims. The PTO rejected a number of those claims in an October 24, 1998 "Office Action Summary." The rejection included numbered claim 20.[252] The Office Action Summary was completed by Examiner Uyen Le, who was in "Group Art Unit 2711," and reviewed by Supervisory Patent Examiner Andrew Faile, who was in "Group 2700."[253]

Claim 20 recited a computer video signal communications system for transmission of sets of analog color video signals from a plurality of computers to a monitor. The invention required the use of a "switching means" device to selectively transmit each set of signals received from each computer.[254] In reviewing the patentability of claim 20, Le compared the subject matter against the inventions recited in U.S. Patent No. 5,283,789, issued on February 1, 1994 ("the Gunnarsson patent").[255] Le noted that, even though most of the elements found in claim 20 also were found in the Gunnarsson patent, there was an important difference between the two: Gunnarsson did not explicitly mention a "switching means" device for selective transmission of signals. Le nevertheless determined that such a distinction did not render claim 20 patentable, because (as he stated) "Official notice is taken that it is well known in the art to use a video switch to select a video source for transmission."[256] Therefore, Le reasoned that it would have been "obvious" to one of ordinary skill in the art to *combine* the elements of the Gunnarsson patent with the "video switch" device that was "well known in the art," and to thereby create the invention disclosed in claim 20 of the '076 application.[257] The Office Action Summary was mailed to Clodfelter on October 28, 1998.[258]

#### a. *Phillips's fifth request for correction of the filing date of the '442 application*

On February 4, 1999, Charles Phillips sent yet another (his fifth) request to the patent office seeking correction of the filing date of the '442 application.[259] The document was received by the patent office on February 16, 1999,[260] and received in Group 2700 on March 5, 1999.[261] A duplicate copy of Phillips's correspondence was received in Group 2700 on either April 6 or 8, 1999.[262] Phillips again stated his re-

252. Doc. no. 171 (ClearCube's motion for summary judgment), Ex. K (Office Action Summary), at 2.

253. *See id.* at 1 and 8.

254. This court could not locate in the evidentiary record a complete copy of the '076 application, including claim numbered 20. It is undisputed, however, that claim 20 of the '076 application was renumbered and ultimately issued as claim 16 of the '919 patent. The description of the invention in the text is from claim 16 of the '919 patent. *See, e.g.,* doc. no. 190 (ClearCube's brief in opposition), Ex. OO ('919 patent), col. 20, lines 48–55.

255. Doc. no. 171 (ClearCube's motion for summary judgment), Ex. K (Office Action Summary), at 2–3.

256. *Id.* at 3.

257. *See id.*

258. *See id.* at cover sheet of Office Action Summary (Bates stamp No. 909).

259. *See* doc. no. 184 (Avocent's brief in opposition), Ex. Z.

260. *See id.*

261. *See id.*

262. *See* doc. no. 171 (ClearCube's motion for summary judgment), Ex. O.

quest for correction of the filing date of the '442 application from January 5 to January 4, 1994. He stated that correction was "needed because of pending patent applications which depend upon the filing date of subject abandoned patent application."[263]

**b.** *Clodfelter's first (March 4, 1999) amendment in response to the PTO's Office Action Summary rejecting pending claim 20*

Meanwhile, Mark Clodfelter filed an amendment under 37 C.F.R. § 1.116, in direct response to the Office Action Summary denying the patentability of claim 20 in the '076 application. The amendment was received by the patent office on March 4, 1999, but not by Group 2700 of the PTO until March 9, 1999.[264]

With regard to rejected claim 20, the document argued that the functions, structure, and operation of the Gunnarsson patent were vastly different from the system recited in claim 20. Clodfelter devoted over three pages of text, and three hand drawn diagrams, to drive home the point, which Avocent summarized in its brief as follows:

> In addressing the merits of the claim 20 rejection, Mr. Clodfelter demonstrated how Examiner Le had misread the primary Gunnarsson reference. In the Office Action, Examiner Le asserted that Gunnarsson disclosed a system for providing television signals *to computer workstations*. But Mr. Clodfelter

showed that Gunnarsson's television signals are *never* sent to a computer workstation. Instead, the television signals transmitted through the Gunnarsson system are sent to a *television*.[265]

**c.** *Clodfelter's second (March 22/23, 1999) amendment in response to the PTO's Office Action Summary—the "Supplemental Amendment"*

Clodfelter also filed a "Supplemental Amendment" in response to the PTO's Office Action Summary, which was received by the patent office on March 15, 1999, but not received in Group 2700 until either March 22 or 23, 1999.[266] Like the March 4, 1999 amendment, Clodfelter's "Supplemental Amendment" objected to the rejection of pending claim 20. The important difference between the two, however, was that Clodfelter now challenged the "video switch" portion of the obviousness rejection, saying that the prior art relied upon by patent examiner Le was the "applicant's own patent [*i.e.*, the '404 patent], which is a parent of the instant application":

> Applicants patent 5,276,404 [*i.e., the '404 patent* ], which is the *parent* for the instant application, was filed July 13, 1992, *and discloses "switching means for selectively providing a said set of said color video signals from a selected said computer . . .*", as claimed in claim 20. Further, in the referenced patent filed in 1992, Applicants state "in this instance, it is to be appreciated that

---

263. *See* doc. no. 184 (Avocent's brief in opposition), Ex. Z.

264. *See* doc. no. 184 (Avocent's brief in opposition), Ex. X ("Amendment under 37 C.F.R. 1.116"). This document, on its face, does not specify that it was submitted by Mark Clodfelter. However, Avocent states that it was. *See* doc. no. 158 (Avocent's memorandum), at 20.

265. Doc. no. 158 (Avocent's memorandum), at 9 (emphasis in original) (internal citations omitted).

266. *See* doc. no. 171 (ClearCube's motion for summary judgment), Ex. M ("Supplemental Amendment"). The receipt stamps show conflicting dates regarding the date of receipt in Group 2700. One stamp shows March 22, 1999. The other shows March 23, 1999. *See id.*

there would be a discrete circuitry 10 for each of the discrete video signals which, in the instance of a VGA monitor, include primary red, green, and blue analog signals." (Pg. 6, lines 6–10 of instant application). *Clearly, Applicants were selecting and switching sets of R, G, and B computer color video signals from a plurality of computers to a remotely located monitor no later than the filing date in 1992.* Further, Applicants are unaware of any prior art earlier than the filing date of their '404 patent that discloses switching of computer R, G and B color video signals from a plurality of computers to a separately located monitor, also as provided by claim 20. *As such, Applicants submit that the Examiner's assertion of "Official Notice" is taken from Applicants own patent, which is a parent of the instant application, and thus is improper.* Accordingly, Applicants request the Examiner produce a reference prior to Applicants 1992 filing date that supports the "Official Notice" statement by the Examiner, i.e. discloses switching of sets of R, G, and B computer color video signals from a plurality of computers to a separately located monitor, as claimed by Applicants, along with other references properly combinable that disclose the other features of Applicants claims 20, 21. As

stated in the response mailed 03/01/99, Applicants do not believe the Examiner has established a *prima facie* case of obviousness with the references of Gunnarsson and Chou,[267] as required by 35 USC 103.[268]

**d. The PTO's "Notice of Allowability" of pending claim 20**

The rejection of pending claim 20 was withdrawn on March 23, 1999.[269] The reason for doing so was stated in a "Notice of Allowability" initialed by Examiner Uyen Le ("UL") and reviewed by Supervisory Examiner Andrew Faile[270] as follows:

> With regard to claim 20, the prior art of record does not disclose or make obvious a computer video signal communications system for selectively coupling sets of R, G, B computer video signals from one of a plurality of computers to a separately located color monitor through twisted pairs of conductors as recited in claim 20; or otherwise suggest its use together with all the limitations claimed.[271]

The Notice expressly stated that it was "responsive to the amendment filed 4 March 1999"[272]—i.e., Clodfelter's *first* amendment in response to the PTO's Of-

267. Wayne W. Chou and Richard Erett are the named inventors on U.S. Patent No. 4,054,910, issued October 18, 1977. *See* doc. no. 150 (ClearCube's brief in opposition), Ex. G (Chou patent). In the Office Action Summary mailed to Clodfelter on October 28, 1998, Examiner Le determined that claims 21 and 24–26 of the '076 application were unpatentable for obviousness in view of the subject matter recited in the Gunnarsson patent and the Chou patent. *See* doc. no. 171 (ClearCube's motion), Ex. K (Office Action Summary), at 3–5. Those rejections, however, are not pertinent to this case.

268. Doc. no. 171 (ClearCube's motion for summary judgment), Ex. M (Supplemental

Amendment), at 1–2 (underline and ellipses in original) (italicized emphasis supplied).

269. *See* doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 24 (Notice of Allowability).

270. *See id.* at 4. The date "03/23/99" is *directly below* the initials "UL." Supervisory Examiner Faile's stamped signature is to the right, at a significant distance on the page. No date is affixed in the proximity of Faile's signature.

271. *Id.* at 2.

272. *Id.* at 1.

fice Action Summary, as opposed to his *Supplemental* Amendment. The Notice was mailed to Clodfelter on March 30, 1999.[273]

**e.** *Examiner Le's markings on the Supplemental Amendment*

Nearly a month later, on April 28, 1999, Examiner Le inscribed the following markings on the first page of Clodfelter's Supplemental Amendment, in the left hand margin: [274]

**f.** *Rejection of Charles Phillips's request for a change to the filing date accorded the '442 application*

The record includes a patent office form entitled "Application Filing Date," and dated May 27, 1999.[275] The '442 application is identified as the pertinent subject matter, and the form states that the request to change the filing date of the '442 application was *rejected,* because the "date on the Express Mail label is the date given on the Filing Receipt." [276] The form is generically addressed to the "Applicant or Attorney of Record," but otherwise does not identify Charles Phillips as the interested recipient. It also does not specify who completed the form or, indeed, whether it was ever mailed. In any event, and according to Clodfelter's declaration, he was finally told by Charles Phillips sometime in "mid–1999" that the patent office had refused to change the filing date of the '442 application.[277]

**g.** *Amendment under 37 C.F.R. § 1.312*

Clodfelter subsequently filed an amendment to the '076 application (that ultimately issued as the '919 patent) under 37 C.F.R. § 1.312, and it was received in Group 2700 on June 24, 1999.[278] Clodfelter stated that an error in the chain of pendency had been "discovered," and that the filing date of the '442 application, as represented on the face of the '076 application, needed to be changed from January 4 to January 5, 1994. Clodfelter also asked that the specific clause in the '076 application that described the '442 application as a continuation-in-part of the '689 application (that had issued as the '404 patent on January 4, 1994) be deleted.[279]

On July 27, 1999, Examiner Le inscribed on the front page of Clodfelter's amendment "ENTER UNDER ORDER 0.3311." [280] Supervisory Examiner Faile also signed a form, mailed to Clodfelter on July 29, 1999, stating that Clodfelter's Amendment was "entered as directed to matters of form not affecting the scope of the invention (0.3311)." [281]

273. *See id.* at cover page.

274. *See* doc. no. 171 (ClearCube's motion for summary judgment), Ex. M (Supplemental Amendment).

275. *Id.,* Ex. X ("Application Filing Date" form).

276. *Id.*

277. Doc. no. 184 (Avocent's brief in opposition), Ex. L (Declaration of Stephen Mark Clodfelter) ¶ 9.

278. Doc. no. 171 (ClearCube's motion for summary judgment), Ex. L ("Amendment under 37 CFR 1.312").

279. *See id.*

280. *Id.*

281. Doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 26.

### 7. *Issuance of the patents-in-suit*

Even though the '697 application was filed last (October 31, 1996), it issued first, as the '997 patent, on November 21, 2000. Conversely, the '076 application, which was filed first (June 3, 1996), issued last, as the '919 patent, on February 6, 2001. Before issuance, claim 20 of the '076 application was renumbered, and became claim 16 of the '919 patent.

### B. *The Inequitable Conduct Doctrine*

■ Applicants for patents, as well as their representatives, are required to prosecute applications in the patent office with candor, good faith, and honesty. A breach of this duty constitutes "inequitable conduct," which includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir. 1995) (citing *J.P. Stevens & Company v. Lex Tex, Ltd.*, 747 F.2d 1553, 1559 (Fed. Cir.1984)).

■ When conducting an analysis of a party's accusation of inequitable conduct, the district court must first determine whether the party asserting inequitable conduct has proved "a threshold level of materiality and intent by clear and convincing evidence." *Digital Control, Inc. v. Charles Machine Works*, 437 F.3d 1309, 1313 (Fed.Cir.2006). *"Both* of these elements, intent *and* materiality, must be proven by clear and convincing evidence." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335, 1339 (Fed.Cir.2006) (emphasis supplied). *See also, e.g., Allen Organ Company v. Kimball International, Inc.*, 839 F.2d 1556, 1567 (Fed.Cir.1988) (observing that "materiality does not presume intent, which is a separate and essential component of inequitable conduct"). "The court must then determine whether the questioned conduct

amounts to inequitable conduct by balancing the levels of materiality and intent, 'with a greater showing of one factor allowing a lesser showing of the other.'" *Digital Control*, 437 F.3d at 1313 (quoting *Union Pacific Resources Company v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed.Cir.2001)). Ultimately, "[i]n light of all the circumstances, an equitable judgment must be made concerning whether the applicant's conduct is so culpable that the patent should not be enforced." *Molins*, 48 F.3d at 1178 (citing *LaBounty Manufacturing, Inc. v. International Trade Commission*, 958 F.2d 1066, 1070 (Fed.Cir.1992)).

### 1. *The materiality of withheld information, or false and misleading statements to an examiner*

The Federal Circuit has recently recognized that there are at least *five* workable tests for materiality. *See Digital Control*, 437 F.3d at 1314–1316. Three standards emerged from earlier decisions of the federal courts: *i.e.,*

> the *objective* "but for" standard, where the misrepresentation was so material that the patent should not have issued; the *subjective* "but for" test, where the misrepresentation actually caused the examiner to approve the patent application when he would not otherwise have done so; and the "but it may have" standard, where the misrepresentation may have influenced the pa[t]ent examiner in the course of prosecution.

*Digital Control*, 437 F.3d at 1315 (emphasis supplied) (citing *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed.Cir.1984); *Plastic Container Corp. v. Cont'l Plastics of Okla., Inc.*, 607 F.2d 885, 899 (10th Cir.1979); *Gemveto Jewelry Co. v. Lambert Bros., Inc.*, 542 F.Supp. 933, 939–40 (S.D.N.Y. 1982)).

The other two standards emerged from the requisite duty of candor and good faith before the Patent and Trademark Office, as codified in the 1977 amendments to 37 C.F.R. 1.56, as subsequently amended in 1992. *See id.* at 1315–16. In pertinent part, the 1977 amendment to Rule 1.56 read as follows:

(a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is *material* to the examination of the application. *Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.* The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

37 C.F.R. § 1.56 (1977) (emphasis supplied). From this language emerged the fourth standard of materiality, commonly referred to as the "reasonable examiner" test. *Digital Control,* 437 F.3d at 1315 (citing *American Hoist,* 725 F.2d at 1362). Under this standard, and consistent with the plain language of the regulation, information is "material" to patentability where there is "a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56 (1977). *See also American Hoist,* 725 F.2d at 1362 (parsing the "reasonable examiner" standard to require each of the following elements: information "is material where there is [1] a *sub-*

*stantial likelihood* that [2] a *reasonable examiner* [3] would consider it *important* [4] in deciding *whether to allow the application to issue as a patent* ") (emphasis and brackets in original).

In 1992, § 1.56 was amended again, creating an arguably narrower standard of materiality than that of the "reasonable examiner." *See Digital Control,* 437 F.3d at 1314. The pertinent part of the modern rule reads as follows:

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (2006).

The Federal Circuit recently held that the five standards of materiality outlined above are *each, independently,* available for purposes of evaluating a charge of inequitable conduct. *See Digital Control,* 437 F.3d at 1316. No one test supplants

or replaces the others, *see id.*—although arguably, the standard of the "reasonable examiner" remains the broadest, most-encompassing standard. *See American Hoist,* 725 F.2d at 1363 (observing that, compared to the "but for" standards, and the "but it may have" standard, the "reasonable examiner" standard "appears to be the broadest, thus encompassing the others"); *Digital Control,* 437 F.3d at 1314 (observing that the 1992 amendments to Rule 56 created "an arguably narrower standard of materiality" than that of the "reasonable examiner").

### 2. *Intent to deceive*

■ "Intent 'need not, and rarely can, be proven by direct evidence.'" *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.,* 394 F.3d 1348, 1354 (Fed.Cir.2005) (quoting *Merck & Company, Inc. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1422 (Fed.Cir.1989)). "To satisfy the requirement of the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" *M. Eagles Tool Warehouse,* 439 F.3d at 1341 (citing *Paragon Podiatry Lab. v. KLM Lab.,* 984 F.2d 1182, 1189 (Fed.Cir. 1993)) (in turn quoting *Kingsdown Med. Consultants Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988)). It is axiomatic, however, that intent "cannot be 'inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.'" *Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.,* 438 F.3d 1123, 1134 (Fed.Cir. 2006) (quoting *Hebert v. Lisle Corporation,* 99 F.3d 1109, 1116 (Fed.Cir.1996)).

### 3. *Balancing the materiality of withheld information or false or misleading statements to an examiner against evidence of an intent to deceive*

■ "Once the threshold levels of materiality and intent have been established, the trial court must weigh materiality and intent to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Li Second Family Limited Partnership v. Toshiba Corporation,* 231 F.3d 1373, 1378 (Fed.Cir.2000) (citing *Molins,* 48 F.3d at 1178). "This requires careful balancing: when the misrepresentation or withheld information is highly material, a lesser quantum of proof is needed to establish the requisite intent." *Purdue Pharma,* 438 F.3d at 1128–29 (citing *N.V. Akzo v. E.I. Dupont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987)). *See also Digital Control,* 437 F.3d at 1316 (explaining that, with regard to the five tests of materiality, "to the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower").[282] The converse also is true: "when the level of materiality is relatively low, the showing

---

**282.** The Federal Circuit illustrated this interplay between "materiality" and "intent" in *American Hoist:*

 Thus, for example, where an objective "but for" inquiry is satisfied under the appropriate standard of proof, and although one is not necessarily grossly negligent in failing to anticipate judicial resolution of validity, a lesser showing of facts from which intent can be inferred may be sufficient to justify holding the patent invalid or unenforceable, in whole or in part. Conversely, where it is demonstrated that a reasonable examiner would merely have considered particular information to be important but not crucial to his decision not to reject, a showing of facts which would indicate something more than gross negligence or recklessness may be required, and good faith judgment or honest mistake might well be a sufficient defense.
*American Hoist,* 725 F.2d at 1363.

of intent must be proportionately higher." *Purdue Pharma,* 438 F.3d at 1135.

**4.** *Knowledge: claims of inequitable conduct arising from failure to disclose prior art*

In addition to materiality and intent, "knowledge" is an essential component of the inquiry when an alleged infringer contends that a patentee has engaged in inequitable conduct by failing to disclose material information, such as prior art references, to the PTO. *See, e.g., Digital Control,* 437 F.3d at 1318; *Molins,* 48 F.3d at 1178; *FMC Corporation v. Manitowoc Company, Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987).

> [O]ne who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO. That proof may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO); (b) if the prior art or information was material, a showing that applicant did not know of that art or information; (c) if applicant did know of that art or information, a showing that applicant did not know of its materiality; (d) a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO.

*FMC Corporation,* 835 F.2d at 1415. *See also Elk Corporation of Dallas v. GAF Building Materials Corporation,* 168 F.3d 28, 30 (Fed.Cir.1999).

**C.** *That Aspect of Avocent's Motion Seeking a Declaration against ClearCube's "inequitable conduct affirmative defenses and counterclaims"*

ClearCube's amended answer asserts three independent bases for finding the patents-in-suit to be unenforceable because of inequitable conduct before the PTO. Avocent moves for a partial summary judgment declaring that ClearCube's affirmative defenses are due to be rejected, and the related counterclaims dismissed (doc. no. 157).

**1.** *ClearCube's challenge to the '919 patent based upon the "Extender" and "AutoBoot Commander" line of products*

As discussed in Part Eleven, Section A *supra,* the "Extender" products represented Robert Asprey's earliest inventions in the field of transmitting computer-generated, digital and analog video signals over extended distances. Asprey also worked on the so-called "switch commander," which allowed a user, stationed in front of a single keyboard and monitor, to selectively transmit information from a plurality of computers to the monitor. The "AutoBoot Commander" was an additional improvement on this concept of "switching," as it ensured that all computers in the system would "boot," regardless of whether a computer was directly interfaced with the keyboard.

It is undisputed that several versions of the "Extender" and "AutoBoot Commander" products were not disclosed to the patent office during prosecution of the '076 application, which matured as the '919 patent. In its amended answer, ClearCube alleges that Robert Asprey, Mark Clodfelter, Thomas Lusk, or Phillip Kirshtein, or all four of such persons, intentionally failed to make these disclosures. Since this allegation raises a "failure to disclose" form of

inequitable conduct, the court must inquire into the elements of materiality, knowledge, and intent.

### a. *Materiality*

ClearCube asserts that the threshold level of materiality is met under the "reasonable examiner" standard, due to these facts: (*i*) Asprey was the primary inventor of the "Extender" and "AutoBoot Commander" products, and also an inventor of the subject matter recited in the '919 patent; (*ii*) the "Extender" and "AutoBoot Commander" products embodied technology "very similar" to that disclosed in the '919 patent; and (*iii*) the "Extender" and "AutoBoot Commander" products constituted "prior art" to the '919 patent.[283]

Avocent does not challenge these contentions of materiality, but instead asserts that there is yet another requirement that must be considered. Uyen Le and Andrew Faile reviewed the following prior art references during their examination of the subject matter recited in the '919 patent: U.S. Patent No. 3,845,240 ("Alaily"); U.S. Patent No. 4,054,910 ("Chou *et al.*"); U.S. Patent No. 5,193,200 ("Asprey *et al.*"); U.S. Patent No. 5,208,560 ("Yasutake"); U.S. Patent No. 5,257,390 ("Asprey *et al.*"); U.S. Patent No. 5,283,789 ("Gunnarsson *et al.*"); U.S. Patent No. 5,321,372 ("Smith"); and U.S. Patent No. 5,386,518 ("Regale *et al.*").[284] Avocent argues that ClearCube's "materiality" argument is fatally flawed, because ClearCube has offered no evidence that the "Extender" and "AutoBoot Commander" products were not merely *cumulative* to the information contained in the preceding patents. Avocent's argument is not persuasive.

The Federal Circuit has instructed that, where the form of inequitable conduct alleged is "failure to disclose," and a thresh-

old question of materiality is established under the "reasonable examiner" standard, proof of materiality may be *rebutted* by a showing that the withheld materials were merely "cumulative" to prior art or information cited by the PTO. *See Elk Corporation,* 168 F.3d at 30 (stating that proof of materiality "may be rebutted by a showing that: (a) the prior art was not material ....."); *FMC Corporation,* 835 F.2d at 1415 (stating that proof of materiality "may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO) ....."). *See also Digital Control,* 437 F.3d at 1319 (holding that the *patentee* raised a genuine issue of material fact as to whether information contained in a particular patent was cumulative to information already before the patent examiner).

Stated differently, once ClearCube establishes materiality under the "reasonable examiner" standard—and there is no dispute that it has—*Avocent* may offer a *rebuttal* by showing that information related to the Extender and AutoBoot Commander products were "merely cumulative" to the information already before the patent examiners. Avocent attempts to turn this principle on its head, however, by arguing that the burden is somehow on *ClearCube* to show that the withheld information was "not cumulative." That is not the law.

### b. *Knowledge*

Avocent altogether fails to challenge the knowledge component of ClearCube's affirmative defense and related counterclaim. It is not disputed that Robert Asprey, as the inventor of the Extender and AutoBoot Commander line of products, had actual knowledge of those items at the time of

---

**283.** *See* doc. no. 190 (ClearCube's brief in opposition), at 27–28.

**284.** *See* doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 2 ('919 patent), at "References Cited."

prosecution of the '076 application and, additionally, had knowledge that such items were material. There also is evidence that Mark Clodfelter had actual knowledge of the AutoBoot Commander products, and knew of their materiality.[285]

### c. Intent

The decisive issue, therefore, is whether there is any evidence to support a finding of an intent to deceive the patent office. Intent cannot be inferred solely from the fact that material information was not disclosed. There must be a factual basis for a finding of an intent to deceive by knowingly failing to disclose material information. See, e.g., Purdue Pharma, 438 F.3d at 1134. See also M. Eagles Tool Warehouse, 439 F.3d at 1343 ("The district court's finding of inequitable conduct based on the nondisclosure of the Model 220 essentially amounted to a finding of the strict liability for nondisclosure. Such is not the law.").

ClearCube points to the deposition testimonies of Robert Asprey and Mark Clodfelter as evidence of an intent to deceive. Turning first to the cited testimony of Robert Asprey, the court finds no factual basis to support a finding that he intended to deceive.[286] ClearCube's reliance on the deposition testimony of Mark Clodfelter also is unavailing. The court is directed to pages 186–87 and 190–91 of Clodfelter's November 16, 2004 deposition testimony.[287] There, Clodfelter admits that he drafted the language of the '919 patent, including the "Background of the Invention" portion of the specification, which describes the AutoBoot Commander.[288] ClearCube characterizes Clodfelter's testimony as follows: (i) he first attempted to deny any memory of the AutoBoot Commander; but (ii) upon remembering that he had written about the product in the '919 patent specification, (iii) he attempted to characterize the specification as an "advertisement" for the Commander line of products.[289] ClearCube's conclusion is that

---

**285.** See doc. no. 190 (ClearCube's brief in opposition), Ex. RR (Clodfelter deposition), at 186–91.

**286.** ClearCube directs the court to pages 117 and 118 of Robert Asprey's July 15, 2004 deposition testimony. See doc. no. 190 (ClearCube's brief in opposition), at 29. There, Asprey was questioned about a Declaration of Patent Application, in which he stated that he was one of the inventors of the subject matter recited in the '076 application. See id., Ex. SS (Asprey deposition), at 113. Asprey was first reminded by ClearCube's counsel that the Declaration, by its very terms, required him to provide truthful information. This conversation followed:

Q. So you understood the seriousness of complying with the obligations that you set forth in this declaration, is that correct?
A. Absolutely.
Q. With respect to the prior art that you had an obligation to disclose, do you recall disclosing any prior art to Mr. Clodfelter with respect to this patent application?

MR. JACKSON: Object to the form.
A. This particular application, *I don't remember the details on that. That was 10 years ago. I'm sure that we reviewed the literature.* For one thing, if we could find something to buy, we would buy it, not build it. So we would search. And if we could find something, we would use that. If not, then we'd invent it.

*Id.* at 117–18 (emphasis supplied). ClearCube's position is that the words "I'm sure that we reviewed the literature," in combination with the fact that information about the Extender products was not actually disclosed, is evidence of Robert Asprey's intent to deceive the patent office. See doc. no. 190 (ClearCube's brief in opposition), at 28–29. This court cannot agree.

**287.** See doc. no. 190 (ClearCube's brief in opposition), at 29.

**288.** See id., Ex. RR (Clodfelter deposition), at 186–87.

**289.** See doc. no. 190 (ClearCube's brief in opposition), at 29.

these facts, woven together, demonstrate Clodfelter's intent to deceive the patent office by clear and convincing evidence. After careful review of the cited testimony, however, this court again disagrees. Construing the evidence in the light most favorable to ClearCube, and drawing all reasonable inferences in its favor, the court finds that the cited testimony, at best, merely establishes Clodfelter's knowledge of the AutoBoot Commander line of products.

#### d. *Conclusion*

▮▮ Avocent's motion for partial summary judgment therefore will be granted. That aspect of ClearCube's affirmative defense challenging the enforceability of the '919 patent on the basis of an alleged failure to disclose information related to the Extender and AutoBoot Commander products will be stricken, and the related counterclaim dismissed.

#### 2. *ClearCube's challenge to the '997 patent based upon the "Extender" line of products*

ClearCube alleges that Robert Asprey, or Charles Phillips, or both, committed inequitable conduct during prosecution of the '697 application, which matured as the '997 patent. The basis of ClearCube's claim is that information regarding the "Extender" line of products was not disclosed during prosecution of the '697 application. Consequently, the court must again inquire into the elements of materiality, knowledge, and intent.

#### a. *Materiality*

ClearCube asserts that the threshold level of materiality is met under the "reasonable examiner" standard, due to these facts: (*i*) Asprey was the primary inventor of the "Extender" products, and also the sole inventor of the subject matter recited in the '997 patent; (*ii*) the "Extender" products embody technology "very similar" to that disclosed in the '997 patent; and (*iii*) the "Extender" products constituted "prior art" to the '997 patent.[290] Avocent does not challenge these contentions but, again, retorts that ClearCube has failed to produce any evidence that the Extender products were "not cumulative" to the information already before the patent examiners.[291] This argument is rejected a second time, for the reasons discussed above.

#### b. *Knowledge*

Avocent altogether fails to challenge the knowledge component of ClearCube's affirmative defense. It is not disputed that Robert Asprey, as the inventor of the Extender line of products, had actual knowledge of the Extender products during prosecution of the '697 application, and knew of their materiality.

#### c. *Intent*

Even so, the court must again conclude that there is no factual basis for concluding that Asprey or Phillips intended to deceive the patent office. ClearCube does not cite, and the court could not locate, any evi-

**290.** See doc. no. 190 (ClearCube's brief in opposition), at 27–28.

**291.** Examiners Bipin Shalwala and Kent Chang reviewed the subject matter recited in the '697 application. *See* doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 1 ('997 patent). The following prior art references were examined: U.S. Patent No. 3,613,078 ("Manning et al"); U.S. Patent No. 3,623,067 ("Deal, Jr. et al"); U.S. Patent No. 3,750,137 ("Wong et al"); U.S. Patent No. 3,774,158 ("Clark"); U.S. Patent No. 5,029,111 ("Mansell"); U.S. Patent No. 5,117,225 ("Wang"); U.S. Patent No. 5,245,-327 ("Pleva et al"); U.S. Patent No. 5,268,-676 ("Asprey et al"); U.S. Patent No. 5,299,-306 ("Asprey"); U.S. Patent No. 5,576,723 ("Asprey"). *See id.*

dence that either individual intended to deceive the patent office by knowingly withholding information about the Extender line of products during prosecution of the '697 application.

#### d. *Conclusion*

 Avocent's motion for partial summary judgment will be granted. Clear-Cube's affirmative defense alleging unenforceability of the '997 patent will be stricken, and the related counterclaim dismissed.

**3.** *ClearCube's challenge to the '919 patent based upon the filing date of the '442 application and pending claim 20 of the '076 application*

The '076 application that ultimately issued as the '919 patent originally included twenty-six claims. The PTO rejected a number of those claims, including numbered claim 20, in an October 24, 1998 "Office Action Summary." As discussed in Part Eleven, Section A(6) above, this claim was rejected on the basis that the subject matter recited therein was "obvious" in light of combinations of elements from the Gunnarsson patent and a "switch" device "well known" in the art. The Office Action Summary was completed by Examiner Uyen Le, who was in Group Art Unit 2711, and reviewed by Supervisory Patent Examiner Andrew Faile, who was in Group 2700.

Clodfelter first filed an amendment under 37 C.F.R. § 1.116, challenging the patent examiners' reliance on the Gunnarsson patent as prior art. Clodfelter then filed a "*Supplemental Amendment,*" challenging the examiners' reliance on the "switch" device. In that submission, Clodfelter correctly noted that Cybex's own '404 patent recited a switching means for selectively providing a set of color video signals from a plurality of computers to a monitor. He also asserted that the patent examiners, in relying on the "switch" device in their

obviousness analysis, were implicitly referring to the subject matter recited in the '404 patent. Clodfelter then made the following critical representation: the '404 patent was a *parent* to the '076 application and, therefore, it could not be used as a prior art reference for purposes of the patent examiners' obviousness analysis.

For that representation to be accurate, however, there would have to be a chain of copendency from the '076 application, to the '442 application, to the '689 application, which issued as the '404 patent on January 4, 1994. What Clodfelter failed to disclose in the Supplemental Amendment was that the patent office had actually accorded the '442 application a filing date of January 5, 1994—one day too late to preserve the copendency chain. While Charles Phillips repeatedly requested a change of the '442 application's filing date to January 4, 1994, that request was never granted.

Construing this evidence in the light most favorable to ClearCube, the non-moving party, the court finds that Clodfelter's Supplemental Amendment failed to disclose the January 5, 1999 filing date accorded to the '442 application by the PTO, or the dispute involving that date. It also advanced an affirmative misrepresentation regarding the status of the '404 patent as a parent to the '076 application. Provided that the requisite thresholds of materiality and intent are met, Clodfelter's nondisclosure and misrepresentation may constitute inequitable conduct. *See, e.g., Li Second Family Limited Partnership v. Toshiba Corporation,* 231 F.3d 1373, 1379 (Fed.Cir. 2000).

#### a. *Materiality*

The Office Action Summary was issued on October 24, 1998. Clodfelter's amendment under 37 C.F.R. 1.116 was received by the patent office on March 4, 1999. The evidence clearly establishes that Examiners Le and Faile withdrew the rejec-

tion of pending claim 20 *in response to this first submission.* The Notice of Allowability expressly stated that it was "responsive to the amendment filed 4 March 1999."[292]

Of course, ClearCube takes no issue with the March 4, 1999 amendment. It is Clodfelter's "Supplemental Amendment" that is the basis of ClearCube's assertion of inequitable conduct before the PTO. The Supplemental Amendment was received by the patent office on March 15, 1999, but it was not received in Group 2700 until either March 22 or 23, 1999. To put those dates in context, it is important to note that the Notice of Allowability was issued on March 23, 1999. There is no evidence that either Uyen Le or Andrew Faile personally received, let alone reviewed, the Supplemental Amendment prior to withdrawing the rejection of pending claim 20. Indeed, there is clear evidence to the contrary: Examiner Le inscribed the following markings on the first page of the Supplemental Amendment: "Please enter. UL [Uyen Le's initials] 28 Apr 1999."[293] That date—April 28, 1999—was over one month *after* the rejection of pending claim 20 was withdrawn.

Undaunted, ClearCube has repeatedly asserted that this case is governed by the Federal Circuit's decision in *Li Second Family Limited Partnership v. Toshiba Corporation,* 231 F.3d 1373 (Fed.Cir. 2000). This court disagrees. In *Li,* a patent applicant's repeated misrepresentations and nondisclosure of priority date information were deemed to be highly material, because the applicant induced a patent examiner's reliance on his statements, eliminating a prior art reference from consideration and resulting in issu-

ance of the pertinent claims. *See Li Second Family,* 231 F.3d at 1380. Clearly, those are not the facts here.

### b. *Conclusion*

■ The court finds that the nondisclosure and misrepresentation included in Clodfelter's Supplemental Amendment do not rise to the requisite threshold level of materiality under *any* of the five standards recognized by the Federal Circuit. Given the evidence in this case, ClearCube certainly cannot satisfy the objective "but for," the subjective "but for," or the "but it may have" standards of materiality.

ClearCube's reliance on the "reasonable examiner" test also is unavailing. Under this standard, information is "material" to patentability where there is "a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Unlike the "but for" test, a patent examiner's reliance on an applicant's misrepresentation or nondisclosure of information is not a requisite element. *See, e.g., Merck & Company, Inc. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1421 (Fed.Cir.1989) ("To be material, a misrepresentation need not be relied on by the examiner in deciding to allow the patent."). Nonetheless, it is important to note again that Examiners Le and Faile withdrew their rejection of pending claim 20 on March 23, 1999, on the *explicit* basis of Clodfelter's first "amendment filed 4 March 1999."[294] There is no evidence that either Uyen Le or Andrew Faile personally received, let alone reviewed, Clodfelter's Supplemental Amendment prior to rendering that decision. Of course, once

---

292. Doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 24 (Notice of Allowability), at 1.

293. Doc. no. 171 (ClearCube's motion for summary judgment), Ex. M, Supplemental Amendment.

294. Doc. no. 158 (Avocent's memorandum and evidentiary submission) Ex. 24 (Notice of Allowability), at 1.

the rejection of pending claim 20 was withdrawn, whatever contentions for allowability of pending claim 20 asserted in Clodfelter's Supplemental Amendment were rendered *moot.* The Supplemental Amendment simply had no effect on the patent application process. Under these circumstances, this court cannot conclude that there was a *substantial likelihood* that a reasonable examiner would have considered the information contained in the Supplemental Amendment to be *important* in deciding whether to allow the '076 application to issue as a patent.

Finally, in one of its many briefs on the issue, ClearCube asserts that the threshold level of materiality may be satisfied under the modern version of 37 C.F.R. § 1.56, and in particular, subsection (b)(2) of that rule.[295] Rule 56(b)(2) states:

> (b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, *and*
>
> . . . . .
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
> (i) Opposing an argument of unpatentability relied on by the Office, or
>
> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b)(2) (2006) (emphasis supplied). ClearCube asserts that Clodfel-

ter's failure to disclose the "whole truth" regarding the filing date of the '442 application was "material" under this rule:

> For example, some of Avocent's misstatements fall under Rule 56(b)(2) because Avocent failed to tell the USPTO the whole truth, *i.e.* that the filing "date" was, at best, in dispute. This whole truth would have been "inconsistent with, a position" Avocent took in both "opposing an argument of unpatentability relied on by the Office" and "asserting an argument of patentability." This is because Avocent could not have demanded that the USPTO Examiner forego the '404 patent as a source of rejection if the USPTO Examiner knew of the very suspect status of the '404 patent as a parent.[296]

This court agrees with one aspect of ClearCube's argument. The fact that the '442 application was accorded a filing date of January 5, 1994 was indeed "inconsistent" with Clodfelter's position, asserted in the Supplemental Amendment, that the '404 patent was a parent to the '076 application.

Even so, it is important to note that ClearCube's analysis altogether avoids the predicate requirement set forth in 37 C.F.R. § 1.56(b): that is, there must be a showing by clear and convincing evidence that the challenged information was "not cumulative to information already of record or being made of record in the application." [297]

---

**295.** *See* doc. no. 171 (ClearCube's motion for summary judgment), at 13–14.

**296.** *Id.*

**297.** As discussed *supra,* in Part Eleven, Sections B(4) and C(1)(a) of this opinion, Federal Circuit precedent generally requires, in cases alleging a "failure to disclose" form of inequitable conduct, the following sequence of proof: the alleged infringer must show that prior art or other information is material; and, in *rebuttal,* the *patentee* may show that

such prior art or information was merely cumulative with that already of record before the patent office. *See Elk Corporation of Dallas v. GAF Building Materials Corporation,* 168 F.3d 28, 30 (Fed.Cir.1999) (stating that proof of materiality "may be rebutted by a showing that: (a) the prior art was not material ...."); *FMC Corporation v. Manitowoc Company, Inc.,* 835 F.2d 1411, 1415 (Fed.Cir. 1987) (stating that proof of materiality "may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumu-

The '442 application was accorded a filing date of January 5, 1994 by the patent office. That filing date never changed. Indeed, in each and every correspondence sent from the patent office to Charles Phillips regarding the '442 application, January 5, 1994 was identified as the application filing date.[298] In response, Charles Phillips repeatedly requested an amendment of that date from January 5, 1994 to January 4, 1994.

This court presumes that this protracted dispute, memorialized in the file of the '442 application, also was made of record in the '076 application and reviewed by patent examiners Uyen Le and Andrew Faile. That is because the '076 application was a continuation-in-part of the '442 application. *See* U.S. Department of Commerce Patent and Trademark Office, *Manual of Patent Examining Procedure* § 609 (6th ed. rev. July 1997) (stating that the patent "examiner *will* consider information which has been considered by the Office in a parent application when examining a continuation or continuation-in-part application") (emphasis supplied). Given these circumstances, ClearCube has failed to demonstrate how Clodfelter's disclosure of the "whole truth" would *not* have been cumulative to the information already of record in the '076 application.

The bottom line, however, and one that bears repeating, is that the Supplemental Amendment simply had no effect on the patent application process. ClearCube does not cite, and the court could not locate, a Federal Circuit decision where a nondisclosure or misrepresentation was deemed "material," even though it was never actually brought to the patent examiners' attention at the pertinent time of decision. This court holds that the threshold level of materiality cannot be met under these circumstances.

As ClearCube's evidence fails to satisfy the requisite threshold of materiality under any standard recognized by the Federal Circuit, the court finds that Avocent's motion for partial summary judgment of "no inequitable conduct" is due to be granted. ClearCube's affirmative defense based upon the doctrine of inequitable conduct will be stricken, and the related counterclaim dismissed with prejudice.

**D.** *ClearCube's "Motion for Summary Judgment for Unenforceability of Avocent's '919 and '997 Patents"*

The motion filed in this case as doc. no. 171, entitled "Defendant ClearCube's Motion for Summary Judgment for Unenforceability of Avocent's '919 and '997 Patents," focuses entirely on one, now-familiar argument. As discussed above, the patent office initially rejected pending claim 20 on the basis that the subject matter recited

---

lative with prior art or information cited to or by the PTO) . . . ."). *See also Digital Control Incorporated v. Charles Machine Works,* 437 F.3d 1309, 1319 (Fed.Cir.2006) (holding that the patentee raised a genuine issue of material fact as to whether information contained in a particular patent was cumulative to information already of record before the patent examiner). These cases, however, were decided upon application of the "reasonable examiner" test of materiality. The modern Rule 56 standard is at issue here. This court notes that modern Rule 56 expressly requires a showing that information is *"not* cumulative," without specifying who bears the burden to make that showing. Logic dictates, however, that the *alleged infringer* must establish that the cited information was "not cumulative" to the information already before the patent examiners.

298. *See, e.g.,* doc. no. 171 (ClearCube's motion for summary judgment), Exs. B (Notice to File Missing Parts of Application Filing Date Granted), H (Examiner's Action mailed November 20, 1995), and N (Examiner's Action mailed April 16, 1996); doc. no. 184 (Avocent's motion for partial summary judgment), Ex. Z (Advisory Action mailed June 24, 1996, Bates stamp No. A 499).

therein was "obvious" in light of a combination of elements from the Gunnarsson patent and a "switch" device well known in the art. ClearCube alleges that Mark Clodfelter committed inequitable conduct to overcome the rejection when he submitted the Supplemental Amendment in March 1999.

#### 1. ClearCube's challenge to the '919 patent

ClearCube's motion for a partial summary judgment declaring that the '919 patent is unenforceable due to the inequitable conduct of Mark Clodfelter will be denied. ClearCube's evidence fails to meet any threshold level of materiality recognized by the Federal Circuit, for the reasons discussed above.

#### 2. ClearCube's challenge to the '997 patent

ClearCube did not allege in its amended answer that the '997 patent was unenforceable due to the inequitable conduct of Mark Clodfelter, or Charles Phillips, or both, in misrepresenting the filing date of the '442 application. However, ClearCube now moves for partial summary judgment on that basis, stating in its brief:

> Ultimately, there is no doubt that Avocent intentionally misstated the filing "date" of the '442 application and applied that misstatement in order to mischaracterize the status of the patents-in-suit and '404 patent as having a parent-child relationship. Therefore, as demonstrated above, the '919 *and* '997 patents are unenforceable under the United States patent law.[299]

Rule 8(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... fraud ... and any other matter constituting an avoidance or affirmative defense." Fed.R.Civ.P. 8(c). Rule 9(b) of the Federal Rules of Civil Procedure further states that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). *See also, e.g., Intex Recreation Corp. v. Team Worldwide Corp.*, 390 F.Supp.2d 21, 23 (D.D.C.2005) ("Although it has never held squarely that Rule 9(b) applies to inequitable conduct claims, the Federal Circuit has suggested in *dicta* that this requirement is appropriate.") (citing *Ferguson Beauregard/Logic Controls v. Mega Sys.*, 350 F.3d 1327, 1344 (Fed.Cir.2003)); *Stowe Woodward, LLC v. Sensor Products, Inc.*, 230 F.R.D. 463, 465 (W.D.Va.2005) (observing that "the majority of district courts have held that the heightened pleading requirements of Rule 9(b) do apply to claims of inequitable conduct").

A party waives its right to advance an affirmative defense by failing to assert it in pleadings. *See Steger v. General Electric Company*, 318 F.3d 1066, 1077 (11th Cir.2003) (citing *American National Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1537 (11th Cir.1983)).[300] There are exceptions to this general rule: "[I]ssues not raised in the pleadings may be treated as if they were properly raised when they are 'tried by express or implied consent of the parties,' Federal Rule of

---

**299.** Doc. no. 171 (ClearCube's motion for summary judgment), at 27.

**300.** The Federal Circuit applies the law of the pertinent regional circuit when the issue to be decided involves an interpretation of the Federal Rules of Civil Procedure not unique to

patent law. *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647–48 (Fed.Cir. 1994). *See also, e.g., Ultra–Precision Manufacturing v. Ford Motor Company*, 411 F.3d 1369, 1376 (Fed.Cir.2005) ("Regional circuit law governs the question of waiver of a defense.").

Civil Procedure 15(b), or are included in a pretrial order." *Id.*

Avocent protests that the present issue regarding the unenforceability of the '997 patent was raised, for the first time, in the body of ClearCube's present motion for partial summary judgment. ClearCube does not dispute this contention, but attempts to side-step the issue by arguing that "the underlying circumstances constituting inequitable conduct relevant to the '919 patent also underlie inequitable conduct relating to the '997 patent[;] therefore the seminal facts relevant to unenforceability are the same." [301]

ClearCube's argument is rejected. Any affirmative defense of inequitable conduct against the *'997 patent* founded upon the alleged misrepresentation of the filing date of the '442 application has been waived. ClearCube's motion for partial summary judgment will be denied.

### E. *Motions Related to the Precise Filing Date of the '442 Application*

The parties also have moved for partial summary judgment on a number of issues related to the precise filing date of the '442 application. In view of this court's conclu-sion that the representations contained in Mark Clodfelter's Supplemental Amendment had no effect upon the PTO's ultimate allowance of '076 application claim 20 (which became claim 16 of the '919 patent), discussion of the dispute concerning the filing date accorded the '442 application is somewhat anti-climatic. Nevertheless, the parties' motions, four in number,[302] will be addressed in turn.

As previously discussed, the '442 application purported to be a continuation-in-part of the '689 application, which issued as the '404 patent. Mark Clodfelter testified that he deposited the '442 application in a U.S. Postal Service "drop box" during the evening hours of January 4, 1994—the same date on which the '689 application issued as the '404 patent—and completed an "Express Mail Certificate" that identified January *4* as the document's "date of deposit." When the Postal Service processed the mail item, however, a "date in" of January *5*, 1994, and a "time in" of 1617 (4:17 p.m.), was handwritten on the express mail label. Upon receipt, the Patent and Trademark Office determined that the legal "filing date" of the application was January *5*, 1994. The patent office review-

---

**301.** Doc. no. 204 (ClearCube's brief in reply), at 10.

**302.** Specifically, the motions are:
(1) That aspect of Avocent's motion for partial summary judgment seeking a declaration that the '442 application was filed on January 4, 1994, in accordance with 35 U.S.C. § 21 and 37 C.F.R. § 1.10 (doc. no. 142);
(2) That aspect of ClearCube's motion for partial summary judgment seeking a declaration that: (*i*) the filing date of the '442 application is January 5, 1994; (*ii*) the '442 application lacks copendency with the '689 application, which issued as the '404 patent; and (*iii*) accordingly, no Avocent application or patent can claim priority to the '689 application/'404 patent to receive an earlier effective filing date (doc. no. 136);

(3) That aspect of Avocent's motion for partial summary judgment seeking a declaration that "under Manual of Patent Examining Procedure § 609 and the case law interpreting and applying that rule, Avocent and its patent agent, Mr. Clodfelter, were not obligated to re-cite the '404 patent because it was considered by the Patent Office during prosecution of the parent '442 patent application" (doc. no. 157); and,
(4) That aspect of Avocent's motion for partial summary judgment seeking a declaration that, "under 37 C.F.R. § 1.312, Avocent and its patent agent, Mr. Clodfelter, were not required or obligated to withdraw the '919 patent application from issue based upon the changes made by the June 24, 1999 Rule 312 Amendment" (doc. no. 157).

er correctly noted that the date identified on the Express Mail Certificate was January 4, 1994, but the date inscribed on the express mail label was January 5, 1994. The reviewer reasoned that the '442 application should be granted a filing date of January 5, "because the date on the certificate [January 4] does not coincide with the date of deposit on the Express Mail label [January 5] *which the PTO takes as evidence of when the package was mailed .... Applicant cannot receive an earlier date than the 'In Date' from the Post Office."* [303]

January 4, 1994 was a Tuesday, and neither that day or the Wednesday following was a National holiday.

### 1. *Avocent's motion*

■■■ Avocent moves for a partial summary judgment declaring that "the '442 application was filed on January 4, 1994 in accordance with 35 U.S.C. § 21 and 37 C.F.R. § 1.10." [304] Avocent clarifies that it "is not asking this Court to take the unusual step of formally correcting the filing date of the '442 application," but is only requesting the court to declare that Clodfelter duly complied with the requirements set forth in 35 U.S.C. § 21, and the version of 37 C.F.R. § 1.10 in effect during January of 1994, and "thereby filed the '442 application on January 4, 1994." [305] The statutory provision relied upon by Avocent, 35 U.S.C. § 21, provides:

(a) The Director *may by rule* prescribe that any paper or fee required to be filed in the Patent and Trademark Office will be considered filed in the Office *on the date on which it was deposited with the United States Postal Service* or would have been deposited with the United States Postal Service

but for postal service interruptions or emergencies designated by the Director. 35 U.S.C. § 21(a) (emphasis supplied).

In accordance with that enabling statute, the Code of Federal Regulations was amended in 1983 to provide a procedure for assigning filing dates to "express mail" materials. *See Revision of Patent Procedure*, 48 Fed.Reg. 2696 (January 20, 1983). These procedures remained unchanged through the dates relevant to this discussion, and read in pertinent part as follows:

(a) Any paper or fee to be filed in the Patent and Trademark Office can be filed utilizing the "Express Mail Post Office to Addressee" service of the United States Postal Service and be considered as having been filed in the Office *on the date the paper or fee is shown to have been deposited as "Express Mail" with the United States Postal Service* unless the date of deposit is a Saturday, Sunday, or federal holiday within the District of Columbia. *See* § 1.6(a).

．　　．　　．　　．　　．

(c) The Patent and Trademark Office will accept the certificate of mailing by "Express Mail" and accord the paper or fee the certificate date under 35 U.S.C. 21(a) (unless the certificate date is a Saturday, Sunday, or federal holiday within the District of Columbia—*see* § 1.6(a)) without further proof of the date on which the mailing by "Express Mail" occurred *unless a question is present regarding the date of mailing.* If more than a reasonable time has elapsed between the certificate date and the Patent and Trademark Office receipt date *or if other questions regarding the date of mailing are present, the person*

---

**303.** Doc. no. 136 (ClearCube's motion and memorandum), Ex. H (Jan. 10, 1994 determination) (emphasis supplied).

**304.** Doc. no. 142.

**305.** Doc. no. 143 (Avocent's motion and combined memorandum), at 12.

*mailing the paper or fee may be required to file a copy of the "Express Mail" receipt showing the actual date of mailing* and a statement from the person who mailed the paper or fee averring to the fact that the mailing occurred on the date certified. Such statement must be a verified statement if made by a person not registered to practice before the Patent and Trademark Office.

37 C.F.R. § 1.10 (1994) (emphasis supplied).

The *Federal Register's* 1983 announcement of the final regulation also offered responses to questions raised during the rule-making process. The following question was specifically addressed:

*Comment:* One person questioned what treatment will be accorded a paper placed in an "Express Mail" box receptacle after the box has been cleared for the last time on a given day.

*Reply:* The paper will be considered to be deposited *as of the date of receipt* indicated on the "Express Mail" mailing label *by the Postal Service clerk.*

*Revision of Patent Procedure,* 48 Fed.Reg. 2696, 2702 (Jan. 20, 1983) (emphasis supplied).

Further clarification, albeit more than a year after 1994, was provided in the *Manual of Patent Examining Procedure* published by the Patent and Trademark Office:

*Where there is a discrepancy between the certificate date and the "Date–In" on the Express mail label, the Office will use the Date–In placed on the label by the Postal Service as the date of deposit for the correspondence.* Therefore, care should be exercised so as not to deposit an Express Mail package in an Express Mail receptacle or mailbox after the last pickup for a given day.[306]

### a. *Analysis*

As a threshold matter, the court observes that the plain language of 35 U.S.C. § 21 is susceptible to the determination that a patent application should be accorded a filing date consistent with *either (i)* the date on which it is physically placed in an express mail "drop box," *or (ii)* the date on which the "date in" on the express mail label is inscribed by the U.S. Postal Service employee. Section 21 merely states, without elaboration, that the filing date is "the date on which [the patent application] was *deposited with* the United States Postal Service." 35 U.S.C. § 21(a) (emphasis supplied).

The language of 37 C.F.R. § 1.10, as it was in effect in 1994, also is susceptible to either construction. Subsection (a) states, without elaboration, that the appropriate filing date of a patent application is the date the item "is shown to have been *deposited* as 'Express Mail' with the United States Postal Service." 37 C.F.R. § 1.10(a) (emphasis supplied). Subsection (c) provides only limited clarification. The introductory clause supports Avocent's contention that the '442 application should have been granted a filing date of January 4, 1994, the date identified by Mark Clodfelter on the Express Mail Certificate. *See* 37 C.F.R. § 1.10(c) ("The Patent and Trademark Office will accept the certificate of mailing by 'Express Mail' and accord the paper or fee the certificate date under 35 U.S.C. 21(a) . . . ."). However, that clause is qualified by the phrase, "unless a question is present regarding the date of mailing." 37 C.F.R. § 1.10(c). The regulation does not expressly define

---

**306.** Doc. no. 147 (ClearCube's brief in reply), Ex. P, Patent and Trademark Office, U.S. Department of Commerce, *Manual of Patent Examining Procedure* § 513 (6th ed.1995 rev. Sept.1995) (emphasis supplied).

all circumstances under which such a "question" may be present. Moreover, it is stated that, when such a "question" does arise, the patent applicant "may be required to file a copy of the 'Express mail' receipt," in order to prove the "actual date of mailing." 37 C.F.R. § 1.10(c).

The language of 37 C.F.R. § 1.10, of course, was "interpreted" by the patent office in its *Manual of Patent Examining Procedure* ("MPEP"). *See Refac International, Ltd. v. Lotus Development Corporation*, 81 F.3d 1576, 1584 n. 2 (Fed.Cir. 1996) (observing that "[t]he MPEP does not have the force and effect of law; however, it is entitled to judicial notice as the agency's official interpretation of statutes or regulations, provided that it is not in conflict with the statutes or regulations") (citations omitted). In the 1983 *Federal Register*, it was explained that, when a patent application is placed in an "Express Mail" receptacle after the box has been cleared for the last time on a given day, the filing date is the date of receipt indicated by the U.S. Postal Service *clerk* on the "Express Mail" *mailing label*. The MPEP further clarified that, when there is a discrepancy between the date identified on an express mail certificate, and the "date in" inscribed on the express mail label by the U.S. Postal Service clerk, the *"date in"* identifies the filing date. Indeed, this was the precise rationale adopted by the patent office when assigning the '442 application a filing date of January *5* as opposed to January *4*.

This court cannot conclude that the PTO's interpretation was plainly erroneous or inconsistent with 37 C.F.R. § 1.10. *See, e.g., Bowles v. Seminole Rock and Sand Company*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (holding that an agency's interpretation of its own regula-

tion is controlling unless plainly erroneous or inconsistent with the regulation).

Perhaps the best that can be said for Avocent's position is that Charles Phillips and Mark Clodfelter had *an arguable basis* for contending that the '442 application was filed on January 4, 1994, in accordance with the plain language of 35 U.S.C. § 21 and the version of 37 C.F.R. § 1.10 in effect in 1994. Even so, this court cannot go so far as to declare, as Avocent requests, that "the '442 application *was filed* on January 4, 1994," in accordance with the applicable statute and regulation.[307]

### 2. *ClearCube's motion*

ClearCube moves for a partial summary judgment declaring that "the filing date of the '442 application is January 5, 1994; that the '442 application lacks copendency with the '404 patent/'689 application; and accordingly, that no Avocent application or patent can claim priority to the '404 patent/'689 application to receive an earlier effective filing date."[308] Each part of that motion is due to be granted.

The filing date of the '442 application is January 5, 1994. This is the filing date of the '442 application granted by the Patent and Trademark Office; and, while Avocent asserts that the decision was clearly inconsistent with the plain language of 35 U.S.C. § 21 and 37 C.F.R. § 1.10, this court disagrees, for the reasons stated above.

Having resolved the filing date of the '442 application, the court also must conclude that the '442 application lacked copendency with the '689 application, which ultimately issued as the '404 patent on January 4, 1994.

Finally, "no Avocent application or patent can claim priority to the '404 pat-

---

**307.** Doc. no. 142 (Avocent's motion) (emphasis supplied).

**308.** Doc. no. 136 (ClearCube's motion and memorandum), at 29.

ent/'689 application to receive an earlier effective filing date." Avocent asserts that the '997 patent may claim priority to the '689 application, issued as the '404 patent, due to copendency of the '442 and '689 applications. This argument must be rejected on the basis that there was, in fact, no copendency.

### 3. *Avocent's motion under MPEP § 609*

Avocent moves for partial summary judgment declaring that, "under the Manual of Patent Examining Procedure § 609 and the case law interpreting and applying that rule, Avocent and its patent agent, Mark Clodfelter, were not obligated to recite the '404 patent because it was considered by the Patent Office during prosecution of the parent '442 application."[309]

Each individual associated with the prosecution of a patent application comes under "a duty of candor and good faith" when dealing with the patent office, including a duty to disclose certain information known to the individual to be material to patentability. 37 C.F.R. § 1.56 (2006). An applicant may satisfy the disclosure requirements by submitting an "Information Disclosure Statement," which in turn complies with the requirements set forth in 37 C.F.R. §§ 1.97 and 1.98. *See id.* Section 1.98 states the requisite contents of the Information Disclosure Statement, and section 1.97 provides the procedural filing requirements. *See* MPEP § 609 (Rev.3, July 1997).[310] Once the minimum requirements of 37 C.F.R. §§ 1.98 and 1.97 are met, the patent examiner has an obligation to consider the information provided. *See id.*

■ Even so, patent applicants may be relieved of certain disclosure obligations under certain circumstances. Avocent directs the court to the 1997 version of MPEP § 609, which provides in part:

> Information which has been considered by the Office in the *parent* application of a file wrapper continuing application under 37 C.F.R. 1.62 will be part of the file before the examiner *and need not be resubmitted* in the continuing application to have the information considered and listed on the patent.

MPEP § 609 (1997) (emphasis supplied). A similar rule applies to continuation-in-part applications. Where information has been considered in a parent application, "the information need not be submitted in the . . . continuation-in-part application unless applicant desires the information to be printed on the patent." *Id. See also ATD Corporation v. Lydall, Inc.,* 159 F.3d 534, 547 (Fed.Cir.1998) (holding that, in view of MPEP § 609, it is not inequitable conduct for a patent applicant to fail to re-submit, in a divisional application—another form of a "continuing application"—information that was cited or submitted in the parent application); *Advanced Respiratory, Inc. v. Electromed, Inc.,* 2002 WL 31386740, at * 4–5 (D.Minn. Oct.22, 2002) (holding that, in view of MPEP § 609, it is not inequitable conduct for a patent applicant to fail to re-submit, in a continuation application—another form of a "continuing application"—a prior art reference submitted in the parent application).

In this case, the '442 application was assigned to Examiner Ulysses Weldon for review. Weldon specifically cited the '404 patent as prior art to the '442 application during the examination; indeed, he rejected certain claims in the '442 application in view of the '404 patent, under the judicial-

---

**309.** Doc. no. 157.

**310.** It is undisputed the July 1997 version of MPEP § 609 is controlling in this case. This

version of § 609 may be located at doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 30.

ly-created doctrine of "obviousness-type double patenting."

In turn, the '076 application, which matured as the '919 patent, was a continuation-in-part of the '442 application. This court agrees with Avocent that, even though Mark Clodfelter did not "re-cite" the '404 patent as information "material" to patentability during prosecution of the '076 application, that omission cannot form the basis of a claim of inequitable conduct.

Pursuant to MPEP § 609, where information (*i.e.*, the '404 patent) has been considered in a parent application (*i.e.*, the '442 application), the same information (*i.e.*, the '404 patent) need not be resubmitted in a continuation-in-part application (*i.e.*, the '076 application). Avocent's motion for partial summary judgment will be granted.

### 4. *Avocent's motion based upon 37 C.F.R. § 1.312*

Avocent moves for a partial summary judgment declaring that, "under 37 C.F.R. § 1.312, Avocent and its patent agent, Mark Clodfelter, were not required or obligated to withdraw the '919 patent application from issue based on changes made by the June 24, 1999 Rule 312 Amendment."[311] The relevant part of 37 C.F.R. § 1.312 that was in effect during 1999 read as follows:

 **(a)** No amendment may be made as a matter of right in an application after the mailing of the notice of allowance. Any amendment pursuant to this paragraph filed before the payment of the issue fee may be entered on the recommendation of the primary examiner, ap-

proved by the Commissioner, without withdrawing the case from issue.

37 C.F.R. § 1.132(a) (1999).

According to Mark Clodfelter, he was informed by Charles Phillips, sometime during mid–1999, that the patent office had finally rejected Phillips's numerous requests for a change in the filing date of the '442 application. Clodfelter subsequently filed an amendment to the '076 application under 37 C.F.R. § 1.312. Clodfelter stated that an error in the chain of pendency had been "discovered." He asked that the portion of the '076 application representing the filing date of the '442 application as January 4, 1994, be amended to state January 5, 1994. Clodfelter also asked that the specific clause in the '076 patent describing the '442 application as a continuation-in-part of the '689 application (which issued as the '404 patent) be deleted.

On July 27, 1999, Examiner Le inscribed on the front page of Clodfelter's amendment, "ENTER UNDER ORDER 0.3311."[312] Supervisory Examiner Faile also completed a form, mailed to Clodfelter on July 29, 1999, stating that Clodfelter's Amendment was "entered as directed to matters of form not affecting the scope of the invention (0.3311)."[313] In light of the foregoing, the court finds that Avocent's motion for partial summary judgment is due to be granted.

The plain language of 37 C.F.R. § 1.312 provides that an amendment to a patent application (*i*) filed before the payment of the issue fee (*ii*) may be entered (*iii*) on the recommendation of the primary examiner, (*iv*) approved by the Commissioner, (*v*) *without withdrawing the case from*

---

**311.** Doc. no. 157.

**312.** Doc. no. 171 (ClearCube's motion for summary judgment), Ex. L, "Amendment under 37 C.F.R. 1.312."

**313.** Doc. no. 158 (Avocent's memorandum and evidentiary submission), Ex. 26.

*issue.* It is undisputed that Clodfelter's amendment was filed before payment of a patent issue fee. Entry of the amendment also was recommended by the primary examiner (Uyen Le), and approved by the Commissioner, by delegation of his or her authority to Supervisory Examiner Faile. *See* MPEP § 714.16 (7th ed. 1998) ("The Commissioner has delegated the approval of recommendations under 37 C.F.R. 1.312(a) to the supervisory patent examiners."). Accordingly, the patent office had the authority to exercise discretion, as evidenced by the words "may be entered," to enter Clodfelter's amendment "without withdrawing the case from issue."

ClearCube's objection to Avocent's motion is misplaced. Relying on the Federal Circuit's decision in *Rohm and Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556 (Fed. Cir.1983), ClearCube contends that Avocent's amendment could not "cure" its earlier misrepresentations to the patent office regarding the filing date of the '442 application.[314] The *Rohm* Court, however, identified the "narrow issue" before it as follows: "[W]hether voluntary efforts during prosecution by or on behalf of an applicant, knowing that misrepresentations have been made to the examiner of his application, can ever *alleviate* its effect." *Rohm*, 722 F.2d at 1571–72 (emphasis supplied). The Court held that, on the condition of three requirements, the effects of an earlier misrepresentation could indeed be mitigated.[315]

Avocent's motion does not seek a judgment to "cure," or "alleviate," any misrepresentation or deception by Mark Clodfelter that resulted in the issuance of the '919 patent. Avocent merely seeks a declaration that, "under 37 CFR § 1.312, Avocent and its patent agent, Mr. Clodfelter, were not *required or obligated* to *withdraw* the '919 patent application from issue based on the changes made by the June 24, 1999 Rule 312 Amendment."[316] That motion will be granted.

## PART TWELVE

### *Avocent's Motion for Separate Trial of ClearCube's Inequitable Conduct Allegations*

Avocent moves for an order "bifurcating trial of the inequitable conduct issue from the issues to be tried to the jury."[317] However, for the reasons discussed in Part

---

**314.** Doc. no. 190 (ClearCube's brief in opposition), at 22.

**315.** The Court stated as follows:

The first requirement to be met by an applicant, aware of misrepresentation in the prosecution of his application and desiring to overcome it, is that he expressly advise the PTO of its existence, stating specifically wherein it resides. The second requirement is that, if the misrepresentation is of one or more facts, the PTO be advised what the actual facts are, the applicant making it clear that further examination in light thereof may be required if any PTO action has been based on the misrepresentation. Finally, on the basis of the new and factually accurate record, the applicant must establish patentability of the claimed subject matter. Considering the overall objectives of the patent system, we think it

desirable that inventions meeting the statutory requirements for patentability be patented and, therefore, we also think it desirable to reserve the possibility of expiation of wrongdoing where an applicant chooses to take the necessary action on his own initiative and to take it openly. It does not suffice that one knowing of misrepresentations in an application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome, leaving him to formulate his own conclusions.

*Rohm and Haas Company v. Crystal Chemical Company*, 722 F.2d 1556, 1572 (Fed.Cir. 1983).

**316.** Doc. no. 157 (emphasis supplied).

**317.** Doc. no. 154.

Eleven above, ClearCube's affirmative defenses founded upon the doctrine of inequitable conduct are due to be stricken, and the related counterclaims dismissed with prejudice. Accordingly, Avocent's motion for a separate trial of ClearCube's inequitable conduct allegations will be denied as moot.

## CONCLUSION

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

## ORDER

In accordance with the memorandum opinion entered contemporaneously herewith, it is ORDERED, ADJUDGED, and DECREED as follows:

**A.** Avocent's motion for a partial summary judgment declaring that it engaged in "no inequitable conduct" before the Patent and Trademark Office (doc. no. 157) is GRANTED.

1. Accordingly, the fourth and fifth affirmative defenses of ClearCube's amended answer—*i.e.,* "Unenforceability of the '997 Patent Based on Inequitable Conduct" (fourth affirmative defense); and, "Unenforceability of the '919 Patent Based on Inequitable Conduct" (fifth affirmative defense)—are stricken.

2. Further, the third and fourth counterclaims asserted in the amended answer, seeking a "Declaration of Unenforceability of the '997 Patent Based on Inequitable Conduct" (third counterclaim), and a "Declaration of Unenforceability of the '919 Patent Based on Inequitable Conduct" (fourth counterclaim), are DISMISSED with prejudice.

**B.** The following motions are DENIED:

1. Doc. no. 154—Avocent's motion for separate trial of ClearCube's inequitable conduct allegations, filed May 10, 2006;[1]

2. Doc. no. 160—Avocent's motion for a partial summary judgment declaring that ClearCube's products satisfy the "amplifier" limitation of claims 1 and 6 of the '919 patent, and, claim 1 of the '997 patent, filed May 11, 2006;

3. Doc. no. 166—ClearCube's motion for partial summary judgment of noninfringement of claims 1 and 6 of the '919 patent (*i.e.,* the "adapter motion"), filed May 11, 2006;[2]

4. Doc. no. 168—ClearCube's motion for partial summary judgment of noninfringement (*i.e.,* the "amplifier motion"), filed May 11, 2006;[3] and,

5. Doc. no. 171—ClearCube's motion for a partial summary judgment declaring that Avocent's '919 and '997 patents are not enforceable, filed May 11, 2006.

**C.** The following aspects of doc. no. 136 (ClearCube's motion for summary judgment declaring that certain Avocent patents and/or applications constitute prior art to the patents-in-suit, filed on March 17, 2006) are GRANTED, and it is declared that:

1. "the filing date of the '442 application is January 5, 1994";

2. "the '442 application lacks copendency with the '404 patent/'689 application; and accordingly, that no Avocent application or patent can claim priority to the '404 patent/'689 application to receive an earlier effective filing date";

3. "the effective filing date accorded to claim 1, 6, and 16–18 of the '919 patent is June 3, 1996";

---

1. This motion is denied as moot.

2. A redacted version of this motion is located at doc. no. 169.

3. A redacted version of this motion is located at doc. no. 170.

4. "the effective filing date accorded to claim 1 of the '997 patent is January 5, 1994";

5. "the '404 patent constitutes prior art under 35 U.S.C. § 102(b) as against the '919 patent"; and,

6. "the '404 patent constitutes prior art under 35 U.S.C. §§ 102(a) and 102(e) as against the '997 patent."

However, that aspect of doc. no. 136 seeking a partial summary judgment declaring that "the common subject matter between the '997 patent and the '442 application constitutes prior art under 35 U.S.C. § 102(e) as against the '919 patent" is DENIED.

**D.** The following aspects of doc. no. 142 (Avocent's motion for a partial summary judgment declaring that the patents-in-suit "are not invalid," filed on April 19, 2006) are GRANTED, and it is declared that:

1. "ClearCube has failed to provide any evidence of invalidity under 35 U.S.C. §§ 102 and 112";

2. "ClearCube's affirmative defenses under 35 U.S.C. § 103 are defective as a matter of law because ClearCube has failed to identify evidence of a proper motivation, teaching or suggestion for combining the prior art references";

3. "[t]he '997 patent is not prior art to the asserted claims of the '919 patent";

4. "Robert Asprey is the sole inventor of the '997 patent claims and the asserted claims of the '919 patent (*i.e.*, claims 1, 6, and 16–18)."

In addition, the first and second affirmative defenses of ClearCube's amended answer—*i.e.*, "Invalidity of the '997 patent" (first affirmative defense); and "Invalidity of the '919 patent" (second affirmative defense)—are stricken. Further, that aspect of the first counterclaim in the amended answer, seeking a "Declaratory Judgment of . . . Invalidity of the '997 patent," and that aspect of the second counterclaim,

seeking a "Declaratory Judgment of . . . Invalidity of the '919 Patent," are both DISMISSED with prejudice. However, that aspect of doc. no. 142 seeking a partial summary judgment declaring that "[t]he '442 application was filed on January 4, 1994 in accordance with 35 U.S.C. § 21 and 37 C.F.R. § 1.10" is DENIED.

**E.** Further, the following aspects of doc. no. 174 (Avocent's motion to strike Sections II through V of the supplemental expert report of Gregg L. Vaughn, Ph.D., filed on May 15, 2006) are GRANTED, and the described portions of the supplemental expert report of Gregg L. Vaughn are stricken:

1. the last sentence of paragraph 5, and all of paragraphs 6 and 7 in Section II of the report; and,

2. all paragraphs of Sections IV and V of the report, *except for* paragraphs 20, 22, and 41, and, paragraphs 30, 33, 37, 43, and 48, but only to the extent that each incorporates, by reference, paragraph 22.

In all other respects, the motion filed as doc. no. 174 is DENIED.